UNITED STATES v. HARTFORD–EMPIRE CO. et al.

No. 4426.

District Court, N. D. Ohio, W. D.

Aug. 25, 1942.

544 .

See, also, D.C., 1 F.R.D. 424.

Thurman Arnold, Asst. Atty. Gen., Samuel S. Isseks and Lawrence S. Apsey, Sp. Assts. to the Atty. Gen., and Victor H. Kramer, and Seymour D. Lewis, Sp. Attys., all of Washington, D. C., and Frank Shields, Sp. Atty., of New York City, for plaintiff.

E. J. Marshall, S. S. Wall, Richard S. Cole, and Marshall, Melhorn, Davies, Wall & Bloch, all of Toledo, Ohio, Thomas G. Haight, of Jersey City, N. J., Edgar J. Goodrich, of Washington, D. C., and Sidney F. Parham and James M. Carlisle, both of Hartford, Conn., for defendant Hartford Empire Co.

John B. McMahon, Franklin F. Hayward, and McMahon, Webber & Hayward, all of Toledo, Ohio, Halsey Sayles, of Elmira, N. Y., William P. Stewart, of Buffalo, N. Y., and Sayles, Flannery, Collin & Evans, of Elmira, N. Y., for defendant Corning Glass Works and another.

Lloyd T. Williams, Henry A. Middleton, Robert L. Peters, and Williams, Eversman & Morgan, all of Toledo, Ohio, and Edmund P. Wood, of Cincinnati, Ohio, for defendant Owens-Illinois Glass Co.

Joseph D. Stecher and Yager, Bebout & Stecher, all of Toledo, Ohio, and Stephen H. Philbin, of New York City, for defendant Hazel Atlas Glass Co.

Ralph Emery, of Toledo, Ohio, and Mandeville, Waxman, Buck, Teeter & Harpending, of Elmira, N. Y., for defendant Thatcher Mfg. Co.

Lehr Fess and Doyle & Lewis, all of Toledo, Ohio, and Albert Diven and Pence, O'Neill & Diven, all of Anderson, Ind., for defendant Lynch Corporation.

Wilber Owen, Carl F. Schaffer, and Owen & Owen, all of Toledo, Ohio, Everett Warner, of Muncie, Ind., and E. W. McCallister, of Pittsburg, Pa., for defendant Ball Bros. Co.

Luther Day, Rufus S. Day, Chapman Rose, and Jones, Day, Cockley & Reavis, all of Cleveland, Ohio, for Glass Container Ass'n of America, Inc.

George D. Welles, Fred E. Fuller, Leslie Henry, Fred A. Smith, and Welles, Kelsey, Cobourn & Harrington, all of Toledo, Ohio, H. C. Laughlin, of Lancaster, Ohio, and Corbett & Mahoney, of Columbus, Ohio, for Anchor Hocking Glass Corporation.

Stanley J. Hiett, of Toledo, Ohio, and Earl Foster, of Oklahoma City, Okl., for Liberty Glass Co.

KLOEB, District Judge.

This is a civil action initiated by the Government of the United States under the antitrust laws—sections 1, 2 and 4 of the Sherman Act, 15 U.S.C.A. §§ 1, 2, 4, and section 3 of the Clayton Act, 15 U.S.C.A. § 14. The complaint was filed on December 11, 1939.

Sections 1 and 2 of the Act of July 2, 1890, 26 Stat. 209, 15 U.S.C.A. §§ 1, 2, commonly referred to as the Sherman Anti-Trust Act, as amended by the Act of August 17, 1937, 50 Stat. 693, provide in part, as follows:

Sec. 1. "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal * * *."

Sec. 2. "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor * * *."

Section 3 of the Clayton Act, 15 U.S.C.A. § 14, reads in part as follows: "It shall be unlawful * * * to lease or make a sale or contract for sale of * * * machinery, * * * whether patented or unpatented, * * * on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the * * * machinery * * * of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce."

Section 4 of the Sherman Act reads in part as follows: "The several district courts of the United States are invested with jurisdiction to prevent and restrain violations of this act [sections 1–7 and 15 of this title]; and it shall be the duty of the several district attorneys of the United States, in their respective districts, under the direction of the Attorney General, to institute proceedings in equity to prevent and restrain such violations. Such proceedings may be by way of petition setting forth the case and praying that such violation shall be enjoined or otherwise prohibited."

The defendants named in the complaint originally consisted of twelve corporations and one hundred and one individuals, the latter being officers, directors, or actors associated with the defendant companies in the activities complained of by the Government. Since the filing of the complaint, three of the corporations and forty of the individuals have been dismissed. A motion for summary judgment was made by the Stevenson Corporation and this was sustained before the commencement of the trial. The Anchor Hocking Corporation and the Liberty Glass Company each made motions to be dismissed upon completion of the plaintiff's testimony, and these were sustained by the court. Two of the remaining corporate defendants and the individuals associated therewith—Corning Glass Works and Thatcher Manufacturing Company—filed motions for dismissal at the close of the plaintiff's testimony, and argument upon these motions was heard by the court in the final argument of the case. These two motions, being as yet undisposed of, are hereby overruled. The forty individuals were dismissed in various ways— through the same motions for dismissal of the corporate defendants, by motion of the plaintiff at the conclusion of the case because of lack of evidence, and because of the death of some of them since the complaint was filed.

The complaint is brought against the leading concerns in the glass container industry. It charges, generally, a violation of the anti-trust laws, "by unlawfully conspiring, monopolizing, attempting to monopolize, and by unlawfully contracting, combining, and conspiring to restrain interstate and foreign trade and commerce, and more particularly by acquiring and maintaining monopolies of (a) patents covering the manufacture and licensing of glass-making machinery, (b) the manufacture and distribution of glass-making machinery, and (c) the manufacture, distribution, and sale of glass products, and by excluding others from the fair opportunity to engage freely and unrestrictedly in the interstate and foreign trade and commerce in said machinery and glass products." (Paragraph 34 of the complaint.)

More specifically, in paragraph 37 of the complaint, it is charged:

"Defendants herein have conspired, and are now conspiring, unlawfully to attempt to monopolize and to monopolize, and have unlawfully combined and now are combining to restrain trade, and such defendants have maintained and are now maintaining an unlawful monopoly or unlawful monopolies, and such defendants have, and now are, unlawfully restraining trade among and between the several States of the United States with respect to—

"(a) Patents on automatic machinery for the production of pressed and blown glassware and glass containers;

"(b) Machinery for the production of pressed and blown glassware and glass containers, and the distribution of such machinery;

"(c) The manufacture and distribution of pressed and blown glassware and particularly heat-resisting glassware;

"(d) The manufacture and distribution of all kinds of glass containers;

"(e) The manufacture and distribution of milk bottles;

"(f) The manufacture and distribution of fruit jars."

The relief prayed for requests generally that the court enjoin the illegal practices complained of, including the performance of the contracts between the various defendants, or the execution of similar agreements; that the court enjoin the holding of stock in another corporation in the industry by one corporate defendant, or an individual defendant connected with a corporate defendant; that the Hartford-Empire Company be dissolved and its patents and other properties be rearranged under several separate and independent corporations; and that such other relief be granted as may be necessary or the court deems proper.

The defendants have denied any violation of the anti-trust laws in the manner alleged in the complaint. The Hartford-Empire Company, answering generally, avers: "These defendants deny that they,

or any one or more of them, individually or with one another, or with anyone else, have intended to establish or maintain, or have established or maintained, any conspiracy or monopoly in restraint of trade or commerce, or have entered into any combination or agreement in restraint of trade or commerce, or have committed, or threaten or intend to commit, any violation of the Sherman Anti-Trust Act or the Clayton Act."

The position of the Hartford-Empire Company which, broadly, is the position of the remainder of the defendants with the exception, perhaps, of the Glass Container Association, whose situation differs from that of the other defendant corporations, is concisely set forth in the closing argument of defense counsel as follows (Record, page 11,526), "I want to say in conclusion, again, our position is that Hartford started out to create, started out to protect by patents what it did create, and to exploit its creation by appropriate means pointed out by the law and business custom. We claim that such domination of any part of the industry, either glass machinery or glass, as Hartford ever had, was only that inherent in the patents to which we believe we were entitled. That is what we sought, and that is what we got. The situation today is that the dominating adjudicated patents are those of Hartford's own inventors."

Description of the Corporate Defendants.

The defendant Hartford-Empire Company, hereinafter sometimes referred to as Hartford, is primarily a patent holding and developing company. It is a Delaware corporation, with its principal office in Hartford, Connecticut. It was organized in 1922 as the successor to the Hartford-Fairmont Company. The Hartford-Fairmont Company was organized in 1912 by a combination of interests of the Beech-Nut Packing Company, the Monongah Glass Company, and a group of Hartford engineers. In 1912, the Beech-Nut Packing Company was in need of a cheaper source of supply of glassware for its packing industry; the Monongah Glass Company was a glass manufacturing concern and had been supplying the Beech-Nut Packing Company with glassware; and the third group, comprised of engineers and inventors, was engaged in research work on automatic machinery for the production of glassware in the city of Hartford, Connecticut. The Hartford-

Empire Company does not manufacture glassware of any kind except for experimental purposes. Its income is derived chiefly from royalties and fees obtained from the licensing and leasing of its machinery. The machinery is not made by Hartford but is manufactured for. it by the Hartford Special Machinery Company. The Hartford-Empire Company owns or controls substantially all of the gob feeding patents in the glass container industry.

The defendant Corning Glass Works, hereinafter referred to as Corning, is a New York corporation, with its principal office at Corning, New York. It is the successor of two other corporations that date back to 1875. It is one of the largest manufacturers of glass products in the United States, engaged primarily in the production and distribution of incandescent bulbs, signal and optical ware, heat-resisting (Pyrex) ware, and other forms of specialty ware. The field encompassed by Corning is commonly known as the pressed and blown field, or the non-container field, as distinguished from the container field. Corning does not now engage and during the period of this inquiry has not engaged in the manufacture of glass containers, with the exception of a limited production of tumblers.

The defendant Empire Machine Company, hereinafter referred to as Empire, was originally organized by Corning in 1909, under the laws of the State of Maine with its principal office at Portland, Maine, as a patent holding and developing company. Since 1922 it has owned substantially 43% of the stock of the defendant Hartford-Empire Company. Since the filing of the complaint in this case, the Empire Machine Company has been dissolved. It was represented in closing argument that there are no remaining assets of this company.

The defendant Owens-Illinois Glass Company is an Ohio corporation with its principal office in Toledo, Ohio. It owns and operates a large number of glass manufacturing plants scattered throughout the United States. In December, 1895, the Toledo Glass Company was organized by Edward D. Libbey and Michael J. Owens for the purpose of developing Mr. Owens' inventions in glass producing machinery. In 1903, Mr. Owens produced the first fully automatic machine for blowing bottles. This is known as the suction type

of machine, in which the molten glass is sucked up into the mold, in contradistinction to the gob feed type of machine developed later, in which the molten glass is dropped through a hole in the bottom of the tank or an extension thereof into the molds in a forming machine, the size and shape of the glass delivered being controlled by a mechanism known as a feeder machine. The feeder and the forming machine together constitute one unit fully automatic in operation, as distinguished from the Owens suction machine. The Toledo Glass Company caused the organization of the Owens Bottle Machine Company under the laws of New Jersey. This company was changed to the Owens Bottle Company in 1919, and in 1929 it was merged with the Illinois Glass Company and became the Owens-Illinois Glass Company. The corporate predecessors of the Owens-Illinois Glass Company operated for some years as manufacturers of glass making machinery, and licensed and leased glass manufacturers in the use of such machinery. About 1909 Owens began the actual manufacturing of glassware and gradually shifted its efforts away from the manufacture of machinery except for its own use. About 1904, Owens began the pursuit of a policy of granting exclusive rights to certain licensees in limited fields for the manufacture of glassware, and it obtained and maintained an influence over the industry which it thus divided by acquiring substantial stock interests in the licensed companies, such as Thatcher and Hazel-Atlas, defendants herein. The Owens-Illinois Glass Company is the largest manufacturer of glass containers in the United States. Its efforts are directed mainly toward the manufacture of what is known as narrow neck ware. It and its predecessors will hereinafter be referred to as Owens.

The defendant Hazel-Atlas Glass Company, hereinafter referred to as Hazel-Atlas, is a West Virginia corporation with its principal office at Wheeling, West Virginia. It operates numerous plants, distributed throughout the country. It was originally incorporated in 1901 as the Atlas Glass and Metal Company and later merged with the Hazel Glass Company. It is the second largest manufacturer and distributor of glass container products in the United States. It directs its efforts chiefly to the manufacture of what is known as wide mouth ware.

The defendant Thatcher Manufacturing Company, hereinafter referred to as Thatcher, is a New York corporation with its principal office at Elmira, New York. It was organized in 1905. Its efforts are devoted chiefly to the manufacture of milk bottles, and in this field it is the largest manufacturer and distributor in the United States.

The defendant Lynch Corporation, hereinafter referred to as Lynch, is an Indiana Corporation with its principal office at Anderson, Indiana. With its predecessors, it dates back to 1917. It manufactures glass making machinery, and is the largest manufacturer of forming machines in the United States. It does not engage in the manufacture of glassware.

The defendant Ball Brothers Company, hereinafter referred to as Ball Brothers, is an Indiana corporation with its principal office at Muncie, Indiana. With its predecessors, it dates back to 1882. It is the largest manufacturer and distributor of fruit jars in the United States.

The defendant Glass Container Association, Inc., is a Delaware corporation with its principal office in New York City. It was organized in 1919 and is a statistical and research company. It does not engage in the manufacture of glassware. Its members include all but two of the glass container manufacturers in the United States. All of the corporate defendants herein are members of the Glass Container Association.

## History of the Case

A brief resume of the history of automatic machinery in the glass container industry and of the contracts and agreements entered into by and between these various corporate defendants and complained of by the Government, is helpful to an understanding of the facts of the case. Acts and things done by the defendants and complained of by the Government cover a period of approximately 25 years.

There are today two fully automatic processes for making glassware—suction and gob fed. In the *suction machine* process, the glass is sucked up from the surface of an extension of the furnace into the mold where it is formed into the desired product. In the feeder fed machines, the glass is delivered to the mold by a special device known as a *feeder*.

In the gob feed process, the molds into which the molten glass is fed are parts of a separate machine known as a *forming machine*. In the suction process the molten glass is sucked directly into the molds.

After the glassware leaves the forming machine, it is carried by a conveyor into a *lehr* or closed tunnel, where it is stacked on a belt which moves slowly through an annealing chamber. The purpose of this, of course, is to prevent the finished product from cracking due to rapid changes in temperature. The bottles at the front end of the lehr are at a temperature of over 1,000 degrees Fahrenheit. The temperature gradually decreases as the bottle or container moves through the lehr. Upon its discharge the glass is cool enough to handle with bare hands.

The complaint deals with all four of these types of machinery, that is, the suction machine, the feeder machine, the forming machine and the lehr.

The suction machine was the first to appear and was the first fully automatic glassware manufacturing machine ever produced. It was put on the market in 1903 and immediately and completely revolutionized the industry, which had hitherto been limited to the hand-gathering method or to various types of semi-automatic methods. The Owens Bottle Machine Company possessed the exclusive rights on the suction machine. It licensed the use of that machine to manufacturers for specific kinds of ware, and thus set a pattern that was later followed by Hartford in the licensing and leasing of its automatic feeders. The Owens Company licensed Ball Brothers to make domestic fruit jars; it licensed Baldwin-Travis, later purchased by Thatcher, to make milk bottles; it licensed Hazel-Atlas to manufacture wide mouth ware; and it licensed the Illinois Glass Company to make narrow mouth ware. At the present time, only one of these licenses is outstanding, the license to Hazel-Atlas. However, Hazel-Atlas no longer uses the suction machine. Owens is the only concern that is now engaged in the use of that machine.

As a result of the licensing by Owens of only certain manufacturers, the remaining manufacturers in the industry were faced with the prospect of being forced entirely out of business unless a competing machine could be found. Extensive research and development programs were financed. The Brooke stream feeder was produced, but this was unsatisfactory. The invention of suspended gob feeding followed. This gob feeder was found to be more economical for certain lines of ware than the suction machine, as the latter was then constituted, due chiefly to its ready application in the manufacture of diversified kinds of glassware, whereas the suction machine was better for long and steady runs on one item. Owens today uses both methods, suction and gob, although its use of suction greatly predominates.

Prior to the advent of the gob feeder, Owens had the whole field of automatic machinery for itself. Then, after the gob feeder was proved successful, Owens obtained certain patents and patent rights relating to that process, including the Brookfield and the Lott patent rights, and thereafter licensed a few companies in the use of its gob feeding machines.

Hartford was one of the pioneers in the development of the gob feeder. It proceeded to license and lease gob feeders in much the same manner that Owens had theretofore licensed its suction machines, that is, by issuing licenses to make specific kinds of ware.

Empire had been formed by Corning as a patent holding Company for the latter. Empire owned certain rights relating to the Chamberlin applications. These applications were in interference in the Patent Office with the Hartford gob feeder applications.

On June 30, 1916, Empire and Hartford entered into an agreement wherein Empire was granted an exclusive license to use the patented glass making apparatus and processes of Hartford for the production of pressed and blown glassware, and Hartford in turn was granted an exclusive license by Empire to use the latter's patented glass making apparatus and processes for the production of glass containers. In this manner, and by this means, Empire obtained for Corning the exclusive right to Hartford's machinery and patents in Corning's lines of ware, to wit, the pressed and blown field or the non-container field; and Hartford retained a free hand with respect to the remainder. This is the first transaction that the Government complains of as a violation of the anti-trust laws.

There followed agreements between Empire, Hartford and Corning on October

6, 1922, resulting in the formation of the Hartford-Empire Company, although the evidence discloses that the parties had agreed orally to the terms several years prior thereto. Hartford-Empire received all the assets of Hartford-Fairmont and all the assets of Empire Machine relating to the manufacture of machinery for the production of glassware. Empire received approximately 43% of the stock of Hartford-Empire. Corning received approximately the same exclusive use that Empire had received in the 1916 agreement, and Hartford-Empire received approximately the same rights from Corning that it had received from Empire in 1916, subject to a shop right in Corning that has never been exercised.

From 1916 to 1924, competition had arisen between Hartford and Owens with respect to the gob feeding process. They were in interference in the Patent Office together with other inventors who had invented, manufactured, and placed upon the market glass feeding machines. There was extensive litigation between the two companies. Numerous conferences were held between officials of the two companies from 1921 to 1924, looking to a settlement of their differences.

On April 9, 1924, Hartford and Owens entered into a written agreement by the terms of which Owens granted to Hartford an exclusive license on Owens' patents relating to feeders and forming machines, and Owens received the right to use the Hartford patents for the manufacture of glassware. Owens was not to sell or license any of its gob feeding machinery. It was excluded from the pressed and blown field that had previously been reserved to Corning. Owens received one-half of Hartford's divisible income over and above $600,000 per annum, to be collected by Hartford from its licensees. Section 22 of the agreement contained a provision that required Hartford to obtain Owens' consent to the granting of any new licenses on machines embodying Owens' inventions. In other words, Owens retained a veto power over the extension of licenses to use the gob feed machines of Hartford. This section was eliminated from the agreement in 1931. The agreement does not specifically mention suction machines, but, as will be shown later, it was the intention and understanding of the parties that there would be no undue competition between the suction and gob

feed processes and that Owens intended to guard against any invasion of the suction field by anyone, including Hartford.

Immediately after the consummation of this agreement, the two companies set out to obtain control of the remaining feeder patents in the industry, sharing equally the costs and expenses between them, combining the efforts of their legal staffs for joint operation against the owners of feeder patents, and contributing equally to the cost of purchase and litigation expenses. Their goal was to control the licensing and production of glassware in the entire industry.

Hartford had purchased the feeder patents of the Howard Automatic Glass Machinery Company in 1921. In 1925, Hartford purchased the feeder patents of the W. J. Miller Company for $145,000, Owens sharing the purchase price. In the same year, Hartford purchased the feeder patents and applications of Tucker, Reeves & Beatty, sometimes referred to as the Federal Company, at a cost of $1,600,000, Owens contributing one-half of the purchase price. Both Miller and Tucker, Reeves & Beatty had important patent rights and were in extensive interference proceedings with Hartford and Owens in the Patent Office. The Miller Company, before the sale to Hartford, had manufactured its feeders and had sold them outright to glass manufacturing concerns. After the acquisition of the Miller rights by Hartford, the latter brought suit against the purchasers and owners of Miller machines with the result that eventually nearly all of them became licensees of Hartford, and title to the feeders was surrendered to Hartford. Tucker, Reeves & Beatty had licensed its feeder machines. After the acquisition of the Tucker, Reeves & Beatty rights by Hartford, the licensees of the former promptly became licensees of the latter.

Other feeder rights were obtained by Hartford through suit or threatened suit. It is Hartford's claim that all these patents or patent applications were dominated by Hartford's patents and patent rights. However, it is well here to mention that no controlling patents were issued to Hartford until 1926, and these were not tested in the courts until 1932.

Hazel-Atlas offered the strongest opposition to Hartford and Owens between the years 1924 and 1932. There was considerable litigation between them. Two impor-

tant infringement suits were decided by United States Circuit Courts of Appeals in 1932, one in favor of Hazel-Atlas in the Sixth Circuit, Hartford-Empire Co. v. Nivison-Weiskopf Co., 58 F.2d 701, and one in favor of Hartford in the Third Circuit. Hartford-Empire Co. v. Hazel-Atlas Glass Co., 59 F.2d 399. Then, on July 1, 1932, Hartford, Owens and Hazel-Atlas entered into a series of agreements. Hartford granted to Hazel-Atlas the right to use Hartford patents and inventions, but Hazel-Atlas was not to license or sell such patents and inventions to anyone. Hazel-Atlas granted to Hartford the right to use Hazel-Atlas patents and inventions. Hazel-Atlas agreed to pay Hartford royalties for the use of the Hartford inventions. Hazel-Atlas was excluded from the pressed and blown field, which had previously been reserved to Corning. Hazel-Atlas and Owens were each to receive one-third of Hartford's divisible income, that is, the income over and above $850,000 per annum that Hartford collected from royalties and license fees.

The result of these agreements was that the remaining opposition to Hartford collapsed and everyone took a license from Hartford. At the time the complaint was filed in December, 1939, there were only four small companies engaged in the manufacture of glassware who were not under license and lease from Hartford, representing less that 4% of the total production in the industry. Three of these four companies are defendants in the courts at the hands of Hartford. The fourth company, the Kerr Company, manufactures glassware with the Brooke stream feeder and appears to be out of the reach of an infringement suit because the patents on that process have expired.

The history of the forming machine control differs somewhat from that of the feeder history. The forming machine control ended with Hartford and Lynch manufacturing substantially all the forming machines for the industry. Hartford had at an early date purchased the Cox forming machine patent rights, and in 1925, the year following its agreement with Owens, it purchased the Sears & Lobb applications. In 1924, Hartford, with Owens sharing equally in the cost, took an option on the Headley & Thompson forming machine applications controlled by the Whitall-Tatum Company. This option was exercised in 1933, when it appeared that the

patents would issue with very broad claims and might dominate all narrow neck forming machines. Also in 1933, Hartford purchased the O'Neill forming machine patents.

Headley & Thompson had been in interference in the Patent Office for many years with Lynch. In 1933 the Patent Office held in favor of Headley & Thompson. Immediately thereafter, Lynch purchased the Ed. Miller forming machine business located in Columbus, Ohio, a manufacturer of forming machines for the manufacture of wide mouth glassware. This transaction was accomplished through the financial assistance of Hartford and Owens, each contributing to Lynch the sum of $125,000. In addition, Lynch raised $200,000 additional through the sale of stock, with W. E. Levis, President of Owens, underwriting the sale thereof. Two days later, on August 23, 1933, Hartford and Lynch entered into a cross-licensing agreement whereby Lynch was given the right to sell forming machines embodying Hartford patents and inventions to anyone who obtained a forming machine license from Hartford, and thereafter Hartford granted a forming machine license free of royalties to its feeder licensees but charged royalty rates equivalent to the rates on feeders to anyone desiring a forming machine who was not a feeder licensee. In view of the fact that Headley & Thompson, now controlled by Hartford, was claimed to have dominated the Lynch forming machines, the result of the agreement was that Lynch could sell no narrow neck forming machines except to persons who had first obtained a forming machine license from Hartford. The Ed. Miller acquisition placed in the hands of Lynch wide mouth forming machine rights, and these apparently did not come within this requirement. This is the only situation in which the Government claims there is a violation of the Clayton Act.

Owens had already obtained an option on all present and future Hartford inventions in the suction field. In the purchase of the Ed. Miller Company by Lynch, the latter secured certain suction rights of the Miller Company. Owens purchased these from Lynch, in addition to any other suction rights which Lynch might have. Also in 1933, Owens purchased the Knox-O'Neill vacuum machine rights. As a result of these transactions, Owens substantially completed its program for the acquisition

of all suction rights in the United States. So far as the record is concerned, no one can now manufacture and use this type of machine without the consent of Owens. While it is true that the original suction patents have expired, Owens has improvement patents which make it impossible for anyone to get a modern version of the machine. Owens, since 1924, has refused to license or sell its suction machines to anyone who did not already have a license.

In 1934, Hartford attempted to purchase the lehr business of the Amsler-Morton Company and, failing in that, sued the Swindell Brothers, a manufacturer of glassware who had purchased some lehrs from Amsler-Morton. Under the terms of the contract of sale, Amsler-Morton was compelled to defend this suit. It was limited in its defense of the suit, however, because Swindell was under license and lease from Hartford and had agreed not to contest the validity of Hartford's patents. Hartford prevailed in the Circuit Court of Appeals and Amsler-Morton was enjoined from further manufacture of lehrs.

On December 6, 1937, Hartford purchased title to the Nagle lehr from the Thatcher Company, and thus completed its control over the manufacture and licensing of all lehrs used in the glass container industry. It is contended by Hartford that there are in existence three or four other concerns that engage in the manufacture and sale of lehrs, but these are of so little consequence as to be negligible.

Thatcher obtained the exclusive right to manufacture milk bottles on Hartford's original paddle needle feeder in 1920. Hartford's first effort at the invention of a gob feeder resulted in what was known as the paddle feeder, and it came into production about 1916. The paddle needle feeder followed thereafter. Then came the single feeder, which is the machine in general use today. Prior to 1920, Thatcher had the exclusive right to manufacture milk bottles on the Owens suction machine. This was obtained early in the history of Owens, at a time when Owens obtained substantial stock holdings in Thatcher. All the other milk bottle manufacturers were gradually brought under the Hartford licensing system and, with the exception of the Liberty Glass Company, a small Oklahoma concern, were restricted in quantity. Owens also has an unlimited right to make milk bottles. Approximately two-thirds of all milk bottles manufactured and sold

in the United States are manufactured by Owens and Thatcher.

Prior to 1933, Ball Brothers was the largest manufacturer of domestic fruit jars, but Hartford had never been able to license that company. Ball Brothers had operated on machines of its own design, as well as on the suction machine of Owens, the right to the latter having been obtained early in the life of the Owens Company.

On March 25, 1933, Ball Brothers took a license from Hartford and also obtained the residual rights of Hartford in fruit jars. As a part of this transaction, several companies that were engaged in the manufacture of fruit jars under license from Hartford sold back to Hartford their limited fruit jar rights, or sold them to Ball Brothers. General Glass Company sold its fruit jar rights back to Hartford. The Knox Company sold its fruit jar rights to Ball Brothers, with Hartford cooperation. Brockway's fruit jar business was sold to Ball Brothers by and with the cooperation of Hartford. Gayner did likewise under similar circumstances.

Much discussion was had as to the rights of Hazel-Atlas and Owens to manufacture fruit jars, and it was proposed that they be limited by written agreement to 300,000 gross and 100,000 gross annually, respectively. It was finally decided to refrain from setting such a restriction down in writing. However, since that date, neither of these companies has in any one year exceeded these limitations, with but one negligible exception. There is one additional manufacturer of fruit jars, the Kerr Glass Company, and that company is not a licensee of Hartford. At the time the complaint was filed, Ball Brothers manufactured approximately 54.5% of all the fruit jars manufactured and sold in the United States, Hazel-Atlas 17.6%, Owens 6.4%, and Kerr 21.5%.

In 1935, the agreements between Hazel-Atlas, Hartford and Owens were revised, although they were originally designed to run until 1945. At the time of the revision, Hartford purchased Owens' right to participate in Hartford's divisible income for the sum of $2,500,000.

This whole system of purchases, agreements and mergers has resulted in a situation where less than 6% of the total production of glassware on feeders is on feeders not owned or controlled by Hart-

ford, and this represents less than 4% of the total production on all types of machinery. The only other substantial production is that of Owens on its suction machines, and of course Owens does not have to pay royalties on its suction production.

It is impossible for anyone to obtain a feeder machine except by virtue of a license from Hartford. Owens has consistently refused to sell or license its suction machine. The same is true of forming machines and lehrs—a license must be obtained from Hartford. The result is that no new concern may engage in the manufacture of glass containers except with the consent of Hartford extended through a license to use its machines—feeders, formers or lehrs. During the life of Section 22 of the 1924 agreement between Hartford and Owens, Hartford was required to consult Owens before it issued a license to any newcomer in the industry. As a result, it is contended by the Government, no newcomers have been admitted into the industry during the entire existence of the Hartford Company. Hartford claims that it has licensed two newcomers, the Northwestern and Diamond companies. Although Section 22 was stricken from the 1924 agreement by Hartford and Owens in 1931, yet the record indicates that adherence to the requirements of this agreement has been carried on since 1931 without the necessity of a written agreement.

### The Nature of the Case.

At the outset, it is well to consider that this is a conspiracy case; that the alleged conspiracy must be looked at as a whole; that if the conspiracy as a whole is an unlawful one, then the Government has made out a case for relief.

In Standard Oil Company v. United States, 1911, 221 U.S. 1, at page 75, 31 S.Ct. 502, at page 520, 55 L.Ed. 619, 34 L.R.A.,N.S., 834, Ann.Cas.1912D, 734, the Supreme Court laid down the principles followed by it in ascertaining the intent of the parties to restrain trade, to monopolize, and to bring about monopolization. The Court there said: "the *prima facie* presumption of intent to restrain trade * * * is made conclusive by considering (1) the conduct of the persons or corporations who were mainly instrumental in bringing about the extension of power in the New Jersey corporation before the consummation of that result and prior to the formation of the trust agreements of 1879 and 1882; (2) by considering the proof as to what was done under those agreements and the acts which immediately preceded the vesting of power in the New Jersey corporation, as well as by weighing the modes in which the power vested in that corporation has been exerted and (3) the results which have arisen from it."

It may be well, therefore, in order to determine the intent of the parties involved in the case at bar, to consider, first, the conduct of the parties who were the main actors, second, the proof as to what the actors said and did, and, third, the results which their activities accomplished.

A total of one hundred and twelve days was consumed in actual time of trial and arguments. The evidence produced is voluminous. The record of testimony and argument consists of over twelve thousand pages. There are over three thousand exhibits, consisting chiefly of letters, contracts and memoranda, that are considerably more voluminous than the record of testimony. This is primarily a documentary case.

In the course of the trial, many of the chief officers and attorneys for the defendant corporations appeared as witnesses at the behest of the Government. Their testimony was utilized primarily for the purpose of identifying letters, memoranda and contracts that form the history of the case. Some of these witnesses conscientiously observed their oaths and freely disclosed matters within their knowledge; some of them quite apparently were testifying under difficulty because of the long period of time covered by the inquiry; and some of them, unfortunately, were clearly reluctant to make disclosures that their apparent physical and mental capabilities, and the positions occupied by them in the industry, would credit them with knowing. The reticence of some of the key witnesses to disclose what plainly was within their knowledge as principal actors in the main conferences that occurred over a period of time, and that resulted in the consummation of important agreements, was of such a pronounced character as to discount substantially the weight of their testimony, and their credibility, in the eyes of the court.

From a study of the entire record, I am convinced that there has not only been a violation of the anti-trust laws, beginning with the first agreement between Hartford and Empire in 1916, but I am convinced

that this violation of the laws was as deliberate as any that I can find in a review of anti-trust cases. The evidence is so conclusive that I can arrive at no other conclusion.

In many cases the court is required to rely upon inferences derived from circumstantial evidence, so meager is the record before the court; in many cases the court must rely upon inferences from some direct as well as circumstantial evidence and arrive at its conclusions accordingly; in this case, the men who planned and directed the proceedings under scrutiny, from 1916 down to the time of the filing of the complaint herein, left behind them numerous exchanges of letters and many memoranda executed contemporaneously with the happening of the main events and designed for the information of their contemporaries, their boards of directors, or for their successors in office. It is hard to imagine a case in which a court would have more first-hand information of what the parties did and intended than in the case at bar. These documents indisputably make a case that sustains the Government's contention that the defendants have violated and are now violating Sections 1 and 2 of the Sherman Act and, in the case of Hartford and Lynch, Section 3 of the Clayton Act, "by unlawfully conspiring, monopolizing, attempting to monopolize, and by unlawfully contracting, combining, and conspiring to restrain interstate and foreign trade and commerce, and more particularly by acquiring and maintaining monopolies of (a) patents covering the manufacture and licensing of glass-making machinery, (b) the manufacture and distribution of glass-making machinery, and (c) the manufacture, distribution, and sale of glass products, and by excluding others from the fair opportunity to engage freely and unrestrictedly in the interstate and foreign trade and commerce in said machinery and glass products."

Now let us examine into the conduct of the principal actors, the proof as to what was done by them, and the results that have arisen therefrom, in order to arrive at the intent of the parties.

The Conspiracy as Related to Feeders.

Corning and Empire. There is very little evidence prior to the 1916 agreement between Hartford and Empire. The evidence does show that the two companies were in interference in the Patent Office through a conflict in the Chamberlin applications of Empire and the Peiler applications of Hartford, and that the two companies decided to settle their differences by leaving the container field to Hartford and the non-container field to Empire. Empire had been formed by Corning and Corning produced only in the non-container field at that time. So far as the production of Corning was concerned, it received everything that it desired. Hartford was given the container field, much larger than the field left to Empire, but, of course, not as large as the whole field. While one purpose of the agreement was to settle patent interferences, the effect of the agreement was also to divide the field between them with a provision that they would not compete in each other's field.

The agreement not only divided the fields of ware by giving the container field to Hartford and the non-container field to Corning, but it eliminated the impending competition between Hartford and the Corning interests in the glass making machinery field. In this connection it is well to note that Corning had "consistently maintained that the contract was a continual exchange of inventions and developments for prescribed fields regardless of patents." (Ex. 358)

There is considerably more evidence in the interim between the agreements of 1916 and 1922 between these companies which sheds light not only on the purpose of the 1922 agreements, but also on the purpose of the 1916 agreement. Some time in the year 1919, F. Goodwin Smith, who was at that time general manager and who later became vice-president and then president of Hartford, wrote a memorandum concerning the proposed merger of Hartford and Empire. It reads in part as follows (Ex. 6):

"Working as one unit properly financed and properly organized, this unit owning or controlling the most modern patented automatic machine process for the various fields of ware—plus special glass formulas, would, within reasonable time, dominate the entire glass industry here in the States as far as manufacturing methods are concerned * * *

"The talent of both organizations combined should at once insure continual improvements in the art and in the design of the machines, which would insure the maintenance of leadership and practically pro-

hibit any other organization from obtaining parallel results.

"Hartford or Empire working alone as individual units will to some degree block each other on the question of patent rights, whereas working together on a basis of exchange of patent rights, the position of each, singly or together, would be greatly strengthened."

This exhibit clearly shows that Hartford was at that time looking to a merger that would result in its domination of the art.

Exhibit 7 is a memorandum prepared by the same author, setting forth what occurred at a conference at South Dartmouth, Massachusetts, on August 2, 3, and 4, 1919, between A. B. Houghton, A. A. Houghton, Dr. Day and Alexander Falck, representing the Corning and Empire interests, and F. Goodwin Smith, the author of the document, representing the Hartford interests, concerning the proposed Hartford and Empire merger. It reads in part as follows:

"Also told them that it was quite apparent to us that we must either proceed independently on a very much 'arger scale than we had in the past, or else consider the desirability of entering into negotiations with the Owens interests, Banking interests, or with the Empire Machine Company's interests. * * *"

Houghton said, "That there should be no secret that if we thought a merger was not the proper procedure for us, they must immediately start an entirely separate company for intensive machine development— and that unquestionably this would result in additional competition and raise the continual question of rights between the Owens group, ourselves, and the Empire group. * * *"

"He therefore thought, all points considered, that if we pooled our entire interests into one company on a 50-50 basis, it would be a proposition which would have a very large and successful future before it. * * *

"There is no question in my mind but what the Owens Co. will increase their efforts to attack our patents as applied to all machines which we produce. This will prove costly as regards litigation, and may prove costly as regards some necessary changes.

"I also feel that the Owens Co. will be forced to let down the bars as regards their present royalty basis as received from their present licensees, which would at once create keener competition between the large Owens groups of manufacturers and our licensees. * * *

"I also feel that it will be a very disturbing factor to have the Empire Machine Co. start out with a large capital and proceed to come into the field with a still separate line of automatic machinery."

The last paragraph clearly shows that Hartford wanted to eliminate a competitor.

Exhibit 8, written by W. H. Honiss, patent counsel for Hartford, dated October 4, 1919, to F. Goodwin Smith of the same company, reads in part as follows: "In connection with your expected conferences of next week, it may be of use to remind you of some of the assets of the Hartford-Fairmont Company which, in aggressive hands, our own or others, might be made very useful in limiting competition."

Exhibit 9 is a memorandum written by F. Goodwin Smith in 1920, commenting on the proposed Hartford and Empire agreement. It reads in part as follows:

"Will not the combined ownership of patent rights dominate the Federal situation so as to preclude this Federal feeder becoming a competitor here in the States, as well as across the water? * * *

"Any concern which can offer the use of automatic machinery and special formulas ought to eventually control the key to the glass industry in this country and foreign countries. * * *"

From the foregoing excerpts, it will be seen that as early as 1919 and 1920, Hartford was looking toward complete control of the gob feeding art; that it wanted to eliminate the competition of Empire and combine the assets and talents of both concerns in the ultimate fight for control; and that it thought their combined rights would dominate the Federal feeder, otherwise known as the Tucker, Reeves & Beatty feeder, an important rival which Hartford must necessarily face in the near future.

An important consideration for Corning in these negotiations was its relationship with the General Electric Company in the manufacture of electric light bulbs. General Electric was a licensee of Corning in the manufacture of bulbs. On October 30, 1920, V. M. Dorsey, patent counsel for Corning, wrote to A. D. Falck, president of that company, as follows (Ex. 677):

"I expressed an opinion that the whole bulb situation would be strengthened if a

monopoly could be gotten into one hand, of the Flowing field, with right to take bulb licenses from the owner of such monopoly, and that unless the Hartford-Fairmont Company succeeded in doing this, as they expected to do, there would be a purely competitive field which would seriously injure the monopoly in the cheapest way of producing bulbs."

The monopolistic intention of Corning in entering into the agreements in 1916 and 1922 is further stated in another letter from Dorsey to Falck, dated September 24, 1921 (Ex. 1988):

"I have been forced to consider what we really intended to get under this Ware, Class D. As originally defined five years ago, it had two possible purposes,—

"(1) To prevent the use of the Hartford machines by others in the manufacture of baking ware, irrespective of the quality of the glass.

"(2) To let Corning use the Hartford inventions in baking ware, milk bottles, etc., if we should discover a new glass not containing boric oxide, but still useable.

"Since that time, Ware Division C has been broadened out in one way so that it no longer demands the use of boric oxide in the glass, but covers all that we really consider good glasses.

"From this it seems to follow to me, that Ware Division D could be now well changed to cover only glass-ware in which food is cooked in an oven, i. e., Oven-Ware. This will prevent our baking dish competitors from using the Hartford-Fairmont inventions without our consent, for making competing ware in the baking field, and will permit us to license them to make such ware with the Hartford invention even though the glass is of inferior quality."

It will be seen from the foregoing that the intention of Corning in entering into the original agreement with Hartford in 1916 that effected a division of the fields of ware was not primarily to settle interferences that then existed in the Patent Office involving the Chamberlin patents of the Empire Company and the Peiler patents of Hartford. The primary intention was "to prevent the use of the Hartford machines by others in the manufacture of baking ware." It was to "prevent our baking dish competitors' from using the Hartford-Fairmont inventions without our con-sent." And it was to "permit us to license them to make such ware with the Hartford inventions even though the glass is of inferior quality." This, of course, meant that the competitors would be charged royalties even though the output was of inferior quality.

The agreements of 1922, including the so-called "Formation Agreement," effectuated a merger of the Hartford-Fairmont and Empire companies into what thereafter was known as the Hartford-Empire Company. The relations between Hartford and Corning were renewed and strengthened.

In 1930 and 1931, negotiations were had between officials of Corning and Hartford with a view toward revising the contractual relationship between the two companies. H. K. Smith, secretary and general counsel of Hartford, prepared a memorandum on December 29, 1930, setting forth the status of the discussions on revision of the contracts. Speaking of the question of the respective fields for the two companies, he stated (Ex. 392):

"This is by far the most difficult and important point of difference between the two Companies. It is very complicated; it is rather hard to get any general principle which will apply throughout for a division of fields and it is hard for each party to foresee the course which the glass industry may take in the coming years.

"It is my impression that Judge Green and I have reached a very vague agreement to the effect that, with many exceptions and reservations, the Corning field is, naturally, the monopolistic high quality field and the Hartford field is, naturally, the competitive low quality field. But as soon as we begin to go any further in detail we arrive at serious differences. * * *

"Corning also raises the question of whether it cannot have a right to make containers out of ordinary glass at standard royalties. To grant any such right is contrary to Hartford's present and long established policy of endeavoring to limit competition between its licensees within reasonable bounds, and Hartford, especially at present, would be quite adverse to putting into this very competitive field a new and powerful competitor."

On March 3, 1931, the same author wrote a memorandum "On the Revision of Glass Contracts Protecting Monopolies." It reads in part as follows (Ex. 393):

556

"1. The present Glass Contract"—between Corning and Hartford—"gives now * * * what Corning wants; namely, Hartford's support and protection of Corning's monopolies. The proposed *new* contract, in the form Corning wants, will do the same, but over a much wider scope, i. e., as to furnaces, handling and finishing devices, and lehrs, in addition to feeders and formers.

"It, therefore, raises the basic question in more acute form.

"2. What Corning wants is that H-E should so tie up all H-E's inventions as to protect Corning's special fields from competition *by H-E's licensees or assignees*, even after the failure or expiration of the patents now covering those fields. * * *

"Now, what support, conversely, can H-E expect for *its* monopolies from Corning? Assume that H-E feeder patents fail or expire. How will our hold on glass feeding be saved or improved by anything coming from Corning under the Glass Contract?

"This contribution and support of Corning for our monopoly is not very imposing. * * *

"11. I do not see that the addition of furnaces will alter the principles above.

(a) It is, however, a very important addition. Probably the next greatest advance will come here. It will have the special advantage of reducing costs *without* increase of production.

(b) A real patent or patents in this line would be a powerful support for our respective monopolies. For practical reasons a merger of interest here is desirable, because furnaces are used for all fields, and separate development programs mean waste and possibly patent deadlock."

It will be seen from this that Corning was looking forward to the day when its patents on the so-called Pyrex oven ware, known as heat resistant ware, would expire, and was making arrangements so that it would have the exclusive use of the Hartford feeders for the making of heat resistant ware in the years thereafter. This is the exact situation that obtained at the time of the filing of the complaint herein.

Again, quoting from the same document: "32. Protection of Monopolies—This is perhaps the most difficult question remaining. We agree on the general principle that it is desirable that each party should use its patent strength to protect the exclusive fields of the other."

This plainly is an illegal, cooperative effort upon the part of Corning and Hartford to use the patent strength of each to protect the exclusive fields of the other. It is a cooperative effort for the purpose of maintaining monopolies.

From the above extracts, it is plain that the purpose of entering into this contractual relationship, both in 1916 and 1922, was, from Hartford's viewpoint, to eliminate Empire as a possible competitor in automatic machinery, to obtain Corning's support in getting and maintaining a monopoly on automatic machinery, and to eliminate Corning as a manufacturer in the container field; and, from Corning's viewpoint, to obtain from Hartford a monopoly in the manufacture of non-container ware.

The result of these contracts was to give Corning the power to exclude all others from Corning's fields. During the years that followed down to the filing of the complaint herein, there are many instances where manufacturers were kept out of Corning's fields, either by Hartford alone or by Corning's refusal to consent to their entrance into its fields. Hartford refused requests by Fry Glass Company, Mantle Glass Company, Owens, Bartlett-Collins and Swindell Brothers. Corning refused to consent to the licensing of MacBeth-Evans, Fairmont, Indiana Glass Company, McKee, and Anchor Hocking. The record does show that in two or three instances limited licenses were granted in this field with Corning's consent.

Corning's valuable glass composition rights for heat resistant ware and oven ware expired in 1936, but Hartford refused to license anyone to make this ware on its feeders, thus helping Corning to maintain its monopolies.

The contract between Corning and Hartford does not in itself give Corning any control over the future policies of Hartford. But that Corning does exercise such a control consistent with its own desires is clear. A. D. Falck, president of Corning, in exhibit 676, dated June 8, 1920, wrote that it was decided "not to make this request, as we have entire confidence in you and your group. We will, however, wish to participate actively in formulation of policies and major decisions, and I assume

from what you have said to me that this will be your desire."

Also, F. Goodwin Smith of Hartford wrote to A. D. Falck on October 27, 1927 (Ex. 271): "at the time of the formation of the Hartford-Empire Company, you considered Empire's minority holdings of 45% amply protected, as Beech-Nut, Hartford and Monongah represented to you three separate and distinct holdings, and, further, that these three groups might not always agree among themselves. Therefore, from a practical standpoint the 45% held by Empire was to all intents and purposes as good as control."

In addition to the 45% of the stock of Hartford that is held by Corning through Empire, the record indicates that there have always been at least four of eight to nine members of Hartford's board of directors who were also directors of Corning or Empire. Hence Corning not only had an exclusive license from Hartford covering the non-container field, but it also in practical effect had sufficient control over Hartford to dictate the policies of Hartford in accordance with Corning's wishes.

In 1922 these two companies, Corning and Hartford, did not have an actual monopoly of feeders. At that time there were four serious competitors of Hartford in the gob feed field. These were the Howard Automatic Machinery Company, the Owens Bottle Company, the William J. Miller Company, and the Federal Company, the latter having control of the Tucker, Reeves & Beatty feeder rights. Hartford was in litigation and interference with all these companies. But by the end of 1925, Hartford owned or controlled all the feeder rights which these companies possessed.

Howard. The Howard interests were the first to come under the control of Hartford. This was accomplished by outright purchase. Howard had licensed some of its machines and in taking over the patent rights it was necessary that Hartford prevent the Howard licensees from obtaining a defense of estoppel against Hartford, in order to leave Hartford free to sue them and force them to take licenses from Hartford. To this end the Beech-Nut Packing Company, which was one of the original organizers of Hartford, purchased the stock of Howard and then transferred it to the Hartford Special Machinery Company, which in turn transferred to Hart-

ford all the Howard patent rights. We shall later see just what relationship an involved transaction of this kind has to the reference of the Supreme Court to "manifestations of guilt."

The purpose of Hartford in entering into the Howard transaction is clearly expressed by F. Goodwin Smith of Hartford in a statement to his Executive Committee on June 23, 1922, as follows (Ex. 58):

"If outstanding, he presents a very serious competitor commercially. * * *

"The sale of Howard to Owens would be distinctly disastrous, probably the worst single thing that could happen. That Owens has twice tried to buy out Howard, making considerable offers therefor."

That Howard was an active competitor of Hartford is further shown in a statement by V. M. Dorsey, patent counsel for Corning and Hartford, on April 12, 1922 (Ex. 57): "Howard has a going business and a feeder which can compete with ours unless properly shut up."

The same author wrote to F. Goodwin Smith on December 27, 1921 (Ex. 1522):

"I repeat what I have said before that so far as affects the suppression of piracy and control of the gob feeding art, I believe the deal with Howard is more effective than any deal you can make with Owens. * * *

" * * * I again say that you will not by reason of your deal with Owens be able to stop pirates. * * * On the other hand, the deal with Howard permits an immediate, effective, offensive campaign coupled with the necessity of protecting our rear from Owens."

Thus it is plain to be seen that Hartford's purpose in entering into this transaction was both to eliminate a competitor and to obtain rights which could be used against other competitors. It is well at this point to again keep in mind that while Hartford was an applicant for basic patents, none was actually issued to it by the Patent Office until 1926. Regardless of this, Hartford refers to its competitors as "pirates."

Owens. The next important step was an agreement by Hartford with Owens that eliminated all competition between them. From the record, this appears to be the most important and far-reaching step ever taken in the history of the industry. The negotiations extended over a period of several years, beginning about 1919 and

concluding with a written agreement dated April 9, 1924.

At the time negotiations between the two companies commenced, Owens was primarily a manufacturer of glassware, although it still licensed some concerns in the use of the suction machine and had outstanding a few gob feeder licenses.

We now come to another fundamental motive behind the desire of the defendants to concentrate the control of automatic machinery in the hands of one individual. We have already seen that it was Hartford's desire to obtain domination of the feeder art, and this, of course, was for the purpose of receiving the greatest possible income from its proposed licensing system. Owens' main purpose was different. Owens wanted stabilization of the industry in the marketing of glass products so that higher prices might be charged. A means to that end was the control of the feeder business in the hands of one concern, with enough control retained to enable it to keep everyone in line. Thus, the feeder monopoly was a means to an end so far as Owens was concerned. With Hartford it was the other way around. Hartford wanted a feeder monopoly in order to obtain the greatest possible income from royalties. A means to this end was the stabilization of the industry, since a well stabilized industry meant that higher royalties could be absorbed and passed on to the consumer. Thus, stabilization of the industry was a means to an end so far as Hartford was concerned. We will now look to the exhibits which show these purposes and how the companies worked together so that each might obtain its desired end.

During the negotiating period, various plans were offered and rejected or modified. Many conferences were held. The conferring officials of the two companies followed Hartford's policy of preparing memoranda of these conferences as a means of communication with their brother officers, boards of directors, etc. At times it appears that the negotiations had definitely failed. During the entire period of the negotiations, the record indicates that Michael Owens of the Owens Company assumed the initiative in presenting his ideas and the ideas of his company to the Hartford representatives. His expressed convictions looking to a regulated control of the glass container industry cannot be misinterpreted. The general situation at the beginning of the negotiations is clearly set forth in a memorandum prepared by H. K. Smith of Hartford, dated December 23, 1921, in which he set forth what occurred in a conference between officials of the two companies (Ex. 23):

"3. Mr. Owens stated that a number of years ago there had been developed and put into commercial operation glass feeding and forming machinery, broadly known as the Owens machine. At that time the industry was in very crude shape, and in rather precarious condition; that this new machine became adopted, glass manufacturers used it for a number of years and became generally prosperous, and that everything was happy until the rise of the device or process which Mr. Owens referred to as the 'plug feeder'—probably intending to cover thereby the general method of feeding by the plug, needle, or in gobs, as distinguished from the Owens suction method.

"4. That up to this time the industry had become fairly stabilized and was in generally sound condition. That the Owens Company had adopted the general policy of taking in royalties one-third of the saving made by their machines.

"5. But then, upon the appearance of the said new process, trouble arose all around. The patent protection, which had hitherto stabilized the industry, was assailed, seriously endangered.

"6. That he had made two attempts to come to some adjustment with the Hartford-Fairmont Company. * * *

"7. That the Owens Company were now making a third attempt to get some solution of a very serious situation. That if they did not succeed in doing so, they would have to fight over the entire field to a general finish, by all proper means.

"8. That the Owens Company would go in for such a fight expecting one or the other of the following final results:

a. Either that the Owens Company would result in dominating the entire glass industry,—or

b. The whole field of the industry would be thrown wide open on a purely competitive basis, with no considerable patent protection for any one, and any 'farmer' could take up this cheap method and go into the glass business. * * *

"11. He, however, preferred to disregard in this discussion any concrete questions of the merits of patents, assuming that each side has a strong patent position and

is thoroughly confident of that position. Assuming this—the fact nevertheless remains that as long as Owens and Hartford continue to fight each other, the so-called 'outside feeders' will continue to operate and increase in number, with all their destructive effect on the stability of the industry. That as long as these outsiders know that our two companies are fighting with each other, the outsiders will feel safe, or at least safe enough, to go on and increase their present hold on the trade. They are, however, badly scared on the merits of the patent questions and if the Owens and Hartford companies should combine, they would probably run to cover. * * *

"16. Mr. Goodwin Smith then said that he agreed with Mr. Owens namely; that the future stabilization of the glass industry was most important and most essential to both interests, and that he personally was particularly worried as to what the outcome would be if continual patent litigation between Owens and Hartford destroyed all advantages of any patent monopoly and permitted outside feeders to continue to license their machine. * * *

"Mr. Smith stated, however, that he felt some means could and should be worked out whereby Owens and Hartford could combine their patents and skill to effect the stabilizing of the industry. * * *

"19. All of the Hartford representatives indicated that they were in agreement with the position stated by Mr. Owens as to the danger of unstabilizing the industry and of destroying or greatly reducing the present patent control of it, and that they also agreed that it was very important that the two companies should take any measures they could to prevent such dangers."

This exhibit shows that the considerations which prompted the officials of the two companies to negotiate were (a) competition arising between them in licensing and (b) stabilization of the industry.

At a later date another meeting was held between representatives of the two companies, and a memorandum of this conference was written by H. K. Smith of Hartford, exhibit 26, dated January 17, 1922. He wrote that J. C. Blair, of Owens, stated at the conference that "there should be in the glass industry some concern like Owens in a sufficiently strong position practically to force a stable price policy upon all important producers; that if Owens, by the plan as above suggested, had the free use of its own suction feed and the free use of the gob feed it could then go to any other producer who threatened to cut prices and unstabilize the market, and inform him that such a policy was detrimental, but that if the outsider persisted in doing so Owens had a sufficient margin, by reason of its free use of both devices, so that if necessary it could come out on top in a price war and still make money. He felt that some such stabilizing influence was necessary and that it could only be established through one company having such a peculiar strength as would be given in this case."

Exhibit 1962 is a communication by W. H. Honiss of Hartford to F. Goodwin Smith of Hartford dated January 26, 1924:

"Toledo naturally wants one or both of:

"(a) The control of our licensing to keep a check on growing competition from our future licensees.

"(b) A large share of our income as an edge in meeting such competition."

Thus it is plain that one element of stabilization of the industry was the elimination of price-cutting and the establishment of a stable price policy. Owens wanted to be in a position to dictate the prices which could be charged for glassware by having a sufficient lee-way in cost so that no one could fairly compete with it. Owens could then force competitors to sell at its prices. If they refused, Owens would be in a position to win out in a price war.

Exhibit 21 is a letter from F. Goodwin Smith of Hartford to E. M. Ashcraft of the Illinois Glass Company. At this time, Ashcraft was engaged as an intermediary between the Hartford and Owens companies. He was tied by obligations of his company to both Owens and Hartford. The Illinois Glass Company was an early licensee of Owens for the use of the suction machines in the manufacture of narrow neck ware. At a later date it became a licensee of Hartford for the use of the gob feeder in the manufacture of narrow neck ware. The letter is dated February 15, 1921, and reads in part as follows:

"Owens also went on to say that he doubted very much whether either Howard or Miller or ourselves or anybody, as a matter of fact, would control the basic claims for gob feeding—that .he thought the control was very much split up,—prob-

ably we had valuable claims, Howard had valuable claims, Miller had valuable claims, and that Owens could contribute something of value. Therefore, it seemed very logical that we in some way or other should get together with the Owens Company to see if the gob feeding method could be entirely controlled by the two companies, even if it meant acquiring Howard and others.

"Owens felt that if no one controlled the gob feed method, the whole field would be open to a number of feeders which would unstabilize the general trade, and that our licensees would be thrown into competition with a lot of small factories that could get Howard or Miller feeders on a 5¢ or a 6¢ royalty rate."

This letter indicates that Owens was not so much interested in the patent angle as it was in the ultimate control of the patent situation by someone who was in sympathy with Owens' desire to stabilize the industry. There are many other exhibits that clearly show the negotiations were intended to eliminate competition between Hartford and Owens, to control the gob feeding art, and to stabilize the glassware market.

Exhibit 24 is a memorandum by F. Goodwin Smith of Hartford dated January 24, 1922, and reads in part as follows:

"I think it must be definitely assumed that the offer of Owens was based:

"(a) To prevent patent and commercial war between the two methods of manufacture—Suction Machines vs. Gob Fed Machines.

"(b) To stabilize the industry and strengthen patent assets for the purpose of eliminating outside feeders and machines. * * *

"High rates of royalties, Owens maintain, will stabilize business and place them as a company in a very strong position to control and dominate."

Exhibit 30 is a memorandum of a conference by H. K. Smith of Hartford, dated March 3, 1922, in which he states

"That this negotiation is exclusively directed at harmonizing the situation as between the suction and gob feeds. * * *

"Owens wants—

"(a) Stabilization of the industry

"(b) Raise royalties

"(c) Control status of gob and suction feed in container field."

Exhibit 574 contains a part of the minutes of an Executive Committee meeting of Hartford on April 19, 1922: "Other features of the plan were that H-F should receive general immunity for its gob feeders and its formers from Owens—that some restriction preventing over-plant investment and price-cutting was to be placed on the licensing of gob feed by H-F and that Owens should agree not to license their gob feed at all in competition with H-F. That the whole plan should be probably conditioned upon getting the consent of the majority of our licensees to a satisfactory royalty raise. That the two companies would cooperate actively in attacking the outsiders, sharing equally in the expenses including cost of buying out outsiders, if necessary, and equally in the proceeds."

Exhibit 32 is a memorandum by H. K. Smith of Hartford relative to a conference with J. C. Blair of Owens on April 20, 1922:

"It would be a prerequisite that a substantial majority of the H-F licensees should agree beforehand on a proper royalty raise. This extra payment would probably have to be conditioned upon the maintenance, generally speaking, of the gob feed monopoly; that the licensees would undoubtedly say—'Suppose we agree to pay this extra rate and then both your patents and those of Owens fall down so that the field is entirely open. Have we got to go along paying this raise?' I said it seemed to me fairly obvious that the licensees would object to such a possibility. I did not see just what form of guarantee we could give them as to the maintenance of the monopoly. We could not, of course agree that these payments should be conditioned upon the absolute exclusion from the industry of every outside form of feeder; that on the other hand they were entitled to a substantial protection. * * *

"That Owens was not to license its gob feeder to outsiders or in competition with the Hartford gob feed and that some reasonable restrictions shall be placed upon H-F so that it shall not license its feeders in such a way as to produce over-plant investment or danger of price-cutting."

Exhibit 1925 is a communication by A. D. Falck of Corning to F. Goodwin Smith of Hartford, dated April 25, 1922: "The value of the whole deal depends upon the extent to which gob feeding processes can be monopolized, and therefore the How-

ard situation and possibly the Federal must be appraised and provision made for controlling them by successful suit and bringing the users in as sources of income or, failing a control by successful suit, by purchase on a fifty-fifty basis, to which purchase I think Owens must be positively committed."

The last communication indicates that the settlement of patent interferences or infringement suits was not the impelling reason why Hartford and Owens wanted to join their interests, but it does definitely indicate that they were aiming at a complete control of the gob feed process and that they aimed to effectuate that control by purchase of outside feeder patents and rights on a fifty-fifty basis if they failed to gain control by successful suit. The record shows that in due course Howard and Federal were both purchased, the former alone by Hartford and the latter through joint contribution of Hartford and Owens.

On April 22, 1922, H. K. Smith of Hartford wrote to J. C. Blair of Owens as follows (Ex.34):

"There is another point which I think I ought to touch on. As we understand it, this arrangement will practically divide the industry, so far as our two companies are concerned, into two branches—the suction process branch controlled by Owens and the gob feed branch controlled by H-F. We both recognize that there is a distinct field for each of these processes. It would seem then to be the proper thing to let the two processes go along side by side and each develop the proper field as the demand from the industry would naturally work it out. But, of course, we both also recognize that it would be unfortunate to have this parallel development of the two processes reach a stage where competition between the two became generally destructive and unstabilized. With this in view we have accepted the proposition that restrictions tending to preserve stability shall be imposed, and, of course, it is just as important that the suction process and any future development of it should not be used to unstabilize the industry, as it is that the gob process should not be so used. I have tried to state this idea in Section 6 of the memorandum.

"I think we both recognize that when it comes to defining these restrictions, necessary for stability, we shall probably have a good deal of difficulty, but I still feel that it can be done with a fair degree of success."

Here it appears that restrictive licenses were to be resorted to in order to effect stabilization of the industry. Restrictions in the licenses would, of course, be feasible because of the plan followed by Hartford of refusing to sell its machinery outright. By retaining title to its machines and licensing a use thereof and exacting from the user a royalty on all glassware produced from it, Hartford now appears to be considering cooperation with Owens in the use of these restrictions, not as a part of its patent privilege as a patentee, but because "we have accepted the proposition that restrictions tending to preserve stability shall be imposed."

Exhibit 37 is a memorandum by H. K. Smith of Hartford, dated April 27, 1922:

"4. It is agreed in principle as follows:
* * *

"(b) That Owens Company is able to contribute substantially to the maintenance of the Patent monopoly on gob feed.

"(c) That H-F's contribution to such maintenance will be greater than that of Owens Company.

"5. That the commercial considerations, involved in considering either an agreement or a conflict between Owens and H-F, are of greater importance than the relative patent values controlled by the two companies. By 'commercial considerations' is meant the domination of outside feeders, the stabilization of the industry tending against irresponsible price-cutting; the general co-operation between the gob and suction processes for an orderly development of the two side by side, such as will be most beneficial to the interest of the two companies and to the industry; and finally the steadying influence that will be established in the machine side of the industry by a recognized co-operation between the two companies.

"6. That there is a broad field for the application of the gob process and that, broadly speaking, the two processes in the hands of friendly companies should be allowed to develop side by side and find their natural field and expansion.

"7. That under some such arrangement as has been generally discussed in these negotiations H-F would have entire discretion as to the licensing of the gob feeders,

562

and Owens would not license its gob feed in competition therewith. * * *

"11. Contributions by Owens Company. * * *

"(c) Contributing to the control of the outside feeders, to the stabilization of the industry and the establishment of a substantial monopoly over the gob feed process. * * *

"17. There is a further disagreement on the relative values, outside of cash, offered by Owens and H-F. The chief factor in this question is that which relates to maintaining the gob monopoly permanently, and deals with the relative values of the patent defenses offered by H-F and Owens for that purpose."

Here the parties are in agreement that the "commercial considerations"—and by that they mean the domination of outside feeders and the stabilization of the industry tending against irresponsible price-cutting —are of greater importance than the relative patent values controlled by the two companies.

■ This appears to be conclusive of the question as to whether or not the agreement about to be entered into was brought about primarily for the purpose of settling Patent Office interferences and litigation in the courts, or whether it was done so that, by joint efforts and through the cooperation of the two companies, dominance over the entire glass container industry might thereby be obtained. It appears unquestionably that the settlement of patent differences was secondary in purpose.

■ Here also is an agreement about to be entered into between owners of competing patents, each patent employing and defining a separate method in the making of glass products, to wit, the gob feed method and the suction method. A combination of competing patents for the purpose of obtaining domination in a field of industry, where such competing patents represent the only commercially practicable methods in a field of industry such as the glass container industry, has the effect of destroying the competition that has theretofore existed between the two methods of manufacture.

"Combinations between owners of independent patents, whereby, as a part of a plan to monopolize the commercial field, competition is eliminated, are within the Sherman act, for the reason that the restraint of trade or monopoly arises from combination, and not from the exercise of rights granted by letters patent." Blount Manufacturing Co. v. Yale & Towne Manufacturing Co., D.C.Mass.1909, 166 F. 555, at page 562.

While there was no combination of the suction and feeder patents in the case at bar, the owners did enter into an agreement with the understanding that there would be no undue competition between the two methods, as will be discussed more fully later in this opinion.

Exhibit 1892 contains minutes of an Executive Committee meeting of Hartford on April 19, 1923:

"Voted: That the present form of the negotiations with the Owens Company be discarded and that the whole matter be taken up anew with Owens Company on approximately the following basis:

"(a) That no deal between our two companies alone would in any way make a clean-up of the gob feed situation or stabilize the industry.

"(b) That to do this, it is necessary to settle the factor of the Federal patent rights and licensing business.

"(c) That as each of our companies, Hartford-Empire and Owens, have something on the Federal Company, the best strategy is for our two companies to go against Federal in unison. This makes a stronger attack and cuts out the chance of the Federal Company playing one of us off against the other.

"(d) That this, if carried out successfully with Federal, is the one procedure which will promptly and completely stabilize the situation and stop the very serious Miller advance."

Exhibit 43 is a memorandum written by F. Goodwin Smith of Hartford, dated April 27, 1923:

"2. Stabilization:

"We concur and urge the necessity of taking immediate action towards controlling the present feeder situation, and submit the following form of an agreement,— any agreement to merely cover the Container field:

1. Owens agrees to turn over to Hartford its present gob feed patents and applications pertaining to feeders and formers.

2. A deal with Federal to be made, whereby Federal is assured a definite income for a definite term of years, in return for Federal turning over to Hartford all their patents, applications and licensees all

income above the net amount guaranteed Federal, to be divided between Owens and Hartford 50-50.

3. Users of Miller feeders to be sued for infringement by Hartford, with agreement that they either be stopped or certain ones be allowed to continue to use Miller feeders at higher rates of royalty than Hartford is now asking."

From the above extracts it will be seen that Owens was primarily interested in a stabilization of the industry. Later we will go more fully into what the parties meant by "stabilization of the industry." Hartford was fully in accord with this desire, and was willing to go along with it, because it meant that when Hartford obtained control of the feeder art, its income would be enhanced through the power to charge high royalty rates.

As early as the date of the purchase of the Howard assets, Hartford recognized the desirability of stabilizing the feeder situation. Exhibit 1889 contains a statement by F. Goodwin Smith of Hartford to the Executive Committee of Hartford at a meeting on May 18, 1921, to the effect that he "felt that the Howard feeder was sufficiently good to upset trade conditions in general, inasmuch as this feeder when operated by the smaller glass concerns would permit the small concerns to continue to exist and at the same time quote prices which would be detrimental to the general trade."

Again, exhibit 56 is a memorandum by F. Goodwin Smith of an interview with Howard on April 25, 1922: "Howard stated quite frankly that he realizes something ought to be done to stabilize the trade, and that in general he would be willing to consider any proposition that gave the stockholders a reasonable return and did not destroy the prestige which he and his company had obtained."

Corning also thought that stabilization of the industry was a factor to consider. Exhibit 1928, a letter written by A. D. Falck of Corning to V. M. Dorsey on July 25, 1923, reads in part as follows:

"On the whole, however, it seems to me that substantially all the points I have raised in a crude way have the merit of being absolutely fair. The fundamentals of an agreement with Owens for the settlement of our patent differences, the stabilization of the commercial container business, and the sharing with Owens under conditions of the income can all be met without including in the agreement any of the provisions which I consider improper and unfair."

The issuance of new licenses would, of course, play an important part in the program of stabilization. On this point, Dorsey thought that there might be trouble. Exhibit 612 is a letter from H. W. Carter, of the Patent Department of Owens, to J. C. Blair of the same company, dated August 14, 1923, in which the author stated that another problem was, "with regard to the proposed participation of Owens in the future conduct of the feeder business. As to any such arrangement, Dorsey would, in the first place, be in fear of the anti-trust laws, and in the second place, could see no basis of agreement between a company which must primarily regard the granting of licenses from the point of view of greatest possible income, and a company which, on the other hand, would primarily have in mind the effect of such licenses on competition."

Eventually, however, the officials of both companies realized that a cautious policy with respect to issuing licenses worked for the best interests of both.

Hazel-Atlas at this time was a large manufacturer of glass containers and, of course, the policy adopted by it would have considerable bearing on whether the industry could be stabilized in the manner in which Owens and Hartford desired. However, this possibility was evidently taken care of. In a memorandum by H. W. Carter of Owens, dated November 7, 1923, he states (Ex. 611):

"They"—Owens and Blair—"even stated, as their view, that the advantage of having the feeder field under some patent control is so great, from a business standpoint, that this company would rather see such control in the hands of Hartford than to have the field open—that consequently if we should lose out on Lott, we would have no interest in holding Hartford in the Patent Office by interference proceedings, or in defeating Hartford's claims in court—that our interest would rather be in aiding Hartford to maintain its control, than to narrow or defeat its patents, or delay their issue.

"To my inquiry as to whether we could rely on Hazel-Atlas going with us in this policy, their answer was in the affirmative—that they were anticipating no dif-

ficulty in this respect. Mr. Owens quoted statements of Mr. J. C. Brady which would lead to the conclusion that the Hazel-Atlas Company would rather pay royalties for the use of its plug feeders, than to have the field open, quoting him further as saying that they could, if necessary, return to the flow feeder for their line of ware in case the royalty situation became too onerous."

The agreement of April 9, 1924, shows how Owens finally obtained its position of dominance in the industry and how it was placed in a position whereby it could force its policy of stabilization upon the rest of the industry. The agreement gave Owens the use of 40 feeder units, free of royalty. In addition, Owens did not have to pay royalty on its suction production. Finally, Owens was to receive one-half of Hartford's income from royalties over and above $600,000. Hence Owens not only did not have to pay royalties on nearly everything it produced, but it also received a share of the royalties paid to Hartford by all the other licensees of Hartford, some of whom were competitors of Owens. This resulted in Owens obtaining a very favorable position and one in which it would have the power to enforce a stable price policy in the industry.

The procedure to be followed in arriving at the ultimate goals of Hartford and Owens was the elimination of competition between themselves and their respective gob and suction processes, an attack against all outsiders until Hartford had complete control over all automatic machinery used in the production of glassware, and then the licensing by Hartford of every glassware manufacturer in the industry.

Immediately after the agreement of April 9, 1924, the two companies began a systematic program for the elimination of all competition. First, they settled the patent interferences and court litigation existing between themselves. Not only did they settle these interferences and suits, but they did so with an eye to coming out of the Patent Office with the strongest possible claims and patents with which to attack the remainder of the field. For example, claims were dropped if the effect was to make other claims stronger, or the claims in their respective patent applications pending in the Patent Office were shifted about so as to bring out the strongest possible patents.

The agreement of April 9, 1924, did not cover all the inventions of both concerns. However, the companies showed a spirit of cooperation in matters outside the contract, which is an indication that the agreement was not based on patent considerations. Exhibit 614, signed by R. D. Brown of the Patent and Licensing Department of Hartford, and J. F. Rule, of the Patent Department of Owens, dated September 2, 1925, reads as follows:

"The undersigned believe that it is for the interest of both companies to mutually disclose, consider and settle any overlapping or conflicting matters of inventions that may arise between the companies, even though such overlapping or conflicting matters may be outside the field of licensed inventions.

"It is therefore requested that permission be given to the patent attorneys of the respective companies to dispose of any such conflicts by agreement of such attorneys or by means of the arbitration system which is now in force as to matters falling under licensed inventions."

W. J. Miller and Tucker, Reeves & Beatty. Two very important steps were taken in 1925. In that year the assets of the W. J. Miller Company were purchased, as were also the patent rights of Tucker, Reeves & Beatty, sometimes referred to as the Federal Company. The two companies, Hartford and Owens, shared in the purchase price of each, the sum of $145,000 being paid for Miller, and $1,600,000 for Federal. The exhibits clearly show that the purpose in purchasing the Miller feeder rights without going through a patent fight was that Miller was selling machines outright, and this constituted a serious menace to Hartford's licensing and lease system. This is shown in a letter from H. W. Carter of Owens to W. H. Boshart of Owens, dated August 23, 1924 (Ex. 621):

"Miller sells his feeder installation outright for $5000.00, and where does this leave the royalty game? There cannot possibly be more than one answer unless Miller can be stopped by patents.

"It is fatuous to believe that glass manufacturers are going to continue to pay royalties in the face of competition which pays no royalty and yet has the use of such a successful feeder as Miller'."

The same was generally true of Federal, or Tucker, Reeves & Beatty. The feeders

of this company were licensed and leased but at a much lower royalty rate than was charged by Hartford. In this transaction Hartford was interested both in adding more to its income from licenses and in eliminating a competitor. K. E. Peiler, an inventor and engineer for Hartford, wrote in June, 1922, that the Federal feeder was (Ex. 70): "a serious competitor in the tumbler field and a menace in the bottle field. It has many possibilities of development, both as a distinct type of feeder and as an adjunct to other types of feeders."

On August 12, 1925, H. W. Carter of Owens wrote to W. H. Boshart of Owens (Ex. 1972): "Tucker and Reeves are today in possession of a very practical and desirable form of feeder, which is the basis of a going business of sizable income and which feeder is of such a distinctly different type from those developed by Hartford and Owens in principles of construction and method of operation. * * * If the Tucker and Reeves type of feeder is added to what we now have it would be a distinct asset to our feeder business and as an immediate and definite source of income."

Miscellaneous. Another part of the plan was a system of litigation against all remaining outsiders. Here the power of litigation pursued by a strong combination of two companies, one of which, Hartford, was dominated and partially owned by a third powerful company, Corning, backed by unlimited financial means, is brought into play against individual companies, most of them small manufacturers of glass products. Suits were brought against Hazel-Atlas, Kearns-Gorsuch, Lamb, Nivison-Weiskopf and Obear-Nester. The expense of this litigation was shared equally between Hartford and Owens, and this expense was by no means small. The record discloses that Hartford expended substantially $900,000 in the pursuit of litigation against so-called outsiders. The Hartford Company did most of the work, but Owens contributed a substantial part, and the patent lawyers of both companies were continually consulting each other with respect to both substance and procedure.

The litigation against Nivison-Weiskopf cleared itself up when the assets of that company were purchased by the General Glass Corporation, which company then sold its patent rights to Hartford and took a license.

The litigation with the Obear-Nester Company is still pending, several suits having been filed.

The litigation with Lamb ceased after Hartford had come to an agreement with Hazel-Atlas and the latter had taken a license from Hartford. Lamb then followed suit by taking a license.

Kearns-Gorsuch was a subsidiary of Hazel-Atlas and that litigation ended with the settlement with Hazel-Atlas in 1932.

In the meantime, in 1928, Hartford and Owens had purchased the Rankin feeder rights.

The Rankin feeder was controlled by a man named Pratt. He had decided to bring suit against Hartford when Owens and Hartford purchased his rights for $63,500. The purpose of this acquisition is shown in a letter from F. Goodwin Smith of Hartford to W. H. Boshart of Owens, dated October 18, 1928 (Ex. 111):

"You and the rest of us want stabilization in the industry to be accomplished as soon as possible, and you and all of us admit that one step towards accomplishing stabilization is for us to have our patents adjudicated, and the infringers either brought in under a license or closed up. I therefore was strongly of the opinion that if Pratt himself or the purchaser of the Pratt patent and applications brought suit against this Company at this time it would go a long way towards negating the prestige which has come to us in winning the St. Louis suit.

"As I see it, Hartford cannot afford to be in a defensive position. It has assumed the offensive policy and must continue to do so."

Hazel-Atlas. We have seen how Owens and Hartford entered into a partnership agreement in 1924 for the purpose of obtaining a monopoly of all gob feeder rights, for the elimination of competition between the gob feed and the suction methods of manufacture, and for the stabilization of the industry. In 1932, a third partner was brought in, and from then on it was only a question of time until those purposes were achieved. The agreements between Owens, Hazel-Atlas and Hartford made thenceforth a three-way partnership, two of whom were the largest manufacturers in the glass container industry.

Hazel-Atlas had been fighting the Hartford gob patents for a number of years. It had obtained a suction license from Owens at an early date, as we have heretofore seen, but in later years it had been using the gob feed process to a large extent. While it was not much interested in the marketing of machinery, it was insisting upon its right to use the machinery which it manufactured.

Shortly after the completion of the agreement between Owens and Hartford in 1924 these two companies set about to license Hazel-Atlas. The purpose of this attempt was the strengthening of their patent situation and the further stabilization of the industry. However, the negotiations broke down and it was not until 1932 that an agreement was finally worked out.

In 1932, the patent situation between Hartford and Hazel-Atlas was coming to a head. Two suits had just been decided by different United States Circuit Courts of Appeal, one in favor of Hartford (Hartford-Empire Co. v. Hazel Atlas Glass Co., 3 Cir., 59 F.2d 399), and one in favor of Hazel-Atlas. Hartford-Empire Co. v. Nivison-Weiskopf Co., 6 Cir., 58 F.2d 701. There was still the possibility of an appeal to the Supreme Court from the decision in the Third Circuit, which went against Hazel-Atlas, and Hazel-Atlas did contemplate this. Before that was accomplished, the parties reached an agreement.

The underlying reasons for entering into this agreement can be seen from a letter written by F. Goodwin Smith of Hartford to A. D. Falck of Corning, the latter being also a director of Hartford, in June, 1932 (Ex. 140). In this letter, F. Goodwin Smith explained that if no deal with Hazel-Atlas was made and the patent position of Hartford failed,

"1. O. will be affected as follows: * * *

"(b) Loss of opportunity to stabilize industry * * * O. considers stabilization worth several hundred thousand dollars a year. * * *

"2. Hartford will be affected as follows:
(a) * * * practical abandonment of licensing business.

"3. H-A will meet present and increased competition."

But if a deal was made and the patent position did not fail, the writer stated that, "Hartford, Owens and Hazel-Atlas will have solidified industrial situation."

Exhibit 123 is a communication from H. L. Heintzelman, president of Monongah Glass Company, to F. Goodwin Smith, dated June 19, 1924, setting forth what occurred at a conference between the writer and certain officials of Owens:

"I explained that the amount of royalty paid was not so material so long as it was within reason, provided we had some way to get it back, but that my experience was that Hazel-Atlas was not inclined to get big prices for their product, and I enumerated a number of cases to illustrate this. I soon found out that they knew about as much regarding Hazel-Atlas' business methods as I did and that they had been continually endeavoring to get them to change their policy, but that heretofore their representation on the Hazel-Atlas board did not mean anything, as Mr. Brady had been inclined to dominate the policy and had gotten away with it.

"Mr. Boshart informed me that he felt quite sure that Mr. Brady now realized his mistake in policy and that they were going to make an effort to change this policy. He further stated that it is absolutely necessary that they do so, because they had made no money last year, and the forepart of this year was equally as bad, and that they were in a position where they had to do something.

"Owens is now represented on the Hazel-Atlas board by Mr. Boshart and Mr. Biggers, and both of these gentlemen spoke very highly of the two members of the board recently put on.

"Mr. Boshart suggested that I get up a price list, have it printed, then, take the matter up with Hazel-Atlas, and the others concerned, and he felt that some good would come from it. I told him I would give this consideration."

Exhibit 644 is a communication from H. W. Carter of Owens to W. H. Boshart of Owens, dated May 4, 1925:

"In talking with Mr. Neave and Mr. Philbin, Mr. Belknap expressed great confidence in the outcome of our suit against Miller on the Lott patents. We urged that Hazel join with Owens and Hartford on the broad proposition that the true interests of the industry demand the building up, rather than the tearing down, of patent control, and that Hazel as one of the big figures in the industry, should be helping, rather than hindering, in this direction."

Exhibit 140 is a letter from F. Goodwin Smith of Hartford to A. D. Falck of Corn-

ing dated June 15, 1932. In speaking of the proposed Hazel-Atlas agreements, he said that if no deal was made with Hazel and the patent position failed, there would be "Loss of opportunity to stabilize industry as far as present competition goes. O considers stabilization worth several hundred thousand dollars a year."

Under the terms of the agreements worked out between the three companies, Hazel-Atlas contributed its patents to the Hartford pool and received therefor the right to one-third of Hartford's income from royalties paid by Hartford's licensees over and above $850,000. Owens' participation in Hartford's income from royalties was likewise to be one-third thereafter instead of one-half as it had previously received. Hazel-Atlas was to pay standard royalties and was excluded from Corning's fields.

Owens' right to the free use of 40 feeder units was eliminated, as was the provision in the 1924 agreement that Owens was to share in Hartford's litigation expenses. From this time on, the combination and the conspiracy was merely enhanced by the presence of another large manufacturer who, up to that time, was the second largest manufacturer in the glass container industry. The ends desired were still the same, but from this time on there were three large hands to work out the program, instead of two. All three contributed whatever they could toward the common objective.

Results. Hazel-Atlas had been the leader of the opposition to Hartford until 1932. Hartford and Owens were particularly anxious to have Hazel-Atlas take a license because of the effect on the remainder of the industry. In other words, they thought that the remaining outsiders would fold up and become Hartford licensees as soon as they learned that Hazel-Atlas, their leader, had done so. It is also a fact, as established by the record, that with the advent of a favored licensee to the combination, the newcomer immediately put forth his utmost efforts toward inducing other concerns to likewise license themselves to Hartford. This was true immediately after Hazel-Atlas joined the combination in 1932. It was true after Ball Brothers had joined its interests with those of Hartford in 1933. In the case of Hazel-Atlas, it was advantageous to it to induce other concerns to pay royalty fees to Hartford because it, with Owens, was sharing in these royalty fees. It was advantageous to Ball Brothers

to induce other concerns to accept licenses because it brought them under the restrictive licenses of Hartford, whereas it had an unlimited and residual license from Hartford.

What Hartford, Owens and Hazel-Atlas anticipated did shortly occur. Within a year all but seven manufacturers in the industry had taken licenses from Hartford, and three of these subsequently took licenses. Today only four so-called outsiders remain, to wit, Kerr, Obear-Nester, Reed and Jeannette. The latter is not in the container field but manufactures more in the pressed and blown field. All of these companies, with the exception of Kerr, are being sued by Hartford.

### The Conspiracy as Related to Suction Machines.

There can be no doubt that one of the purposes of the 1924 agreement between Hartford and Owens and their relations thereafter was the elimination of competition between the gob feed process and the suction process. While it is not specifically stated in the agreement that Owens would thereafter have the exclusive use of the suction process in return for Hartford's exclusive use of the gob feed process, yet the negotiations preceding the signing of the agreement leaves no doubt that one of the primary purposes in entering into the agreement was to divide the industry into two branches, to wit, suction, to be controlled by Owens, and gob feed, to be controlled by Hartford. Furthermore, as a result of the elimination of competition in the gob feed process, the industry could be stabilized. It would, of course, be futile to eliminate competition in the gob feed process if competition between the suction and gob processes was to continue.

As early as February 15, 1922, F. Goodwin Smith wrote a memorandum (Ex. 20) in which he pointed out that, "a feeder with forming machines represents a competing unit to the Owens Suction-fed automatic bottle machine."

Exhibit 35, a memorandum dated April 21, 1922, written by H. K. Smith of Hartford, reads in part as follows:

"5. Owens is not to go out and license its forms of gob feed in competition with the H-F feed. In principle H-F. is to be the gob feed concern and Owens the suction concern.

"6. H-F. shall restrict the issuance of further licenses in the container field in such manner, (to be defined more specifical-

ly later), as shall preserve the general principle of preventing over plant-investment and over-production, as well as keeping the licenses out of the hands of objectionable and irresponsible parties.

"In like manner, Owens shall restrict the licensing of its suction feed and all developments thereof in such a way as to maintain a similar position."

On April 22, 1922, the same author wrote to J. C. Blair of Owens as follows (Ex. 34): "this arrangement will practically divide the industry, so far as our two companies are concerned, into two branches— the suction process branch controlled by Owens and the gob feed branch controlled by H-F."

On March 3, 1922, H. K. Smith wrote that (Ex. 30):

"Owens wants * * *

"(c) Control status of gob and suction feed in container field."

Exhibit 24, a memorandum by F. Goodwin Smith, dated January 24, 1922, says in part:

"I think it must be definitely assumed that the offer of Owens was based:

"(a) To prevent patent and commercial war between the two methods of manufacture—Suction Machines vs. Gob Fed Machines."

In a memorandum dated April 27, 1922 (Ex. 37), H. K. Smith wrote:

"That the commercial considerations, involved in considering either an agreement or a conflict between Owens and H-F, are of greater importance than the relative patent values controlled by the two companies. By 'commercial considerations' is meant the domination of outside feeders, the stabilization of the industry tending against irresponsible price-cutting; the general co-operation between the gob and suction processes for an orderly development of the two side by side, such as will be most beneficial to the interest of the two companies and to the industry; and finally the steadying influence that will be established in the machine side of the industry by a recognized co-operation between the two companies.

"That there is a broad field for the application of the gob process and that, broadly speaking, the two processes in the hands of friendly companies should be allowed to develop side by side and find their natural field and expansion."

In Exhibit 33, a memorandum by H. K. Smith written in 1922, he says:

"(1) We must keep it clearly in mind that this license plan in theory, at least, still leaves the two companies to go on independently, except so far as they join for the purpose of attacking outsiders.

"In theory this means that the gob and suction processes will be in direct competition, letting the best process win. This situation will raise several questions, as follows:

"(2) Owens will undoubtedly want some limits placed on our new single feeder. If we go out with it broadcast, Owens may also do the same with theirs, as they have threatened, and there will be a sharp competitive war in spite of the agreement. This might go so far as to be bad for both.

"(3) There is also involved in this general question, the question as to what is to be done with the outsiders when dominated. How many shall be allowed to survive and at what price?

"(4) It is almost certain that Owens will recognize these difficulties and will demand that some limits be placed both on our single feeder and on the gob feed outside. In other words, they will want to put some limits on any straight out fight between the gob and suction process.

"(5) If they do this, however, it is equally logical for us to demand that there be limits placed on the use of new forms of the suction feed. If it is not to be a free-for-all fight, then both sides must be limited equally."

Here is the spectacle of an officer—a secretary, general counsel and director of the Hartford company—discussing, in negotiations for an agreement with the largest manufacturer of glass products in the country, agreements or understandings that to him, as a lawyer, he must have known were in direct violation of the anti-trust laws. He says that there is involved "the question as to what is to be done with the outsiders when dominated." He says further, "How many shall be allowed to survive and at what price?" He says that Owens "will want to put some limits on any straight out fight between the gob and suction process." He says, "It is equally logical for us to demand that there be limits placed on the use of new forms of the suction feed. If it is not to be a free-for-all fight, then both sides must be limited equally." I repeat that it is not necessary

for a court in this case to resort to inferences from either circumstantial or direct evidence.

As stated above, the 1924 agreement does not specifically cover the suction process. The reason may be found in the testimony of K. E. Peiler of Hartford, at page 7095 of the record:

"Q. Well now, this much is clear: that you understood, as you just said, that Owens would take the suction field, and your company would take the gob field? A. Yes.

"Q. And you also understood, did you not, that they wouldn't do anything to injure your phase of the business, in entering the gob field business, and, of course, neither would you do anything to injure them in the suction field? A. Well, of course, I realized that once having made an agreement whereby we got the license, they couldn't touch us, and as far as suction was concerned, they were already established, and what little I had done in suction didn't amount to much, so we couldn't have touched them at the then stage of the game on suction."

However, shortly after the 1924 agreement, a question came up with respect to suction feeders, as distinguished from suction machines, in which the glass was raised into a gathering cup by suction, but the glass got into the molds as freely dropped mold charges. On May 12, 1926, R. D. Brown of Hartford wrote to F. Goodwin Smith of Hartford as follows (Ex. 1734):

"The developments now actively under way in Peiler's suction feeder and in O'Neill's suction feeder make it highly desirable that an understanding be had with Owens as to whether suction feeders are or are not 'licensed inventions' under the contract of April 9, 1924. * * *

"I recommend that an understanding with Owens on this question be arrived at before they have a chance to learn of the possibility of commercially exploiting our suction feeder."

In accordance with this letter, the matter was taken up between the two companies and settled with respect to this particular device. Hartford agreed that it was a licensed invention and hence Owens would share in the income. Exhibits 249, 615.

In 1929, the officials of Hartford and Owens got together and determined which of their respective suction patents might be used against the O'Neill suction gathering machine. There was a possibility that some of the claims of each company would be put into interference with each other in the Patent Office, and to avoid the delay in attacking O'Neill a plan was worked out whereby Owens would drop its claims having subject matter interfering with Hartford's application. Exhibit 1880.

Later, in the same year, it was contemplated that in the acquisition of the O'Neill rights, Hartford would be entering into the suction field. Since suction was outside the 1924 agreement, Owens was not entitled to share in the income. Owens would not consent to this, and a special provision was contemplated whereby they would share in the income from this particular device. At that time, both companies realized that there was a possibility that Hartford could compete with Owens in suction. Exhibit 257.

Exhibit 252, a communication by H. K. Smith to F. Goodwin Smith, both of Hartford, dated July 30, 1929, reads in part as follows: "The other important problem is the effect of this partnership with Owens on our mutual relations in the suction field. I have tried to leave us, and Owens, as free as possible in that field for the future, and still bring us together enough to protect the present and future O.S.M."— O'Neill Suction Machine—"as it may be fairly forecast."

Exhibit 253, a memorandum written by H. K. Smith of Hartford, dated July 30, 1929, entitled "Knox-O'Neill Summary", contains the following:

"The purchase contracts now outstanding call for (83) machines. These machines will be free of royalty and free of all restrictions on ware.

"This block is so large that it will certainly, if the machine is successful, cause a great disturbance in the industry; very serious friction with our licensees, and they might have the result of upsetting our present licensing system, on which the stability of the industry depends, and forcing us, also, to a straight sales policy. * * *

"He"—Levis—"stated that he felt, off hand, favorably inclined toward the plan, but that he favored it more because of what it promised for the future relations of Hartford and Owens than because of the merits of this particular O'Neill matter. He said that it was his ideal that Hartford

and Owens should enter into much closer relations; Hartford should be the sole controller and licensor of all patents, both gob feed and suction, or any other form developed by the two companies; should be the sole developing company; and that Owens should confine itself solely to manufacture. He also wanted to have Owens have preferential rates under all the combined group of inventions, and a share in all the income therefrom."

Here is the picture of the second member of this "partnership," Owens, making arrangements to confine its activities solely to manufacturing, giving to the first partner, Hartford, the control and licensing of all patents, both gob feed and suction, or any other form developed by the two companies, and agreeing that Hartford should then be the sole developing company. However, under this setup, Owens was to receive preferential rates over its competitors who were also to be licensees of Hartford; and, in addition, Owens was to have a share in all the income produced by royalties collected from its competitors. This, of course, had the effect of placing Owens in a position of decided advantage over all other manufacturers of glass products who produce the same lines of ware produced by Owens.

Exhibit 629, a communication from Garland Lufkin of Owens to H. W. Carter of Owens, dated October 12, 1929, reads in part as follows:

"I consequently agree with you that there is very little to be gained by us in continuing our present effort to conceive new ideas on feeder type machines.

"Instead, I think we should turn these efforts to suction type machines. The importance of doing this seems to be all the more vital in view of the following analysis:

"At the present time, there are quite a few manufacturers paying feeder royalties to Hartford who are successfully competing with us. This indicates at least a rough equality between Owens operating costs and feeder operating costs plus royalties.

"In a few years these manufacturers will be able to use feeders without royalties, so that we must accomplish sufficient reduction in our cost of Owens operation by that time to offset their present royalty charges, if we wish to remain even on an equal footing.

"We must, however, do better than that if we are to acquire the position in the industry for which we are aiming, and this would mean, among other things, that our Owens costs will have to be much lower than feeder costs.

"If this can be accomplished, it will demonstrate the superiority of the suction gathering process and will therefore attract many other manufacturers to this type of machine. Consequently, it is very necessary that we get all the patent protection possible on improvements in the suction field.

"Inasmuch as the Hartford-Empire Co. has no connection with us on suction inventions and since it is quite likely that their engineers have been giving a lot of thought to this type of process, it would appear that some agreement with Hartford on inventions pertaining to this process, would be desirable. If such an agreement cannot be worked out, then it is of the more importance for us to concentrate our attention on this particular line."

In 1932, as a part of the agreements entered into between Hazel-Atlas, Hartford and Owens, the two latter companies did come to an agreement on suction rights. In this agreement, Hartford gave Owens an option to take up any suction rights that Hartford might develop.

Owens was getting a little apprehensive of Hartford entering the suction field with the possibility of producing a machine that would cut Owens off from its favorite position. Early in 1932, Hartford wanted to get into the Owens plants to see some of Owens' suction developments, but Owens refused. Owens stated that it was very jealous of its suction field, even as against Hartford. H. W. Carter of Owens wrote to F. G. Smith of Hartford on January 29, 1932 as follows (Ex. 631):

"For you will readily see, Goodwin, that the difficulties of our relationships in respect to this particular matter are inherent in our basic agreement. In recognizing your dominant interest in the feeder field, you will recall that we were very careful to insist on our own dominant position in the suction field, and I do not think I am giving away any secret when I say that the interests which control this company, both those which were originally attached to the old Owens organization, and those which have come into control through the Illinois Glass merger, are still decidedly jealous of anything that looks towards an invasion of

this field by others, including yourselves.

"And while there has been a certain relaxation of this attitude because of our common interest in discouraging O'Neill's incursion in this field, this department recognizes it is still the controlling view of our management.

"So much so that when on June 20, last, I made, at the suggestion of Mr. Hazelton, my guarded inquiry as to the rumor which had reached us to the effect that you were trying out a suction feeder, I reported to Mr. Levis as follows—

" 'Concerning Mr. Hazelton's report and the suggestion in that connection that we inquire of Hartford as to what they are doing in their development of a suction feeder. Am doing this as per attached copy of letter to Goodwin Smith, but you will readily understand that we are on delicate ground when it comes to suction improvements.

" 'For this necessarily implies an equally open attitude on our part, and I doubt if our management would care to disclose our plans in regard to the Soubier ram type development, for example.

" 'The trouble, of course, is that if we try to deal at all with Hartford in respect to the suction field, it is so difficult to draw the line between those suction devices in which we would be in partnership, so to speak, with Hartford, and those (like the new Soubier machine) in which we would wish to assert our exclusive control.' "

Shortly thereafter, the two companies entered into the agreement which gave Owens an option on all Hartford developments in suction. That Owens considered this worthwhile is evidenced by the fact that they conceded $750,000 for it. Exhibit 1778 is a memorandum by C. B. Belknap of Owens, dated June 6, 1932:

"For the 4th item we are asking a non-exclusive license under Hartford's suction inventions as defined in the contract submitted and inasmuch as these rights may not have any value in the future, or may be worth considerable, we have figured that the payment which amounts to around $750,000 by our giving up the 4th item is a fair consideration for the non-exclusive license to Owens-Illinois and its subsidiaries, including Hazel and Ball, which we are asking. * * *

"In addition to the question of values there is this situation which makes it necessary for Owens-Illinois, from their standpoint, to get at least a non-exclusive license in the Hartford suction inventions, namely, that if Hartford develops a small suction machine which can displace considerable of the feeder licensing business, that the income from the feeder licenses will be cut down to where Owens-Illinois will be getting back nothing from the net income and will have to pay royalties on such feeders and formers as they use, whereas under the 1924 Agreement their requirements would be taken care of by the free feeder provision, and in addition they would have to pay royalties on the suction development, so that in place of a royalty-free manufacturing company, or one sharing in some of the income, they might easily come into the position where they received no income and paid royalties on all their production, and the Executives of the Owens-Illinois Company feel that when they are making this deal which puts them in that position with reference to feeders and formers, they should protect themselves to the extent of the suction rights above asked for."

Exhibit 141 is a memorandum by H. W. Carter of Owens, dated July 18, 1932:

"This option, added to our free license and release under all suction inventions owned or controlled by Hartford up to July 1, 1932, is believed to put this company in a commanding position with respect to suction developments and render it entirely unlikely that Hartford will branch out widely in the suction field. * * *

"Contracts 4 and 8, being separate Supplemental Agreement between Hartford-Empire Company and Owens-Illinois Glass Company, and between Hartford-Empire and Hazel-Atlas Glass Company, are designed to take care of the contingency that by some outside influence or decree, governmental or otherwise, Owens-Illinois in the one case, or Hazel in the other, should be unintentionally deprived of its right to participate in Hartford's net."

Hartford, besides getting a good price for the option, was primarily concerned with keeping peace in the family. It realized that Owens would never license its suction machines or new developments in that field in competition with the gob feed. Exhibit 1883, a memorandum by K. E. Peiler, contains the following statement:

"I favor an agreement with Owens on suction developments for the purpose of

keeping peace in the family, provided it is recognized that.

"We have no way of determining either present or future values of our suction developments."

Owens, however, was not satisfied. It obtained the suction rights of Lynch, including those that Lynch had obtained from the Ed Miller Mold & Machine Company as a part of the 1933 contract. It also obtained the assets of the O'Neill Company, thereby removing its principal threat in the suction field. Owens paid a considerable sum for this latter—$500,000.

With the accomplishment of these steps, Owens substantially rounded out its program for the control of all suction rights in this country. It then took up the question of the United States rights of certain foreign suction machines which could possibly compete with the Owens suction machine in this country. One of these, the Roirant machine, could be installed at a low cost and was sold outright at a comparatively low figure. Exhibit 746, a communication by C. B. Belknap of Owens to W. E. Levis, president of Owens, dated October 9, 1933, says:

"In the purchase of the O'Neill assets and the suction rights of Lynch (which includes those secured by Lynch from the Miller Machine & Mold Works), the company has substantially rounded out its program for protection in the U. S. of its suction machine rights. These acquisitions, together with the contract which we have to take over Hartford-Empire's suction machine developments, enables this company to proceed, for all practical purposes, with a free hand in its suction machine developments. Moreover, the patents which the company has developed and secured will protect its important developments from being duplicated by others.

"There is, however, the question of suction machines which have originated in Europe that needs to be considered. Among these machines are the Roirant, Monish, and Bullman machines. The first mentioned of these, namely the Roirant machine, is of most importance for two reasons—(1) it is a single mold, ram type machine which can be installed at relatively low expense, and (2) the Roirant patents contain claims which may conflict with our RM machine development. Moreover, the Roirant patents are more dominant as to this particular type of machine than the Owens-Illinois patents, and it should be

considered greatly to the company's interests if they can acquire these U. S. rights to the Roirant machine."

In September of 1935, Ball Brothers was interested in knowing whether it could use the Roirant machine. Exhibit 1217 is a communication by F. C. Ball to E. W. McCallister, attorney for Ball Brothers, dated September 14, 1935. It says in part:

"Mr. Levis, President of the Owens Illinois Company, stated to me over the telephone that the Roirant Machine which dips from a hearth extending from the furnace could not be used in America owing to the fact that his company secured in their purchase from the O'Neill Machine Company patents covering this extension hearth for feeding glass. Please have Mr. Wadsworth examine the patents obtained by the Owens Illinois Company from the O'Neill Machine Company and ascertain whether or not they control patents covering extended hearths for gathering glass, such as used by Roirant, and such as Moorshead proposes to use."

Exhibit 1287 is a memorandum by J. E. Naylor of Owens-Illinois dated August 23, 1938:

"Mr. Barnard reported that O'Neill European were offering a very good suction machine for $18,000 f.o.b Montreal and that Mr. McLeish had reported excellent sales in Europe and South America and that O'Neill European had enough business to operate on a 24 hour a day basis until December. * * *

"Mr. Barnard is also of the opinion that we should watch this situation carefully because our agreement with O'Neill has expired and O'Neill could, if he wished, invade the States with his new machine. Mr. Barnard is also of the opinion that O'Neill might agree to stay out of the States and make some agreement with us about his machine if we would make available to him our information and experience relating to suction machines for exploitation in Europe and in South America."

During the period between the consummation of the 1924 agreement with Hartford and the merger with the Illinois Glass Company in 1929, the Owens Company consistently refused to sell or license the suction machine to newcomers in the industry, and since the merger of the Owens and the Illinois Glass Company in 1929, thereby forming the present Owens-Illinois Company, its attitude has remained the

same, thereby following the policy of Hartford in denying new capital the opportunity of increasing competition in the industry. For example, the record discloses two instances of this in the year 1934, exhibits 876, 875, 877 and 874.

Owens contends that anyone is free to manufacture and use the suction machine, because the original patents have expired, but that no one except Owens is interested in that machine, primarily because the cost of manufacture and installation is so great as to preclude anyone but the largest of manufacturers, such as Owens, to make use of it. This, however, is not in accord with the evidence, which shows that it is impossible for anyone to obtain a modern suction machine because of the improvement patents that Owens has taken out or purchased. Thus, while it is true perhaps that anyone can manufacture and use the identical and original suction machine, it is equally true that no one can obtain anything like a modern model.

Exhibit 388, a memorandum by H. K. Smith of Hartford, dated February 18, 1930, contains the following statement:

"The Owens basic patents expired several years ago. Nobody, however, dare use the present type of Owens machine because of improvements covered by minor patents."

We are considerably fortified in the belief that improvements have been made on the original suction machine, and that these improvements that modernize the machine are not available to the public, by a reference to page 209–210 of the brief for the defendant Owens-Illinois Company, which reads as follows: "These events did not transpire as a bolt from the blue in 1935, but they were long planned and the stage was set for them over a period of several years by Owens' development and improvement of its suction machines and by its securing immunity from other companies, so that it would not be disturbed in the enjoyment of its improved suction machines."

It is the contention of the Owens-Illinois Company that the suction machine is not desired because it is suitable only for certain types of ware and for long runs thereon, and because the original cost of installation is heavy. This, however, is an argument that the court cannot accept. Owens itself uses the suction machine for over 80% of its total production of glassware.

It is true that Owens is the largest manufacturer of glassware in the industry, but there are other companies of considerable size and it does not seem plausible that Owens would be the only one capable of using the suction machine to advantage.

### The Conspiracy as Related to Forming Machines.

We have seen that it was Hartford's intention from the very beginning to obtain control of the gob feed art. In addition, it had the further purpose of making everyone in the industry apply to it for all glass making equipment. This embodied what the record frequently discloses was an ambition upon the part of W. E. Levis of the Owens-Illinois Company to establish a unit system, whereby the controlling company, Hartford, would be able, eventually, to supply a glass manufacturing concern with all the automatic machinery required for the manufacture of glass, to wit, the furnace, feeder, forming machine, stacker and lehr, all to be leased upon a single royalty basis. In this way, Hartford's grip on the industry would be stronger, its income from royalties greater, and its control of the industry perpetuated. The income of Owens, sharing in a division of the royalties received by Hartford, would be increased, and its goal of complete stabilization of the industry could be more readily and effectively maintained.

The next largest item of automatic equipment in the forwarding of this plan was the forming machine, a machine which contains the molds into which the feeder feeds the original gob of molten glass, and which then forms the gob into the desired bottle or container.

Hartford purchased the Sears and Lobb applications for forming machine patents in 1925. About the same time that these applications were purchased, Hartford and Owens, acting jointly, took an option on the Headley & Thompson forming machine applications, paying a considerable sum of money therefor during the next several years, finally exercising the option in 1933. The Headley & Thompson forming machine devices were looked upon by Hartford and Owens as having claims which, if allowed by the Patent Office, might dominate all existing applications and patents relating to forming machines.

In May of 1933, Hartford acquired the forming machine rights of the Knox-

O'Neill Company at a cost of an annuity to F. J. O'Neill of $10,000 per year for ten years.

During the same year, in August, an agreement was worked out with the Lynch Corporation, a defendant herein, which was engaged in the manufacture and sale of forming machines for narrow neck glassware under its own patents.

At the same time that this agreement was concluded between Hartford and Lynch, the Ed. Miller Company of Columbus, Ohio, which was engaged in the manufacture of forming machines for wide mouth glassware, together with all of its equipment and the patents that it claimed or possessed, was acquired by the Lynch Corporation through the contribution of $125,000 each by Hartford and Owens and the purchase of $200,000 of the Lynch stock with money supplied through W. E. Levis of Owens.

The consummation of these purchases and agreements substantially put an end to all opposition and competition in the glass forming machine business.

It is clear from the evidence that Hartford had the intention of extending its monopoly to include the entire chain of automatic equipment in the process of glass manufacture with the ultimate goal of obtaining a more complete domination of the industry.

It is equally clear that Owens, acting in accordance with its 1924 agreement with Hartford and its conduct and commitments during the years following, assisted Hartford in attaining its ambitions through equal financial contributions toward purchases, through the sharing of expenses of litigation, and through the operation and co-operation of their respective legal staffs. The positions occupied by the officers of each of these companies in the industry, as well as the financial strength of the companies, added imposing strength to the consummation of any proposed acquisition, merger, litigation or agreements that the two companies essayed to accomplish.

The addition of Hazel-Atlas in 1932 to this combination of power added to the strength of these dominating companies and served to induce those glass manufacturing concerns that were still outside the influence of Hartford to apply for licenses without undue waste of time.

We will now turn to the exhibits which substantiate the foregoing conclusions.

Exhibit 388 is a memorandum prepared by H. K. Smith of Hartford, dated February 18, 1930. It reads in part as follows:

"Hartford has followed one definite policy, namely, that the future success of the Company could not rest on feeder income alone, but that the growth and asset position of the Company could only be insured by a development of methods and equipment applicable to the entire art of fabricating glass containers. Hartford has considered that the entire chain comprised the furnace link, the melting link, the feeding link, the forming link, the annealing link, with such auxiliary equipment as was applicable to each of these links, and that it would be a shortsighted policy to merely confine our efforts to the feeding link alone."

On July 15, 1924, F. Goodwin Smith stated the following with regard to the Headley & Thompson applications (Ex. 295): "If some kind of control of Forming machines can be obtained, it will be a distinct advantage to us as a licensing company and will practically put us into a position where any bottle manufacturer will be forced to come to us for his equipment."

The Headley & Thompson applications were controlled by the Whitall-Tatum Company, and are sometimes referred to as the Whitall-Tatum applications.

Of course, Hartford and Owens, later joined by Hazel-Atlas, had the desire to obtain a monopoly of forming machine patents as a means of increasing income and control over the industry. This intention is shown by some of the exhibits. Exhibit 296 is a memorandum by H. W. Carter of Owens relating to the Headley & Thompson applications, dated July 22, 1924:

"As forming a possible basis for a considerable degree of control of the forming machine field, therefore, it would seem that these Headley & Thompson applications have a considerable value on the constructive side, in addition to their nuisance value, and this without admitting the extravagant claims for these applications by Headley & Thompson's attorneys. * * *

"The fact at least seems to be clear that if the forming machine field (as a whole, outside of the Owens suction machine development) is ever subjected to any considerable degree of patent control, it must be through these Headley & Thompson applications. There are no other pat-

ents apparently which afford any considerable promise in this direction. And under these circumstances, a broad patent policy would seem to dictate standing in with Headley & Thompson with a view to developing that control, if possible, rather than entering into a fight with them, which can only result in breaking down any possible control and throwing the field open to whatever extent the contest was successful.

"The only thing apparently now standing between the issue of the Headley & Thompson patents, with substantial claims, appears to be the opposition at present offered by Owens and Hartford, through pending and possible interferences. If this opposition were withdrawn, it is believed that these patents could be issued at a very early date, and with claims which would in all probability be greatly improved by the cooperation of our experts, and might prove controlling."

Exhibit 591 is a letter from V. M. Dorsey to F. Goodwin Smith, dated October 27, 1924, as follows:

"1. In the summer of 1922 while the fight with Owens was being vigorously prosecuted, it was suggested that the Hartford-Empire Company stood in danger arising out of the possibility that the Owens Company, if properly advised, might acquire control of the O'Neill and Lynch machines and thus obtain control of the only two then manufacturers who are putting out forming machines capable of use with our feeders.

"2. It was at least in part to avoid this possibility that we started the development of our own I. S. machine with a hope that we would be in a position to put this machine on the market before the contingency above indicated arose. It was recognized then that in entering the former game we were not in as good a position as we were in the feeder game due to our late entry into the field and that our course might be made more or less difficult by patents belonging to our adversaries. * * *

"4. Possible issuance of the Headley & Thompson application will result in exactly what we were afraid of two years ago, namely, a control by some one else of formers suitable for use with our feeders.

"5. * * * b. Relieve us if the Whitall-Tatum claims by any chance are held dominant to cover formers necessary to be used with gob feeding, of being in a position to be forced to share the monopoly in gob feeding with Whitall-Tatum and with the resultant demand by Whitall-Tatum that in such event they obtain half or more of the profits of such game.

"c. Give us the benefit of profit from such monopoly as may result from the Headley & Thompson patent, both to increase our revenue and to strengthen our hold on the monopoly of the gob feeding game. * * *

"12. * * * I found however from Mr. Belknap that the Owens Company were more concerned in obtaining the benefit of any monopoly that might result from Headley & Thompson than in securing the right to continue the economical use of the gob feeders."

Under date of October 27, 1924, W. H. Honiss, R. D. Brown, R. F. Hatch and K. E. Peiler, all of Hartford, joined in a memorandum which reads in part as follows (Ex. 300):

"That our control of the feeder monopoly has not yet advanced to a point where we can expect to effectively hamper Whitall-Tatum's use of feeders in the immediate future. If our feeder control were perfected, we should recommend that no offer whatever be made to Whitall-Tatum. But until we have such feeder control, it is unsafe to dismiss lightly the chances, however slight, that Whitall-Tatum may obtain a strangle hold upon the forming-machine industry. * * *

"If, however, a deal can be made with Whitall-Tatum involving an expense to Hartford commensurate with what we would otherwise have to spend in fighting them, and if such a deal gives us insurance against molestation by them during the next few years, together with a chance to share in any monopoly which, contrary to our expectations, Whitall-Tatum may obtain, then we recommend that such a deal be made."

On May 20, 1925, H. K. Smith wrote to L. T. Williams that W. J. Belknap, counsel for Owens (Ex. 1749): "has suggested, I understand, for our consideration here, the possibility of some arrangement with the Miller Engineering Company and W. J. Miller, the Lynch Glass Machinery Company and the O'Neill Company. This arrangement would look to some sort of an elimination of the patent disputes, but

mainly, I think, toward a combination into single control of the Miller, Lynch and O'Neill forming machine businesses."

Exhibit 304 is a memorandum from R. D. Brown to F. Goodwin Smith, both of Hartford, dated October 24, 1927:

"W. J. Belknap has proposed that we approach Lynch with the proposal that he withdraw from interference with Headley & Thompson, take a license at a reasonable royalty, and agree to put out his forming machines only with feeders supplied by Hartford.

"This would make it necessary to give Lynch something by way of consideration. Such consideration might be a payment of money or an agreement to furnish feeders with his machines, or both.

"Advantages. This scheme would seem off-hand to have the following advantages:

"1. Headley & Thompson's claims would be strengthened and the issue of the Headley & Thompson patents would be very much hastened.

"2. Hartford would have somewhat of a hold upon the narrowneck forming machine situation, beyond what may possibly be obtained through the Headley & Thompson claims.

"3. Lynch would get the protection of the Headley & Thompson claims, and might be able to suppress competition."

In 1932, A. T. Safford of Hartford wrote to F. Goodwin Smith his reasons for continuing the option on Headley & Thompson (Ex. 1779):

"2. Forming Machine 'Trust'. Particularly in the minds of the Owens people there is a picture of a possible combination of all the forming machine interests. Regardless of what Hartford sees in this, it is a possibility and in case it took place the H & T applications would assume a necessary and important place. They would act as an effective club in making the deal probable, and would constitute a guise for making the combination lawful."

He further stated as a reason for the surrender of the option the "Anti-Trust danger—aggregation of too many patents and licenses." And he stated as a reason against the surrender of the option the "Value in event of Forming machine combination."

It appears that Owens in particular was not interested in patent values in making these forming machine deals. This is il-

lustrated by a letter written by H. W. Carter to W. H. Boshart, both of Owens, dated September 10, 1925, referring to the purchase of the O'Neill forming machine business: "On the contrary, the showing, as a whole, is rather against him, and leads us to believe that the decision as to the purchase, must rest on commercial (business) considerations, without much regard to questions of patent value. Insofar as we understand these considerations, we are inclined to favor the purchase, if it can safely be made."

Exhibit 1002 is a letter from F. Goodwin Smith to the Lynch Corporation, dated February 9, 1931, as follows: "We feel that such a conference might readily lead to an arrangement which would not only favor the continuance of the friendly relations existing between your company and our company, but that a position might be created which would more fully protect us both against outside competition."

Exhibit 1750 is a letter dated June 16, 1933, from F. Goodwin Smith of Hartford to C. B. Belknap of Owens. It reads in part as follows: "I want to have Bill Levis feel that we are seriously interested in the BIG program, that we will not procrastinate about it, but I can see where it will be absolutely necessary for us to take more time than he will think necessary."

Exhibit 278 is a memorandum from R. D. Brown to F. Goodwin Smith, dated May 6, 1933, in which the writer reported a conversation he had had with C. B. Belknap, vice-president of Owens:

"C. B. Belknap tells me this morning that he talked with Levis about sharing the cost of purchasing the Headley & Thompson application.

"Mr. Levis is willing to share this expense with us provided the purchase constitutes a part of the general scheme which Mr. Levis has been discussing with you. I am not entirely clear whether this means merely the forming machine pool or includes the matter of unit royalty."

Exhibit 165 is a letter from F. Goodwin Smith to A. D. Falck of Corning, dated June 30, 1933, setting forth a statement made by W. E. Levis at a conference attended by the writer, Levis and J. H. McNash, president of Hazel-Atlas: "Levis then made quite a dissertation on the Unit Plan which he thought could legitimately follow the acquisition of the Whitall-Tatum patents as well as some understand-

ing with Lynch and the Miller Machine & Mold Works, and made four suggestions, as per the enclosed memorandum."

Exhibit H-6048 is a memorandum prepared by R. D. Brown of Hartford and directed to F. Goodwin Smith of Hartford relative to a conference held on July 8, 1933, with Lynch representatives, looking to an agreement with the latter company. He says in part the following:

"1. All parties agree that it is desirable to corner the forming machine business.

"2. The Lynch Corp. is willing to co-operate if they can get a reasonable break assuring them of a future volume of business.

"3. The Lynch Corp. does not consider a mere patent situation sufficient to justify holding down its business to Hartford licensees, because Lynch can fight patent interferences and suits for years, do business in the meantime, and hope that during the fighting period somebody will get up a feeder that is free of Hartford's patents.

"4. Lynch has made connections assuring financial support for future fights, both in the way of money support and a contribution of legal talent. Mr. Bridges added to this statement that Owens must also be in the deal so as to give Lynch the right to build their machine parts. The Lynch people prefer to have a straight license limiting the Lynch Corp. to selling machines to Hartford licensees rather than an arrangement by which they can sell to anyone, but must impose a production royalty on licensees who are not Hartford licensees. This arrangement is preferred on account of some deal they have with a concern not licensed by Hartford under which that concern is to have Lynch's best terms in the purchase of Lynch machines."

On July 17, 1933, A. T. Safford of Hartford, in commenting on the proposed agreement with Lynch, together with the purchase of the Ed. Miller Company by Lynch, stated (Ex. 320):

"Reasons for the plan are as follows:

"(1) It will prevent extra capacity being put into the glass industry.

"(2) Lynch being unwilling to furnish formers it will take away from them"—non-licensees—"the incentive to build feeders.

"(3) It will also have the effect of taking from other persons the incentive to build feeders that might be used with Lynch machines.

"(4) To deal with Lynch in this fashion may rid ourselves of a difficult situation with Levis. * * *

"(6) The former patent situation will be considerably stabilized."

Exhibit 319 is a memorandum, dated July 17, 1933, from the Hartford files, relating to the proposed deal with Owens. It reads in part as follows: "As far as forming machines are concerned, a guarantee against new glass companies entering the field."

Exhibit HA-5085 is a letter written by W. E. Levis to J. H. McNash, dated July 27, 1933: "I think that we have made progress in connection with the Miller, Lynch, Headley-Thompson situation, and as you know, I am particularly anxious to get this matter converted into the so-called 'Unit Plan' before the extension of the Miller option expires in August. I think it is unreasonable for us to proceed to make the large payments that we have to make in the Miller-Lynch deal and for Hartford to spend the fund required for the acquisition of Headley-Thompson unless we have straightened out our differences with you that permit settling the remaining infringement cases with manufacturers who are not Hartford licensees."

In a communication from C. B. Belknap to W. E. Levis, vice-president and president, respectively, of Owens, dated October 9, 1933, is stated the following (Ex. 745):

"The forming machine situation in the U. S. has been very badly involved, owing to the overlapping patents of the Hartford-Empire Company, the Lynch Corporation, and the O'Neill Machine Company. * * *

"In order to round out the forming machine situation, the Lynch Corporation purchased the Miller Machine and Mold Works and also took a license from Hartford whereby the users of Hartford-Empire's feeder equipment could have the use of the Lynch and Miller forming machines without the payment of additional royalties. Such an arrangement not only removes the possibility of complicated litigation relating to forming machines, but it brings together into one hand the licensing of feeder and forming machines. I believe this straightening out of the forming machine situation is one of the most important advances made in the industry,

and it is a long step towards a unit system of licensing whereby Hartford-Empire can furnish the manufacturer with a complete outfit from furnace to stacker at the cost of a single license fee."

Exhibit 278 is a communication by R. D. Brown to F. Goodwin Smith, both of Hartford, dated May 6, 1933, concerning the purchase of the Headley & Thompson applications:

"Mr. Levis is willing to share this expense with us provided the purchase constitutes a part of the general scheme which Mr. Levis has been discussing with you. I am not entirely clear whether this means merely the forming machine pool or includes the matter of unit royalty.

"If Owens joins in purchasing Headley & Thompson, they want to avoid contributing directly to the purchase, but prefer to arrange it somehow as we are arranging our contribution to the O'Neill purchase. C. B's suggestion is that they pay their half of the purchase price for whatever suction rights there may be in Headley & Thompson, or if this does not look plausible enough because there are no Headley & Thompson suction rights, then he suggests that Owens buy something or other in the way of suction from us."

Exhibit 745 was written by C. B. Belknap of Owens to W. E. Levis on October 9, 1933: "Such an arrangement not only removes the possibility of complicated litigation relating to forming machines, but it brings together in one hand the licensing of feeding and forming machines."

Exhibit 1216 is a communication by E. W. McCallister, attorney for Ball Brothers, to that company, dated August 19, 1933, and has reference to the O'Neill Machine Company: "From the foregoing you will see it is my opinion that Hartford-Empire Co. is trying to place itself in a position of collecting royalties on all apparatus used in a glass factory, and particularly in connection with feeders."

Exhibit 799 is an inter-office communication, dated September 25, 1933, by G. F. Rieman of the Anchor-Capstan Company, which reads in part as follows: "Have enclosed copies of letters from Lynch Corporation and Hartford-Empire both on the same subject. The letters tell their own story and if H-E has something fundamental and enforceable, so as to tie the Lynch machines up with H-E feeders,

it looks as if they will have a still greater hold on the industry than before. In fact, this would constitute as complete a monopoly as could be possible in an industry because there are no other substantial outfits to buy or license machinery from."

The agreements entered into between Hartford, Owens and Lynch, on August 23, 1933, provided that Hartford and Owens were each to pay $125,000 to Lynch. Lynch was to purchase the assets of the Ed. Miller forming machine business in Columbus and needed $200,000 additional. This was supplied through the underwriting by W. E. Levis and Harry E. Collin of a sale of Lynch stock. Actually, the assets of the Miller Company were purchased by Lynch two days before the Hartford-Lynch agreement, to wit, on August 21, 1933. The Miller Company also owned some feeder rights and these were transferred to Hartford. Owens received an exclusive license on all Lynch suction inventions, probably including some received from the Ed. Miller Company.

Lynch granted Hartford a non-exclusive license to make and sell forming machines embodying Lynch inventions. Hartford granted Lynch a non-exclusive license to make and sell forming machines embodying Hartford inventions to any person or concern that had obtained from Hartford a license under Hartford forming machine inventions to use such forming machines. This, of course, meant that Lynch could sell no narrow neck forming machines that it manufactured to any person that had not obtained a license from Hartford to use such forming machines, because Lynch conceded that the Headley & Thompson applications covered their own—Lynch's—inventions, and Hartford now owned Headley & Thompson and had dominance over Lynch. The only possible forming machine that Lynch could make and sell without the necessity of a Hartford forming machine license was the wide mouth forming machine that it acquired the right to manufacture through the purchase of the Ed. Miller Company. The agreement also provided that Hartford was to pay Lynch $3,000 per machine in excess of those having an aggregate production capacity greater than 40% of the production capacity of all forming machines delivered by both Hartford and Lynch.

The agreement is not specific as to whether Lynch had the right to sell forming machines for use with a feeder not

licensed by Hartford, but the facts are that Lynch has never sold a forming machine since this agreement to be used with a feeder not licensed by Hartford, and Lynch so informed prospective customers.

The Lynch company adhered strictly to the agreement after its consummation. The record is full of instances where manufacturers of glassware, in applying to Lynch for forming machines, were forced first to obtain a license from Hartford. The purchaser was required by Hartford to pay the same royalty rates on a forming machine as were charged on a feeder, except that if the licensee was already paying royalties on the feeder, then no forming machine royalty was charged.

The agreement of August 23, 1933, between Hartford and Lynch, and the conduct of the parties thereafter in living up to this agreement, was in violation of Section 3 of the Clayton Act, as well as a part of the general conspiracy in violation of the Sherman Act.

Assuming that manufacturing Company A, using its own feeders or the feeders of some independent manufacturer, desired to purchase a Lynch forming machine, and this appeared to be the only concern that a manufacturer could turn to for the purpose of purchasing a forming machine; then Company A would have to contract with Hartford for a feeder to operate with the forming machine. When it accepted a forming machine license from Hartford covering the Lynch forming machines, it had to use a Hartford feeder, or pay excessive royalties on the forming machine. This constituted the lease of a feeder machine on the condition that the lessee shall not use the feeders of a competitor of the lessor. Lynch, as a party to this agreement, was equally in violation of Section 3 of the Clayton Act. This entire procedure, involving the so-called "corner" of the forming machine business, when viewed in the light of the Anti-trust laws, is indefensible from any angle.

### The Conspiracy as Related to Lehrs.

We have seen how Hartford's goal was the control and domination of the entire link of automatic machinery used in the gob feed process, and we have covered the feeder and forming machine links. We now come to the third link—the annealing lehr. Sometime around 1925, the Hartford company began a system of licensing and leasing annealing lehrs under restrictive licenses in much the same manner that it had theretofore followed in the licensing and leasing of feeder machines. The Amsler-Morton Company had been engaged in manufacturing and selling annealing lehrs since the year 1915, and it developed as Hartford's chief competitor as the latter engaged more extensively in the business of manufacturing lehrs following 1925. In 1928, Hartford notified Amsler-Morton that it claimed an infringement of Hartford's patents on lehrs. At a conference of the officials of both companies held in May, 1928, Hartford suggested that the two companies get together, that the Amsler-Morton Company increase its prices charged for lehrs from $9,500 to $13,500, and that Hartford would permit Amsler-Morton to build the lehrs if the difference, $4,000 on each lehr, would be paid to Hartford. Record, page 2278-9.

The Amsler-Morton officials refused to enter into such an agreement. Early in 1934 H. E. Collin, a broker in Toledo and a director of Owens, paid a visit to the Amsler-Morton Company and there stated, according to the uncontradicted testimony of Geer of the Amsler-Morton Company (Record, page 2281): "that he was a member of the company that combined the Owens Bottle Company and the Illinois Glass Company together, forming the Owens-Illinois Glass Company; and that he also was instrumental in combining his company—his company was—instrumental in combining the Lynch Glass Machinery, the Ed. Miller Company of Columbus, and the O'Neill Machine Company of Toledo.

"Mr. Collin suggested that we sell our glass business; he did not say to whom; but he made us an offer of $200,000 for the glass patents, and—well—to get out of the glass business."

A month or two later, Collin, accompanied by Frazier of Simplex Engineering Company, and B. F. Hazelton, Jr., a vice-president of Owens, paid another visit to the Amsler-Morton Company and suggested that the Amsler-Morton Company and the Simplex Engineering Company get together, and thereby put themselves in a position to build the Hartford lehrs.

Geer testified, Record pages 2286-7: "Hazelton * * * said as he was leaving: 'now, boys, we have made you a good proposition.' He said, 'If you take it, you are going to make some money.' He said, 'We will give you a month to think it over.' He said, 'But if you do not go on with us,

you are going to be sued, and continue to be sued until you are out of business.' He said, 'It is our plan that nobody in the glass industry is going to be allowed to own one piece of equipment.'"

In June, 1934, Hartford sued a user of one of Amsler-Morton's lehrs, the Swindell Company, for infringement of Hartford's patents and eventually Hartford prevailed in this suit. Since that date, Hartford has been substantially the only manufacturer of annealing lehrs for use in the glass industry and these are all furnished under the license and lease system.

### The Conspiracy as Related to Milk Bottles.

The Thatcher Manufacturing Company was one of the earliest exclusive licensees for the use of the Owens suction machine and it was confined to the manufacture of milk bottles.

In 1920, Thatcher acquired from the Hartford-Fairmont Company exclusive rights for the use of the Hartford equipment in the milk bottle field. This equipment covered both the feeder and a bottle forming machine for which Hartford had the patent rights. At about the same time that Thatcher acquired these rights from Hartford, it paid the sum of $1,637,000 for the assets of three companies that had theretofore been licensed by Hartford to manufacture milk bottles, to wit, the Essex Glass Company, the Travis Glass Company, and the Lockport Glass Company, and it acquired the license rights of the sole remaining licensee of the Hartford Company, to wit, the J. T. and A. Hamilton Company. At about the same time, the latter company, J. T. & A. Hamilton Company, agreed in consideration of the sum of $100,000 to limit the sale of its production of milk bottles in the future to Allegheny County, Pennsylvania.

Thatcher never received an exclusive license on the Hartford single feeder, but the record shows that Hartford felt morally bound not to license anyone to use the single feeder for the production of milk bottles without Thatcher's consent, and that Thatcher warned Hartford that it would consider this an unfriendly act.

Under a new general agreement of January 1, 1936, exhibit 248, Hartford continued to extend exclusive rights for the manufacture of milk bottles to Thatcher. In the centralization of the rights to manufacture milk bottles, the record indicates a cooperative effort upon the part of Hartford, Thatcher and Owens, the latter being engaged in the manufacture of milk bottles on its suction machines.

A policy of inducing all outsiders to come under the Hartford licensing system, and the acquisition by outright purchase of companies engaged in the manufacture of milk bottles, was persistently followed by Hartford, Thatcher and Owens. Out of 15 companies originally manufacturing milk bottles, 6 were purchased by Thatcher, 5 by Owens, and 4 were given limited licenses by Hartford.

On April 26, 1923, Hartford licensed Berney-Bond; in January, 1926, Buck and Winslow were given a restricted license by Hartford. In May, 1926, the Liberty Company took a Hartford license. Knox was licensed in August, 1932, Universal in September, 1932, Lamb in November, 1932, and Florida in August, 1935. The only remaining milk bottle producers, Atlantic Bottle Company and Peerless Glass Company, were respectively bought out by Owens in 1930 and Thatcher in 1934.

Exhibit 783 is a letter from W. E. Levis of Owens to R. H. Levis of the Illinois Glass Company, which at this time was merely an investment concern, dated August 2, 1932, in which we find the following: "With the plans we now have, there is certain to be a curtailment of the promiscuous manufacture of milk bottles on non-licensed feeders, which will result in our company's and the Thatcher Company's securing a greater proportion of the available milk bottle business. This should stabilize the price and increase the earnings of the Thatcher Company."

It was about this time that a substantial purchase of Thatcher stock was made by the Illinois Company, which was engaged solely in investments in the stock of glass manufacturing companies, and of which W. E. Levis was president.

Exhibit 787 is a letter from F. Goodwin Smith of Hartford to H. C. Mandeville of Thatcher, dated September 10, 1932, as follows:

"Will Levis has just telephoned me that you concur with him in the desirability of immediately getting Davis and Lamb into the fold under restricted conditions such as he mentioned. * * *

"I cannot see any quicker or better way for stabilization than what we have outlined."

In Exhibit 1161 from H. C. Mandeville of Thatcher to I. J. Collins of General, dated September 12, 1932, we find the following: "Underwood"—Knox Company—"has come into the fold and I understand Universal and Lamb will follow."

Knox was brought into the fold under an extremely limited license whereby it was granted the right to make 75,000 gross of milk bottles annually. In this connection, it is interesting to refer to exhibit 246, a letter from F. Goodwin Smith to Amory Houghton, president of Corning and also a director of Hartford, in February, 1934, which reads as follows: "The license we gave Knox on milk bottles was limited and was approved by Thatcher and Owens."

It appears that Thatcher, as a favored licensee following 1920, exerted a keen interest in limiting production of other licensees for the manufacture of milk bottles and in preventing other companies from obtaining a license to manufacture milk bottles.

Exhibit 1249 is a letter from F. Goodwin Smith, of Hartford, to H. C. Mandeville, of Thatcher, dated December 23, 1929, and reads in part as follows:

"This morning when I came to the office I found your letter of December 20th, and also a memorandum from the Accounting Department showing that the Buck Glass Company had exceeded their allotment of 52,000 gross.

"The Buck Glass Company have not obtained our permission to make this over-run, but I suppose they went ahead, feeling that we would not take any legal steps against them for a slight over-run."

To this Mandeville replied (Ex. 431): "Many thanks for your letter of 23rd December in respect of the Buck Glass Company. Their allotment as I understand it, was 52,000 gross. Please tell me how much they have exceeded their allotment. If it is a small amount I do not want to bother about it, but if it is a large amount I would like to devise some method of holding it down because it is hurting."

Here is an interesting example of how tight the lines were drawn, through the license and lease system, on the licensees of Hartford, in order to effectuate almost a complete control, even in the minutest detail, over the operations of glass manufacturing concerns.

Thatcher exerted its influence to prevent the Three Rivers Company from securing a Hartford license for the manufacture of milk bottles; and it operated in conjunction with Hartford in keeping newcomers out of the milk bottle industry. Exhibits 1247, 434, 435, 444, 471.

Exhibit 246 is a letter from F. Goodwin Smith of Hartford to Amory Houghton of Corning, dated February 17, 1934, reading as follows:

"We admit that the purchase of the Peerless plant was an advantage to the industry and did relieve us of a troublesome situation. However, if Mandeville had not bought Peerless, Bill Levis would have bought Peerless and there would have been no claim on the part of Owens. * *

"We have not been legally prohibited from licensing single feeders for milk bottles to anybody we saw fit, but during all these years we have protected Thatcher and Berney Bond and Buck by refusing to grant additional licenses for milks. This action on our part has stabilized the price situation and has been worth hundreds of thousands of dollars to Thatcher. It would have been a very simple thing for us to decentralize the production of milks throughout the country. * * *

"The only potential competitor which Mandeville now has who is not a licensee of Hartford, is Reed of Rochester, with a small yearly production of from twelve to fifteen thousand gross."

Reed is one of the four outsiders engaged in the manufacture of glassware that is now being sued by the Hartford-Empire Company.

Since 1935, Thatcher and Owens, as the leading manufacturers of milk bottles, Thatcher producing about 40% and Owens about 27%, have been in close cooperation. Substantial blocks of the stock of Thatcher were owned by the Illinois Glass Company until its recent dissolution. The latter company was owned and controlled by W. E. and R. H. Levis and members of their families. When W. H. Mandeville was elected to the board of Thatcher, he was requested by W. E. Levis "to represent our stock interest on the board and keep in contact with us regarding the situation, which he has agreed to do." (Ex. 834). W. H. Mandeville is still on the board of Thatcher.

From 1930 to 1938, Thatcher and Owens have manufactured from 65 to 70% of all milk bottles produced in the United States. All other producers of milk bottles, with

the exception of the Reed Company, are licensees of Hartford.

This close control of the milk bottle production in the United States, and the methods employed in attaining this control, due to agreements and understandings between Thatcher, Owens and Hartford, are clearly in violation of the anti-trust laws.

The Conspiracy as Related to Fruit Jars.

In the early years when it was the policy of Owens to extend exclusive licenses for the use of its suction machine to certain manufacturers, it licensed Ball Brothers for the exclusive use of the machine in making domestic fruit jars. This license finally expired in 1933.

As early as 1926, Ball Brothers and Hartford entered into negotiations looking toward the license from the latter to Ball Brothers for the use of the Hartford feeder. Ball Brothers insisted throughout that it have an exclusive license, or as nearly so as Hartford could extend, for the manufacture of fruit jars, in pursuance of a policy established under its exclusive license in former years for the use of the Owens suction machine.

In a memorandum written by H. K. Smith of Hartford and entitled "Ball Brothers", dated March 30, 1926, he says (Ex. 172):

"1. The discussion was mainly on the matter of an *exclusive* license. They seemed more interested in excluding others than in using our machines. * * *

"12. B says Owens practically promised to get them an exclusive on our feeders. We said we had never agreed to give B anything more than a non-exclusive and could not have done so, in view of our contracts."

In line with the aims of Ball Brothers to exclude others, as disclosed in the above memorandum, it is interesting to note from the record that in 1925 Ball Brothers paid upwards of $5,000,000 for the purchase of the Schram Glass Company, which engaged in the manufacture of fruit jars and owned certain glassware patents; that the Schram concern was the owner of three factories, and that since its purchase none of these factories have ever been operated by Ball Brothers. In 1929, Ball purchased the fruit jar business of the Pine Glass Company for $872,400 and since that date this company's plant has been closed.

The record discloses that it was the ambition of Ball Brothers to become and remain as exclusive in the manufacture of fruit jars as it could possibly be made.

After the conclusion of the Hartford, Owens and Hazel-Atlas agreements of 1932, all of these companies were anxious that the Hartford company should license Ball Brothers and that the latter should accept a license from Hartford, Ball Brothers being the largest manufacturer of fruit jars in the United States. The royalties flowing from such a license to Hartford would be considerable and Owens and Hazel-Atlas would share in these royalties. Owens and Hazel-Atlas under their licenses from Hartford had fruit jar rights and hence could place themselves in a position of collecting royalties from their chief rival in the fruit jar business, Ball Brothers, without the knowledge of the latter, and thus obtain a competitive advantage over that company.

Exhibit 783 is a letter from W. E. Levis of Owens to R. H. Levis of the Illinois Glass Company, dated August 2, 1932, and reads in part as follows:

"As I see the situation now, it appears that we are on the eve of straightening out the Hartford patent situation. * * * The only important manufacturers who remain out of Hartford's licensing plan are Ball Brothers and the Root Glass Company. We are negotiating with both of these companies and I am quite confident that they will come in if all of the other feeder operators come in, if for no other reason than to protect fruit jar licensing, as well as to curtail the licensing of beverage bottle manufacturers."

Exhibit 181 is a letter from F. Goodwin Smith of Hartford to F. C. Ball, dated December 22, 1932, and in this the writer states that his company is continually declining new business in fruit jars in the belief that an association with Ball Brothers would be preferred, and he says,

"The easiest thing we could do would be to license Kerr, Brockway, Underwood, Monaca, and five or six more concerns in the East and South, as well as on the Coast. Our troubles would then be at an end, for income would commence to flow into Hartford, and every once in a while I am almost inclined to believe that this is what we should do.

"On the other hand, it seems rather a pity to disrupt the existing general fruit jar situation which, barring a few soft

points, is pretty well in hand and affords a reasonable margin of profit."

Here is the owner of basic feeder patents who, with other patents on feeders that have been acquired, has complete control of the gob feeding process in the manufacture of glass, referring to turning down a flow of income by way of royalties through the licensing of a number of glass manufacturing concerns in order to keep the fruit jar business pretty well in hand, and afford to the licensees enjoying such a privilege a reasonable margin of profit. The reasonable rewards that a patentee might be entitled to, including royalties that may flow in as a result of a policy of licensing the use of machinery rather than an outright sale thereof, are scorned by the licensor so that restrictive licenses may be issued for the obvious purpose of extending and maintaining a control over an unpatented article produced on the patented machine.

At the time that negotiations were being pressed by Hartford, with the aid of Owens and Hazel-Atlas, to secure the acquiescence of Ball Brothers to the Hartford licensing system, Hartford had outstanding an unlimited license to the General Glass Corporation to manufacture fruit jars, and a limited license to Gayner. Owens and Hazel-Atlas had unlimited licenses and the Brockway and Knox companies were manufacturing fruit jars on unlicensed equipment.

In order to clear the path for a residual license to Ball Brothers and give that company the most that it lay within the power of Hartford to extend, steps were taken to limit the prospective competitors of Ball Brothers in the manufacture of fruit jars. Through the cooperation of W. E. Levis of Owens and J. H. McNash of Hazel-Atlas, General Glass surrendered its license to manufacture fruit jars for the sum of $100,000.

Under date of October 10, 1932, F. Goodwin Smith of Hartford wrote to I. J. Collins of General Glass Company in part as follows (Ex. 178):

"All negotiations, however, depend upon two factors,—first, that we will not license others on fruit jars for domestic household trade, and second, that General Glass will cancel their right to make fruit jars for the domestic household trade. * * *

"I told them I thought you would be entirely willing to fulfill your promise to Messrs. Levis and McNash made at White Sulphur Springs, namely, that General Glass would cancel their right. * * *

"In talking with Will Levis this morning about the situation he told me that he was going to take the matter up with you by telephone as he felt it was most necessary that Ball Bros. become a licensee and that it would be suicidal to put up any barriers which would mean that Ball Bros. were on the outside and had to be dealt with in an unfriendly rather than a co-operative and friendly way. * * *

"As I see it the commercial considerations for the policies which we are trying to carry out are far more important than the question of a few rights here and a few rights there."

After the surrender of the General Glass fruit jar rights, Ball Brothers took a license from Hartford.

Ball Brothers then proceeded to purchase the fruit jar business of Knox, the negotiations being had with R. Underwood of the Knox Company. Ball Brothers paid the sum of $100,000 to Knox and Hartford cancelled $44,000 of note obligations owing by Knox to Hartford.

Ball Brothers then purchased Brockway's fruit jar business for the sum of $54,000, and the latter company took a license from Hartford.

In the purchase of the fruit jar rights of both Knox and Brockway by Ball Brothers, these two companies were required in the agreements to remain out of the fruit jar business for a period of·fifteen years.

Before Ball Brothers took its license from Hartford, there were considerable negotiations had between Hartford, Owens and Hazel-Atlas with Ball Brothers concerning the unlimited rights of Owens and Hazel-Atlas to make fruit jars under Hartford license. Ball Brothers insisted that Owens be limited to 100,000 gross annually and that Hazel-Atlas be limited to 300,000 gross annually. The record indicates that Ball Brothers were advised by their attorney that such an arrangement would be illegal, and it was thereupon decided that the written agreements would contain no such provisions.

The Government alleges that the parties had an oral agreement or understanding that Owens and Hazel-Atlas would not exceed 100,000 gross and 300,000 gross respectively during any one year. This is denied by the parties involved.

In exhibit 189, a letter from H. W. Carter to C. B. Belknap, both of Owens, dated February 1, 1933, the writer states that, "we see no reason why there should be any amendment of our General License Agreement with Hartford, believing it would be more advisable to simply have a side agreement by which O-I agreed to limit its fruit jar production under its Hartford license 'if and when and so long as' the above mentioned conditions exist.

"Naturally, perhaps, this will raise the question as to whether the limitation so expressed would not be in contravention of the anti-trust statutes, but on this point, Mr. Naylor suggests that the proposed side agreement make no mention of Ball Brothers, but that it simply be not signed up until as a simultaneous action with the signing up of the Ball license, and that it be phrased to continue so' long as Hartford licensees make and pay royalty on a certain minimum gross of fruit jars yearly."

Exhibit 191 is a memorandum of a conference held in New York City on February 2, 3, and 4, 1933, between Hartford, Ball Brothers, Hazel-Atlas and Owens, and is prepared by J. H. McNash of the Hazel-Atlas Company. He says, in part,

"I told Mr. F. C. and G. A. Ball it was not necessary to have these modifications in the contract as far as I was concerned, if they, (Messrs. F. C. and G. A.), would permit me to tell my story to Mr. F. Goodwin Smith in their presence, inasmuch as he would have to be the umpire under the licensing arrangement, and for them to see whether my statement was correct or not.

"Mr. F. Goodwin Smith came into the room. I presented my story as outlined. * * *

"Messrs, F. C. and G. A. Ball confirmed my understanding in Mr. F. Goodwin Smith's presence,—and I am asking Mr. F. Goodwin Smith to make a record of this, certify to it, to be in his files as a part of the atmosphere, at least of this Ball situation,—so that anyone following Mr. F. Goodwin Smith will know just how the situation is to be handled."

It is significant to note that prior to the year 1933 both Owens and Hazel-Atlas had at times exceeded the respective annual gross output of 100,000 and 300,000 and in some of the years they substantially exceeded these figures. Since the agreement between Ball Brothers and Hartford of March 25, 1933, and the licensing of the former company by the latter, the Owens Company has never exceeded an output of 100,000 gross of fruit jars in any one year save one when there was a very slight overplus, and the Hazel-Atlas Company has never exceeded an output of 300,000 gross of fruit jars in any one year.

All of this leads the court to the conclusion that, despite certain testimony in the record to the effect that no gentlemen's agreement exists for the limitation of the Owens and Hazel-Atlas companies, and that fear of the anti-trust laws restrained the parties from entering such a limitation in the written agreement, such an understanding does exist and is adhered to by the four companies involved in the entire transaction.

As a result of the early acquisition of the Schram and Pine Glass companies, the acquisition of the fruit jar business of Knox and Brockway, and the elimination of General in 1933, together with the limitations on fruit jar output on Owens and Hazel-Atlas, Ball Brothers has placed itself in a position of almost complete dominance in the manufacture of glass fruit jars and is left without any appreciable active competition.

The record shows that Ball Brothers produces over 54% of the fruit jar business of the country; that, while Owens and Hazel-Atlas had produced about 29% prior to 1933, since 1933 they have produced only about 24%; that substantially all of the balance, upwards of 20%, is produced by the Kerr Glass Company, one of the four manufacturing concerns in the United States that remain unlicensed by the Hartford-Empire Company. As previously pointed out, this situation is due to the fact that the Kerr Company manufactures through an old stream feed process on which the patents have expired.

The record is replete with instances, after the consummation of the 1933 agreement, wherein Ball Brothers complained to Hartford whenever it received information that some little manufacturing concern was cutting prices or was manufacturing fruit jars or was behaving in some manner detrimental to the interests of Ball Brothers, and which the latter felt that the Hartford-Empire Company, through the sanctions of its licensing

system, could ameliorate. The record also indicates the cooperative efforts of Hartford in an effort to eliminate these unfavorable conditions complained of by Ball Brothers.

█ These combinations and agreements eliminating competition in the fruit jar business and establishing the dominance of Ball Brothers in this particular phase of the industry through the use of the Hartford restrictive licensing system constructed on an unlawful conspiracy are contrary to the inhibitions of the anti-trust laws.

### The Conspiracy as Related to Glass Container Association.

Paragraph 170 of the complaint alleges that, "In 1919 the defendant Glass Container Association was organized as a trade association for the glass-container industry for the purpose of compiling technical information, publicizing the industry, aiding in the improvement and quality of glass and influencing legislation for the industry * * * since 1928 it has been managed by Charles R. Stevenson * * * and Emory G. Ackerman."

Paragraph 172 of the complaint alleges that, "Prior to 1928 the Association's activities were limited to the collection and dissemination of statistical data, and the issuance of advertising matter regarding the use of glass. Since 1928 the Association, under the active guidance and direction of defendants * * * Stevenson and Ackerman, has also been responsible for fixing production quotas for the industry, and the members thereof."

Paragraph 174 of the complaint alleges that, "From time to time the Association, at the request of Hartford (not a member of the Association) and Owens, has dissuaded new firms from entering the glass-container industry."

Other charges are made against the Association, including a charge of joining in the conspiracy to fix prices in the glass container industry, which the court feels that it is unnecessary to discuss here.

The Association admits that it published production quotas to its members, but insists that this was done in cooperation with the NRA during its existence and that it merely continued the publication of those quotas after the discontinuance of NRA; that for some time past and since the complaint herein was filed, it has discontinued this practice of publication of quotas. The Association further denies that it participated in the alleged general conspiracy or that it has from time to time dissuaded new firms from entering the industry.

Since 1925, the record shows that the Association has maintained a so-called "Statistical Committee" (exhibit 1714), which is a committee composed of seven of the leading figures in the glass container industry, most of whom are officers of the defendant corporations.

The cooperative efforts of the Association under its present management, operating in conjunction with the officers of Hartford in pursuance of the policy of that company, have followed a plan of discouraging all newcomers from entering the industry and have been of considerable assistance to the officers of Hartford in maintaining its policy of refusing to admit newcomers to the industry.

At page 5058 of the record, E. G. Ackerman, of the Association, in testifying, said: "I have heard Mr. Stevenson announce many times his theory of 'live and let live,' and that there was only so much business to be secured in the industry, and that should be divided among members in the industry on some kind of equitable basis, if they could all stay in the industry and exist."

In Exhibit 476, which is a letter from A. M. Pease of Hartford to Ackerman, dated January 14, 1933, we find the following:

"From time to time we have inquiries for equipment in connection with establishing new glass plants. Needless to say, due to the over-crowded condition existing in the industry today, we are reluctant, and, in fact, refuse to license new tonnage.

"It occurs to me that your Association is in a position to do some good work along the lines of discouraging new interests from entering the glass business. * * *

"Generally speaking, we answer all inquiries for our equipment by telling them of the serious over-production, not only in actual operation but the potential production that is at this moment lying idle, and caution them, before they invest any money in the glass venture, to take the matter up with the Glass Container Association and get their views and statistics on the glass industry as it exists today."

Exhibit 477 is Ackerman's reply:

"I was very much interested in your letter telling me of your activity with regards to new bottle companies coming into the industry. Your thoughts tie in very

closely with the thoughts we have had, and I have done a good deal of work during the last several years in an attempt to keep new plants out of the picture. I should be very glad to discuss with you the next time we get together so that our stories may fit together.

"I am enclosing a copy of a letter written a few days ago to a Charles I. Gause who apparently is attempting to revive the old factory out at Caney, Kansas. I should be very glad to have your comments on this letter, and any additional thoughts which you feel should be incorporated in a letter of this character."

At page 5011-12 of the record, Ackerman testified as follows:

"Q. * * * Now isn't it a fact, Mr. Ackerman, that the Association had as one of its functions to discourage new glass companies from entering the industry? A. The industry was greatly over-capacitated working 50 or 60 per cent of its capacity up until 1936.

"Q. Can't you answer yes or no, whether it was one of the functions; I will ask you the reasons later? A. Yes. We attempted to give all newcomers the facts in the industry in hopes they would be discouraged in going into the industry."

And at pages 5027-8 of the record, he further testified:

"Q. As a matter of fact, you were interested in keeping people out of the industry, instead of being interested in people coming into the industry; is that not true? A. I don't know. That letter "—referring to exhibit 1373, a letter from Ackerman to Eldred of Hartford dated June 1, 1933, having reference to a letter of inquiry from an applicant who was desirous of entering the industry—" would indicate that I was interested in keeping them out, because we already had too much production.

"Q. You were telling those interested— A. We did not need any more production.

"Q. I say, you were interested at all times in keeping them out, were you not? A. Yes, sir.

"Q. Then, in addition to the functions you have enumerated, you were interested in keeping people out of the industry? A. Yes, personally, I was. That was my job, to do anything that would be helpful to the industry."

And at page 5013 of the record, he testified:

"Q. But you say you never did discourage them? A. Wait a minute. I tried to define what we did. We tried to give the facts of the industry. The industry was over-capacitated. We did not need new production in the industry, and naturally I was trying to color those facts in a way they might be discouraged. That might be true. I do not think anyone can say I discouraged them other than relating to them the facts regarding the industry."

Exhibit 1377 is a letter from Ackerman to Roy Underwood, president of the Knox Company, dated February 5, 1934, as follows: "I shall be interested in watching the procedure, however, and if there is any danger we shall immediately oppose it the same as we are opposing other new glass bottle operations."

Exhibits 503, 504 and 509 are letters from Ackerman to Pease of Hartford along the same general lines of cooperation in the exclusion of newcomers to the industry.

As late as August 20, 1937, evidence is found that the Association was pursuing this same course. Exhibit 510 is a letter of that date written by Ackerman to the Sandy Valley Grocery Company, and in testifying concerning this exhibit we find the following by Ackerman at pages 5038–5040 of the record:

"Q. But you attempted to discourage them, did you not? A. I don't know whether I could say exactly attempted; I should like to discourage them, because the facts were so gloomy that I could not see how they were anything else but discouraging. * * *

"Q. You told us in 1936 the situation improved in the Glass Industry? A. Yes, sir.

"Q. Yet in 1937 you paint a gloomy picture, do you not, to the Sandy Valley Grocery Company? A. The fruit jar picture was gloomy in 1937; and still is a gloomy picture."

■ It appears to me that this consistent course followed by the Glass Container Association, in cooperation with Hartford in pursuit of a policy that it had rigidly maintained through the years, was such cooperation in the general conspiracy to restrain trade and commerce unreasonably in the glass container industry as to merit the condemnation of the court. We will see in the next section that this was an important part of the program of stabilization.

The record bears out the contention of the Government that long prior to the inauguration of NRA the Association followed a course of sending to its members monthly statistical reports (exhibits 600–606), containing forecasts of production for the whole industry, as well as for the recipient of the report. This policy was inaugurated in 1928. Exhibit 667 is a letter from H. W. Carter of Owens to R. M. Eldred of Hartford, dated August 9, 1929, and reads in part as follows:

"Mr. Levis wishes it to be understood that this company welcomes any reasonable competition and is anxious to avoid placing or maintaining any obstacles in the way of legitimate glass manufacturers. He is, however, in hopes that the Laurens Company will not fail to recognize the somewhat demoralized state of the industry under present conditions and that with manufacturing capacity so far in excess of present demands, increases in operation are likely to work out disastrously if not kept within the reasonable bounds suggested by the Glass Container Association."

There can be no doubt that the members of the Association, comprising substantially all of the glass container manufacturers in the United States, including, of course, the licensees of Hartford, paid heed to the quotas published for each of them by the Association.

Exhibit 432 is a letter by H. C. Mandeville, an officer and director of Thatcher and a member of the Glass Container Board of Directors and of the Statistical Committee of the Association, to F. Goodwin Smith of Hartford, referring to the Liberty Glass Company, dated December 30, 1929. It reads in part as follows: "Second, he is already making more bottles than his forecast justified. He is over his forecast and we are under. Since 1926 there has been, roughly, a 12% growth, or about 4% per year, and in that year we have only grown about 4% while the others have grown 10%."

Exhibit 419 is a letter from A. M. Pease of Hartford to H. W. Carter of Owens, dated March 7, 1930. It reads in part as follows: "The Buck Company works under the Association allotment as far as its milk bottles are concerned and I imagine it does as far as its other business is concerned."

Exhibit 261 is a memorandum dated December 29, 1930, by H. K. Smith of Hartford. It reads in part as follows:

"Mr. Hazelton says that Turner, Knox, and Salem have been trouble makers, producing above their normal quota. * * *

"* * * Owens and Thatcher are below their quotas."

Exhibit 809 is a communication written by G. F. Rieman of Capstan, dated July 3, 1935. Rieman was at that time and for some time previous had been a member of the Statistical Committee of the Association. It reads in part as follows: "As the glass industry is organized, one of the important things we are buying is quota. Francis May has not come through with this exact figure, but we have enough information to know that their quota is very close to 2% as compared to Capstan about 3% and Salem about 3%. Their quota is almost large enough to operate their two furnaces at full capacity the year 'round. The reason for this is that in setting the quotas the 1 and 2 furnace factories were given more than their share because it was the only way the quota arrangement could be made to work. Of course it is considerable of an advantage to have a quota which permits full capacity operation."

Under date of July 15, 1935, Rieman again wrote as follows (Ex. 811):

"It looks as if the Diamond Glass Company could be acquired, including whatever property it has, for a net price in the vicinity of $150,000 or $160,000. * * *

"The main thing we would be buying would be quota. The six major concerns control about 74% of the industry and since the quota system was in operation years before N. R. A. and since at the past meeting all of the major concerns were still in favor of maintaining it, it seems likely it will continue. However, before doing anything definite at Diamond we would of course make sure the major concerns would guarantee this quota to us if we buy the plant and dismantle it. Their quota amounts to 0.7% (as compared to Capstan-Salem 6.0%) and would be about $600,000."

Exhibit 810 is another letter by Rieman, dated October 21, 1935: "We were all agreed that the additional quota would be very valuable but more than this, the elimination of this competition which would mainly affect Salem might easily be worth $100,000 or more a year to Salem * * * We could safely afford to offer them as high as $150,000 in fact, it is conservative to estimate that it would be worth $200,000 to eliminate them from the field. In other

words, $200,000 in preferred stock would amount to $13,000 per year in dividends and certainly we could easily earn many times this amount with the additional quota, as well as removing the hazard of a price cutter right in the Salem territory."

Exhibit 793 is a letter from W. D. Dugan of Olean Glass Company, to R. W. Niver, president of Thatcher, dated June 1, 1936, reading as follows: "It seems strange that they can't get service out of General Glass when General Glass, according to statistics, is around two to three hundred gross behind their quota."

The quotas thus established and mailed to each of the members of the Association were made available to each of the other members of the Association, as follows (from the testimony of Ackerman, page 5176 of the record):

"Q. * * * Now at that time, in 1931, what if anything was the practice of the Association as to giving out information of this kind through the statistical group? A. As I recall, sir, prior to the date of this, or approximately that date, members of the Statistical Committee, at their meetings would pass around to each other their individual figures. After that had gone on for several meetings they asked us if we would not read their individual figures before the Committee, and with everyone's consent at the meeting we did read the figures of the individual companies. * * * (P. 5178) As I recall it, that continued on until about 1937. At that time the statistical group, or someone in the group, said instead of reading the figures to us why don't you make up a copy of the figures, and from 1937 on until July of 1939, as I recall it, we put the statistical figures— I meant the figures for the Statistical Committee, or others who were at the meeting with the Statistical Committee, on a sheet of paper and distributed that sheet to everyone at the meeting."

At page 2516-7 of the record we find the following questions and answers in the examination of Dugan, of Olean:

"Q. Who gave you the information with reference to the quota after the NRA days? A. That information was given out at different meetings.

"Q. Whose meetings? A. The Glass Container meetings.

"Q. At the Association meetings? A. That is right.

"Q. Well, at the Association meetings you received the quota of each glass manufacturer, is that right? A. That is right.

"Q. And the Glass Container Association, in addition to giving you that quota at the various meetings, in their reports would indicate the quota of each glass manufacturer? A. All those glass manufacturers that were present at that meeting.

"Q. You are a member of the Association, of course? A. Yes, sir."

The composition and the operation of the so-called Statistical Committee of the Glass Container Association have been a source of great evil in the assistance and cooperation that they have afforded to the leading defendants in this case in their efforts to dominate, control and stabilize the industry.

It will be noted that, in general, only the leading officers of the large defendant companies comprised the membership of this committee. The Owens-Illinois Company, the largest producer of glass containers in the United States, was represented by William E. Levis; the Hazel-Atlas Company, the second largest producer, was represented by J. H. McNash; and the Anchor Hocking Company, the third largest producer, was represented by I. J. Collins. These three gentlemen were all respectively the presidents of their companies. Ball Brothers was represented by G. A. Ball. Thatcher was represented by H. C. Mandeville.

In the light of the close control that the Hartford company maintains over its licensees by virtue of its system of lease, license and royalty for the use of its machinery on license contracts extending for no more than eight or ten years each, and in view of the cooperation afforded the Hartford company in the maintenance of domination and control over the industry by the defendant corporations herein, as well as the active part played in the matter by the leading officers of these corporations who were also members of the Statistical Committee of the Glass Container Association, the power of this committee and its effect upon the small individual members of the Association may well be imagined, especially when quotas were produced in the monthly meeting.

The Statistical Committee appears to have been a breeding ground for hatching many of the conspiracies that were involved

within the general conspiracy of dominance and control over the glass container industry. This activity of the committee members, and perhaps the activity of the committee at the regular meetings of the association where its presence might impose the sanctions, so aptly referred to by Justice Clarke in the case of American Column and Lumber Company v. United States, 257 U.S. 377, 42 S.Ct. 114, 66 L. Ed. 284, 21 A.L.R. 1093, made this arm of the Association a most vital one in the over-all plan control of the glass container industry.

It is claimed by the Association that it discontinued its quota system sometime in 1939, but, however that may be, the court feels that the power of this Association within the industry, exerted as it has been in the past, or held as a potential power that may be exercised in the future, makes it necessary to adopt measures of relief in the general plan to free the industry and establish competition. This will appear more clearly from a reading of the next section of this opinion.

### Stabilization of the Industry.

We have seen that one of the fundamental purposes in the relationship between Hartford and Owens was the stabilization of the industry. This is a broad term and, of course, would mean a perfectly proper and legal procedure. Some thirty-one pages of the defendant Owens' brief is devoted to a discussion of the meaning of the word "stabilization." On page 224 of that brief we find the following statement: "The correspondence of the parties in this case produced by the plaintiff, in which there are references to stabilization or efforts to stabilize proves nothing except that those in the glass industry were facing the same problems and speaking the same language, as everyone else in industry. The general literature is filled with the discussion of stabilizing everything from the baby's breakfast to prosperity."

There is contained therein a lengthy discussion on the general use of the word "stabilization," an argument on the court references to stability, on "governmental recognition of stability and the necessity for it," and some comment on the testimony in the case regarding stabilization.

The court is interested not so much in the manner in which the word was applied in other times and under other conditions, nor how it was meant to be used by persons in other times and under other conditions. He is interested in the manner in which it was used by those defendants, chief officers and representatives of the defendant corporations herein, who made use of it in the course of their operations and during the time it is alleged that this conspiracy covered. The court is also interested in determining, from the language used and the conditions under which the word was used, what the chief actors in the history covered by this case meant when they used the word "stabilization."

The word "stabilization" may be used as descriptive of many conditions and it may be used to describe various situations, as the defendant Owens has ably demonstrated in its brief. However, the court is interested in the obvious or reasonable interpretation of a meaning sought to be conveyed by a defendant herein when he used the word "stabilize" or "stabilization" in the contemporaneous exhibits that form a part of the record. What meaning did the user extend to the word when he employed it in an exhibit herein?

It appears from the record that the word was used to cover the elimination of price-cutters, the establishment of uniform and high prices, the division of fields or lines of ware, and the division of the market by means of a quota system, each manufacturer to stay reasonably close to his apportioned quota of the sales of each kind of glass product, as well as the control of production through the power to refuse, and the refusal to license new companies.

The ultimate goal of stabilization, as that term was used herein, appears to have been a quieting and levelling off of competition for the ultimate purpose of attaining price stability in a price structure that would be highly remunerative to the parties concerned.

Exhibit 26 is a memorandum written by H. K. Smith of Hartford, dated January 17, 1922. He wrote that J. C. Blair of Owens had stated at a conference that, "there should be in the glass industry some concern like Owens in a sufficiently strong position practically to force a stable price policy upon all important producers; that if Owens, by the plan above suggested, had the free use of its own suction feed and the free use of the gob feed it could then go to any other producer who threatened to cut prices and unstabilize the market, and inform him that such a policy was detri-

mental, but that if the outsider persisted in doing so Owens had a sufficient margin, by reason of its free use of both devices, so that if necessary it could come out on top in a price war and still make money. He felt that some such stabilizing influence was necessary and that it could only be established through one company having such a peculiar strength as would be given in this case."

The record clearly indicates that Owens, as well as all the other licensees of Hartford, continually complained of price-cutting and requested that Hartford sue all price-cutters as soon as possible. Hartford, on the other hand, as the driver in the seat with a whip in hand, was not at all reluctant or slow in applying the whip whenever price-cutters were reported to it through the medium of its licensees.

Exhibit 626 is a memorandum of a conference on feeder litigation dated April 6, 1926:

"We understand that our milk bottle licensees would welcome a suit against Lamb as tending to put an end to Lamb's price-cutting policy. * * *

"Nivison-Weiskopf. Mr. Carter strongly urges suing Nivison-Weiskopf both on account of their price-cutting and on account of the fact that they are manufacturers of feeders as well as users."

Exhibit 583 is a communication from H. W. Carter, of Owens' Patent and License Department, to F. Goodwin Smith of Hartford, dated December 31, 1929:

"In his outlook on the license situation, Mr. Levis is inclined to take a pretty broad view, as in the case of Three Rivers and Hemingray.

"It is therefore particularly unfortunate that we should be confronted immediately upon the enlargement of these licenses with actions of a most demoralizing character on the part of the licensee. We have already discussed this in the case of Three Rivers, and now our Sales Department is very much upset over Hemingray's recent actions.

"We have not informed that department of the broadening of Hemingray's rights, so they know nothing whatever of the situation except as they meet it in the field. In other words it is not a case of expecting trouble and then finding what is expected.

"Hemingray's salesmen, it seems, are already approaching our beverage customers with offers of severe cuts and with the statement that their license rights have been enlarged so that they are now planning to produce 600,000 gross of beverage this year as against 300,000 last."

Exhibit 1853 is a memorandum by W. E. Levis directed to the Owens Board of Directors at a meeting on July 10, 1930:

"Price Lists—The new price lists which went into effect on June 1st are being maintained by us in all lines, and a number of others in the industry have evidenced their appreciation of a stabilized market by following our lead. There are, however, a number of factors who are cutting prices to new low levels. Most conspicuous among these are Salem, Knox and to a lesser degree, Whitall-Tatum. Turner's policy is also rather weak. There is only a very limited amount of large bottle business which comes up for replacement at this season of the year. A true test of our ability to stand at present prices will come in the Fall.

"Generally speaking, the trade has received our effort to create a more stable and equitable market in a most favorable way."

Exhibit 776 is a communication from J. H. McNash of the Hazel-Atlas to W. E. Levis, dated December 31, 1931:

"On the third page of this list is a classification of Emerald Green Ointment Jars. In my judgment this is directly competitive with our opal Ointment Jars. Evidently your sales department has the same thing in mind,—for on the last page of this same price list, last paragraph, under special notice—the observation is made that the price is no more than for opal ware.

"This is just one more step in a direction against a policy that I believe we both appreciate,—and that is, that it is to the benefit of our respective companies to respect each other's special lines.

"Having this same thing in mind, I believe we discussed in Toledo in November, the matter of glass brick and other items of manufacture, in rather a general way; and I believe on our way to luncheon in your car, I mentioned the matter of your decorated and colored glassware in connection with our business in the cosmetic field. So far we have not been able to detect any change in the policy of your sales department in connection with this type of ware."

On January 13, 1932, W. H. Curtiss of Corning wrote to Amory Houghton of Corning as follows (Ex. 1545):

"Instead of setting up positive price control, provide for conducting business under license without unfair competition, unjust trade practices, etc. and provide for arbitration. * * *

"When it is determined just how far we can go *legally* in imposing restrictions on a feeder licensee, review the advantages and disadvantages to Corning in granting the license."

In a letter from the MacBeth Company to I. J. Collins of the Hocking Company, dated October 21, 1932, we find the following (Ex. 1151): "Upon rereading my letter to you of October 20th, with reference to license to manufacture the Marsden shape tumbler, I wish to correct an impression that might be formed—that it is our desire that paste mould tumblers and iron mould tumblers be sold at the same selling price. We feel that paste mould tumblers should be sold at a higher price, but in the absence of any data regarding the competition that either party may receive in the paste mould field, it is impossible to set up a separate schedule at this time for paste mould tumblers."

Exhibit 588 is a communication from J. M. Beatty of Federal to F. Goodwin Smith, dated January 11, 1933, reading as follows:

"The latest cause for writing is the fact that the Tygart Valley Glass Company of Washington, Pa., who are pirates in a sense, have gone out to users of their product and ours, and whom Hazel, Capstan and ourselves are selling, and have made ridiculously low prices on wide mouth jars to the packing trade. * * *

"The Fairmount Glass Company also indulges in similar practices, and as I understand it, both of these concerns are operating machinery that, in view of what has transpired, would be considered an infringement on your patents. * * *

"I am in no position to dictate your policy, but I do think that immediate action should be taken by you to notify both of these companies, and particularly the Tygart, that you consider them as infringers of your patents, and to bring such pressure to bear on them that you can either take them in on some sort of a basis that will be satisfactory to you, as well as the others interested, or if you deem it advisable, to eliminate them entirely.

"In any event, no matter what your action may result in, I think it is due to your other licensees that you should take immediate steps to stop this killing competition. I have discussed this matter with the Capstan and the Hazel people both, and they are in thorough accord with my views, although Hazel is very desirous that they should not appear in any complaint in reference to the Tygart Valley people, due to their personal acquaintance with Mr. Stewart, and also due to the fact that he is a stockholder in their organization."

Exhibit 1360 is a communication from R. S. Davis, president of Universal, to R. M. Eldred of Hartford, dated March 27, 1933:

"Will you please advise what progress you are making with the Peerless Glass Company at Long Island, N. Y. The writer has just returned from an extended absence and found numerous complaints from our New York representative that the Peerless Glass Company are quoting prices independently and are not observing established practices in the industry.

"We trust that with your influences and with the protection of your glass patents, you can get this concern to adopt your feeders and cooperate with the rest of the industry."

Exhibit 954 is a communication from R. J. Miedel to J. H. McNash, both of Hazel-Atlas, dated September 11, 1933, reading as follows: "It seems to me we should not allow the Maywood Glass Company to expand in feeders. It is a price-cutting house, and they have caused a lot of complications in certain fields. I hope my decision on this proposition will be acceptable to you."

Exhibit 956 is another communication from Miedel to McNash dated September 16, 1933, reading as follows:

"It seems to me that when people like the Maywood Glass Company take up with the Hartford-Empire Company about the extension of licenses, that Hartford should certainly not write them and tell them they are referring it to the glass companies for decision; that is what they did in this case. This makes a lot of hard feeling among the competition. If Hartford wants our views, we should certainly give them to them, and then it is up to

Hartford to notify their clients one way or the other.

"As it now stands, due to the way in which this has been handled, we are having trouble with Maywood about maintaining prices, with the up-shot that we have told them where to go to."

Exhibit 1752 is a communication from R. D. Brown of Hartford to Amory Houghton of Corning, regarding the Mc-Kee Glass Company, dated December 26, 1934: "McKee to agree to maintain prices as provided in the existing Corning-Mc-Kee contract. (note: This would probably have to be done by a 'gentleman's agreement', if, as I assume, the McKee Company is not to be allowed to make any heat-resisting glasses on which there will be patents after 1936.)"

Here is some rather notable authority for the assertion by the Government that "gentlemen's agreements" in the industry are not unknown.

Exhibit 1753 is a letter from W. H. Curtiss of Corning to R. D. Brown of Hartford, regarding the McKee Glass Company, dated January 2, 1935, reading as follows: "It has never been clearly established as to just how far we can go in price control in the licensing of patented machinery to make unpatented articles. In any event, we know from many years experience with McKee that their ideas and ours on prices are very far apart, and there is constant difficulty under the two licenses that Corning has granted McKee in keeping that company in line on the provisions of the license, particularly with regard to prices and terms of sale."

Exhibit 810 is an interoffice communication by G. F. Rieman of Capstan, dated October 21, 1935:

"We were all agreed that the additional quota would be very valuable but more than this, the elimination of this competition which would mainly affect Salem might easily be worth $100,000 or more a year to Salem. As you know, I offered them $75,000 in stock with the possibility that this might be increased to $100,000, depending upon our negotiations with Hartford-Empire. (The other conditions were as we discussed; they to assume all current liabilities and get the proceeds from the sale of all stock, etc.) We could safely afford to offer them as high as $150,-000, in fact, it is conservative to estimate that it would be worth $200,000 to elimi-nate them from the field. In other words, $200,000 in preferred stock would amount to $13,000 per year in dividends and certainly we could easily earn many times this amount with the additional quota, as well as removing the hazard of a price cutter right in the Salem territory."

Exhibit 959 is a communication from R. J. Miedel of Hazel-Atlas to J. H. McNash of the same company, dated March 28, 1936: "I am pretty well burnt up about this proposition, because we have kept more or less a small position in liquor bottles, beers and wines, figuring that it was their field, and we would continue to grow in the wide mouth field, but as Hartford Empire has put two price-cutting outfits in position to cut our prices on lines in which we are vitally interested, I feel rather badly about it."

Another point in the program for stability of the industry was the division of fields and the restriction of production to certain specific lines of ware.

The practice of licensing companies for only certain specific lines of ware was followed by Owens in the licensing of its suction machine in the early history of the industry. It is Owens' contention that it did not initiate this practice, but that there had been a division of lines before the advent of the suction machine. This division was due to the fact that in the hand blowing and semi-automatic processes, the procedure of manufacture with respect to each item produced was entirely different and it was difficult for a manufacturer to spread all over the field. This was undoubtedly true before the Owens machine appeared. It was not true after that machine was put into use and after the gob feeder appeared. It is undoubtedly true that with the advent of automatic machinery, particularly the gob feeder, it was no longer impossible for a manufacturer to produce many more lines of ware than formerly. One need only to look at the present-day production of the Owens Company itself, which is extremely diversified, to substantiate this; so that while Owens may have granted licenses in the lines formerly produced by its licensees, nevertheless it did prohibit them from branching out in the future, whether or not that would have been feasible with the suction machine.

The Hartford Company followed this same procedure. It realized that it could not charge as uniformly high rates under

a system of unrestricted licenses as it could with restricted licenses. Competition among the manufacturers would be too sharp. Consequently, Hartford never licensed except on a restricted basis whereby it retained complete control over the actions of its licensees.

This meant, of course, that Hartford and Owens were the final arbiters of who should produce what and how much. In this way the industry was stabilized and competition reduced to a minimum. This was particularly vicious when it is remembered that Hartford had to secure Owens' consent in granting new licenses. Owens was a large and diversified manufacturer and yet could determine who was to manufacture in competition with it. If Owens did not want a manufacturer to produce a certain line of ware that Owens was producing, all it had to do was refuse to give its consent to the license.

Hartford consulted other of its favored licensees with respect to the granting of licenses in certain lines of ware. Particularly, it consulted Thatcher with respect to granting licenses to make milk bottles, and Ball Brothers with respect to granting licenses for fruit jars. Of course, after Ball Brothers purchased the residual rights of Hartford in fruit jars, Hartford no longer had the right to grant further licenses in that field. Ball thereafter continually complained of any other manufacturer producing one single fruit jar. It even complained continually of certain manufacturers permitting packers ware to find its way into the domestic fruit jar trade. When this occurred, Hartford would warn the manufacturer to see to it that its ware did not find its way into the domestic fruit jar trade.

Exhibit 395 is a lengthy memorandum by H. K. Smith of Hartford, dated March 26, 1928, and entitled "Memorandum as to Hartford-Fairmont and Hartford-Empire History and Policy." It reads in part as follows:

"(2) Our process had one important rival—the Owens Bottle Company—the most powerful glass concern in the world. Its process was entirely different from ours. It came into commercial use about 1905 and dominated the industry until about 1917 when our process began to get a foothold. Up to 1924 there was sharp conflict between us and Owens, with some patent litigation. In 1924, after long negotiation, the two companies got together in a cross-licensing arrangement and have since then worked in exceptionally close understanding. There is, however, no combination between the two.

"(3) We began our commercial expansion in 1917 when our first feeders were put into production. It was at once apparent that if we put out these machines broadcast, without restriction, we would disorganize the whole industry which was then divided into a large number of small units and most of these manufacturers would not be able to refrain from using practically all the savings produced by these machines in fighting with each other. In fact, our first group of licensees said so expressly and urged us to take measures to prevent such a result.

"(4) Consequently we adopted the policy which we have followed ever since of restricted licensing. That is to say,

"(a) We licensed the machines only to selected manufacturers of the better type, refusing many licensees whom we thought would be price-cutters, and

"(b) We restricted their fields of manufacture, in each case, to certain specific articles, with the idea of preventing too much competition.

"(c) In order to retain more complete control of the situation, we retained title to the machines, and simply leased them for a definite period of years, usually 8 or 10 years, with the privilege of renewal of a smaller additional term."

It will be noted that among the reasons above assigned for adopting a policy of restricted licensing, we find no reason assigned to the effect that the Hartford Company was following that policy for the purpose of obtaining such reasonable reward as may accrue to a patentee or a licensor by virtue of his patent monopoly. The memorandum continues:

"(5) In specifying the various fields of ware for a given licensee, we have with a few exceptions, based the classification upon the use of the article rather than shape or other physical characteristic. Glass containers have so many shapes that it is practically impossible to classify them by shape and very often numerous different shapes will be used for the same purpose, so that use of the container is the basis for our classification except in a few cases.

"(6) Quite early in our history we foresaw that the glass industry, like others, would doubtless go through a process of combination, which as a matter of fact

has occurred. We felt it to be to our best interest, as well as for the best interest of the whole industry that we should use our influence to steady the industry as much as possible, with a long-distance view towards its general prosperity. The men at the head of our concern took this long-distance view deliberately and have ever since maintained it. For example, although the Hartford-Fairmont Company was organized in 1912, it paid its first dividend on its common stock in 1924. Up to that time it had put back into development all of its profits and considerable amount of cash received from sale of patents abroad.

"(7) We have thus gradually evolved the theory of what may be called a 'glass equipment concern'. In this change of the industry to mechanical equipment, two courses were theoretically possible for the manufacturer—

"(a) He might at his own expense develop automatic machinery and protect the same by patents for his own benefit. Such development and patent protection is an extremely expensive process and if the manufacturers generally had followed this course, there would have been a very large duplication of effort and expense.

"(b) On the other hand, the manufacturer might select some outside concern, like the Hartford-Empire Company; entrust to it the work of developing and protecting machinery of the glass industry generally and support that concern in its development by paying a proportionate contribution which in this case was best measured by royalties on production.

"(8) The latter course was the one which the manufacturers very wisely chose. The result has been that the Hartford Empire Company has now become the most important glass equipment concern in this country and probably in the world. This means that H-E has a duty toward the whole industry not only of developing and supplying machines immediately needed, but of keeping in advance of that need by inventing further improvements. It also must act as a source of service and information for its licensees in all technical matters relating to their business and must help to steady, as far as possible, the general glass industry. H-E has done this to the best of its ability; has spent enormous sums in machine development and patent litigation, as well as in research along mechanical, physical and chemical lines."

Exhibit 2001, a communication from R. A. Blunt of the Buck Glass Company to F. Goodwin Smith of Hartford, dated May 23, 1935, relates a discussion which the writer had with J. Morrison of the Obear-Nester Company, a non-licensee of Hartford:

"My advice to Morrison was as follows:

"'The only really effective control exercised in our industry is through the Hartford agreements. If another feeder comes into the market, it might reduce the amounts of royalties paid by various people now, but it would entirely destroy the protection which various people enjoy in their principal lines. I, therefore, advise you, for the good of the industry and your own operating company, to work out some plan with Hartford whereby you can realize on the feeder and, at the same time, maintain the various ware alignments which now exist in the industry."

The last exhibit ably illustrates the viewpoint of the licensee of Hartford who has been fortunate in securing one of Hartford's licenses. It assumes that, by receiving and accepting a license and coming under the "effective control" of Hartford, the usual worries of a manufacturer over the marketing of his product and the competition that he is forced to undergo are largely settled.

Of course, there was more than one manufacturer in practically every line of ware except the non-container field belonging to Corning. Hence, in order to stabilize the trade further, a quota system was set up and followed by the manufacturers in order to maintain prices and prevent any undue competition. This quota system was published through the medium of the Glass Container Association, one of the defendants herein. The defendants admit that there was a quota system in effect under the N.R.A., but they deny that there was any compulsory quota system during any other time. However, there is evidence that the quota system was in effect both before and after the N.R.A. (Ex. 667).

While it is true that no one was absolutely bound to follow the quota system, nevertheless in practical effect all companies had to follow it quite closely or run the risk of bringing down upon them the wrath of Hartford, Corning, Owens, Hazel-Atlas, Thatcher and Ball. Since the smaller manufacturers had to rely upon Hartford alone for their machinery and equipment,

this was tantamount to compulsion. In fact, Hartford, through its policy of retaining title to practically all the machinery used by its licensees, retained a control over them under the threat of Hartford to take away this equipment in event of their bad behavior, at least at the expiration of the eight or ten year license which was customary. The license, lease and royalty system will be discussed more in detail later in this opinion.

Another method of maintaining the stability of the industry was the absolute refusal of Hartford to license new capital which desired to come into the industry. Whenever new capital was interested, it inevitably wound up in Hartford for the purpose of obtaining machinery. In each instance, Hartford refused to grant the new license (Hartford claims to have issued two new licenses during its lifetime, to wit, to the Northwestern and Diamond companies). Hartford has admitted that this has been its policy. Its reason or excuse for so doing is that it thought the industry was overcrowded and that the plant capacity was far in excess of the demand.

In my opinion, a dangerous situation exists, inimical to the public interest, when one man, or a group of men, has the power, finally and definitely and apparently without other than purely selfish reasons, to exercise the power of life or death over proposed new industries as well as existing and operating industries. It is not only a dangerous situation but is in direct contravention of the spirit and the letter of the anti-trust laws.

From the record in this case, there can be no doubt that Hartford, at times ably assisted by its most favored licensees, to wit, Owens, Hazel-Atlas, Corning, Ball and Thatcher, determines and limits the law of supply and demand. This is beyond the right of any individual or corporation, and certainly goes far afield from the limited monopoly granted a patentee by virtue of his patent. Moreover, the record indicates that both Hartford and Owens wanted every plant in the industry running at full capacity. That is not a normal condition in modern industry.

In exhibit 787, dated September 10, 1932, F. Goodwin Smith of Hartford wrote to H. C. Mandeville of Thatcher, in part as follows:

"Will Levis has just telephoned me that you concur with him in the desirability of immediately getting Davis and Lamb into the fold under restricted conditions such as he mentioned. * * *

"I cannot see any quicker or better way for stabilization than what we have outlined."

In exhibit 1363, dated March 31, 1933, written by R. M. Eldred of Hartford, we find a reply to the request of the Universal Company to make a certain quantity of beer bottles per year, which reads as follows: "we are refusing such requests, knowing that in doing so we will be playing our part in an attempt to stabilize the beer business to some degree.

"Contracts are being made for beer bottles over a wide range of prices, some of which include a small profit, other of which involve an inevitable loss.

"We believe that the beer business and the beverage business generally, demands some form of protection, such as we have exercised in the milk bottle business over a period of years."

In exhibit 585, a communication from W. E. Levis of Owens to F. Goodwin Smith on October 11, 1930, we find the following: "I * * * feel that if you could understand our position and were in general sympathy with it, your contact with many of our competitors would tend to assist in educating them as to the folly of the methods they are using, and would be very beneficial in creating a stability in the industry. We, of course, are legally prohibited from contacting these competitors on matters of this kind, and are trying to maintain a situation whereby our customers are all on an equal level as far as price is concerned when they are using the same volume, and a position where the public generally knows the prices prevailing for the products that we manufacture."

Exhibit 584 is a communication from F. Goodwin Smith to W. E. Levis, dated October 7, 1930, on the subject of price leadership, and reads in part as follows: "leadership in any industry depends upon two basic requirements—

"(a) That such leadership should be clearly aimed at stabilization of prices at a reasonable level above cost.

"(b) That it should be maintained through the years with substantial steadiness and consistency.

"(c) That the industry should have confidence in its purposes and steadiness."

In a memorandum entitled "W. E. L. Price Policy," dated February 13, 1930, W. E. Levis states (Ex. 775):

"Our organization must be perfected along the lines of an aggressive force securing as much business as possible at the best possible prices, and an efficient factory organization producing the highest quality of product at the lowest possible cost. Our organization must be developed to the point where the industry fears it and our house must be in order with all possible economies having been effected and our possible capacity being operated to the maximum.

"Our negotiations with Hartford Empire Company and others, so far as our patent situation and royalty income is concerned, should be an attempt to secure a position whereby we pay no royalty on any item we produce and we attempt to force all others to pay royalty on every item they produce, we participating with anyone else in the royalties they receive.

"Then, I think we can consider a stability program.

"If we contemplate seeking stability before we have done these things, we can obtain it only if we, as leaders, extend every possible co-operation to the rest of the industry by issuing our price list as a new mark for them to shoot at and standing on a one-price basis as well as maintaining our present rated capacity to the possible capacity of the entire industry, which is bound to cause us the loss of some business, thereby reducing the percentage of our possible capacity which we will be operating and preventing our achieving the perfection of organization and economy for which we are working and thus increasing our costs.

"I, therefore, recommend that our Sales policy shall be to get a greater proportion of the natural increase in new business in the industry and a greater proportion of the existing business in the industry at the best possible price and with as little demoralization as possible, securing a sufficient volume to permit us to operate 100% of our possible capacity. This will give us time to develop our organization and perfect the suggested economies. Then, we can determine what our stability program is to be."

It is clear from the record that the stabilization of the industry which the defendant wanted and talked about was an illegal and unlawful stabilization.

It is argued by the defendants that prices generally in the industry are low and that the public is not required to pay exorbitant prices in return for the products that it purchases.

If we accept this argument from the standpoint of a comparison of present-day prices with the prices of glassware produced by the old hand-gathering method, then, doubtless, there is much merit in the contention of the defendants. It is sensible and reasonable to assume that with the advent of automatic machinery there would be a substantial step-up in the daily production of glassware as well as a substantial decrease in the cost of labor employed in the production of glassware. But whether prices are low or high in comparison with the cost of manufacturing and marketing is beside the question in the present inquiry. The defendants are putting forward the same contention that was made by the defendant companies in the case of United States v. American Tobacco Company, 1911, 221 U.S. 106, 31 S.Ct. 632, 55 L.Ed. 663. In the opinion of Judge LaCombe, one of the four trial judges in that case, 2 Cir., 164 F. 700, at pages 702, 703, we find the following statement:

"What benefits may have come from this combination, or from the others complained of, it is not material to inquire, nor need subsequent business methods be considered, nor the effects on production or prices. The record in this case does not indicate that there has been any increase in the price of tobacco products to the consumer. * * *

"During the existence of the American Tobacco Company new enterprises have been started, some with small capital, in competition with it, and have thriven. The price of leaf tobacco—the raw material— except for one brief period of abnormal conditions, has steadily increased, until it has nearly doubled, while at the same time 150,000 additional acres have been devoted to tobacco crops and the consumption of the leaf has greatly increased. Through the enterprise of defendant and at large expense new markets for American tobacco have been opened or developed in India, China, and elsewhere. But all this is immaterial. Each one of these purchases of existing concerns, complained of in the petition, was a contract and combination in restraint of a competition existing when it was entered into, and that is sufficient to bring it within the ban of this drastic statute."

Manifestations of Conscious Guilt.

Earlier in this opinion, acting in accordance with the pattern set down in the First Standard Oil case, we set out to inquire into (a) the conduct of the parties, (b) the proof as to what was done, and (c) the results which have arisen, in order to ascertain the intent of the parties toward a restraint of trade, a monopolization, or an attempt to monopolize.

In the case of United States v. American Tobacco Co., 1911, 221 U.S. 106, at page 181, 182, 31 S.Ct. 632, at page 649, 55 L.Ed. 663, we find the following, which is particularly apropos at this time:

"Considering, then, the undisputed facts which we have previously stated, it remains only to determine whether they establish that the acts, contracts, agreements, combinations, . etc., which were assailed, were of such an unusual and wrongful character as to bring them within the prohibitions of the law. That they were, in our opinion so overwhelmingly results from the undisputed facts that it seems only necessary to refer to the facts as we have stated them to demonstrate the correctness of this conclusion. Indeed, the history of the combination is so replete with the doing of acts which it was the obvious purpose of the statute to forbid, so demonstrative of the existence from the beginning of a purpose to acquire dominion and control of the tobacco trade, not by the mere exertion of the ordinary right to contract and to trade, but by methods devised in order to monopolize the trade by driving competitors out of business, which were ruthlessly carried out upon the assumption that to work upon the fears or play upon the cupidity of competitors would make success possible. We say these conclusions are inevitable, not because of the vast amount of property aggregated by the combination, not because, alone, of the many corporations which the proof shows were united by resort to one device or another. Again, not alone because of the dominion and control over the tobacco trade which actually exists, but because we think the conclusion of wrongful purpose and illegal combination is overwhelmingly established by the following considerations: * * * (c) By the ever present manifestation which is exhibited of a conscious wrongdoing by the form in which the various transactions were embodied from the beginning, ever changing, but ever in substance the same."

Now let us examine again, (a) into the conduct of the parties, and (b) into the proof of what was done, from the viewpoint of possible "conscious wrongdoing," in order to ascertain wrongful purpose and intent.

The record is replete, as disclosed by the contemporaneous writings of the principals in this case, of an apprehension upon their part of a violation of the anti-trust laws, an apprehension that in some instances amounted to a conviction that the laws were being violated—convictions that led to the taking of anticipatory steps upon their part to forestall the full force and effect of the penalties that would follow proof of violation.

The secretiveness that surrounded certain of the many transactions and the frequent instances wherein the anti-trust laws were discussed and analyzed, the extreme care that was taken to complicate the record of a transaction in order to make ultimate discovery difficult, all point to a manifestation of conscious wrongdoing upon the part of the parties involved.

Section 22 of the April 9, 1924, Agreement. The history of the much-talked about Section 22, or "veto" section of the April 9, 1924, agreement between Owens and Hartford, may be considered profitably in discussing consciousness of wrongdoing. Under that section it was necessary for Hartford to obtain the consent of Owens to the granting of any licenses on machines embodying inventions of Owens. We go into the history of that section, not to show that the section itself was or was not illegal, but to show that the parties had a consciousness of guilt with respect to their entire relationship.

Owens and Hartford were very secretive about the 1924 agreement and did not want to have it exhibited to anyone. Exhibit 399 is a memorandum written by H. K. Smith of Hartford, dated December 23, 1926, regarding the suit against Lamb by Hartford: "I said we were not particular about the Miller matters, but the exposure of the 4-9-24 Agreement, especially Sec. 22, Owens veto on licensing, was serious" and "That the judge might easily require all this to be produced"; "That Brown had written for Carter and Wms. to come on. That I did not know what to do about Sec. 22"; "Williams said

both the Owens & Miller matters were serious"; "He asked if Owens had ever really flatly vetoed a license. I said I thought not, strictly speaking. (FGS says I am wrong—i. e. as to Three Rivers Co.)"

On January 25, 1927, H. K. Smith of Hartford wrote to L. T. Williams, counsel for Owens, as follows (Ex. 1839):

"Now as to the really important matter, namely, Section 22, in regard to which you say Mr. Boshart does not wish to make any amendment.

"Of course, so far as this particular patent suit is concerned, our attorneys have succeeded in keeping out the Owens Agreement, so that this immediate risk of disclosure has been eliminated—certainly for the present.

"It is, however, I think, safe to assume that sooner or later, either in one of these various patent cases or in some other way, Section 22 will become public property, and if so, I think it is almost certain that it will be laid, along with other matters of complaint, before the Federal Trade Commission. We have a pretty close touch with the industry and there is enough going on underneath to make me quite sure of that fact. In other words, I think that we ought to act in regard to Section 22 on the assumption that it will be before the Federal Trade Commission (or possibly the Attorney-General) within the next two or three years. Now, the course of events thereafter will, I think, be as follows:

"The Commission will feel that it has enough of a case on Section 22 to justify its going into an investigation of our two companies and their related combination, especially in view of the dominant position of the Owens Company. When they once get this idea, the rest is going to follow like a snowball rolling down hill. Their field agents will come to our companies and either we will give them voluntarily all the information in regard to all our various deals or they will get it from us by subpœna. We will then have a complaint issued, probably against both companies, and taking of evidence and then a trial before the Commission.

"We will then *certainly* be found guilty by the Commission. My experience in the Thatcher case before the Commission was so surprising that I have no hope of any fair hearing before the Commission. They walked right through all questions of law, in so far as they paid any attention at all to my argument and several of them paid no attention and simply found against me in the conclusion. Taken individually, they are as a rule very fair and honorable gentlemen, but as you perhaps may have found out, they are a long ways from being a court or having any real judicial tradition.

"Then we will either have to appeal to the Circuit Court of Appeals for a review or do as I did in the Thatcher case, refuse to obey their dissolution decree and let them appeal to the C.C.A.

"Up to this point in the game, the proceedings will not be widely public property. But when it gets into the C.C.A., of course all of our contract relations of almost every sort will be hauled out and exhibited to the trade. At this point, I think we would have a better chance of winning, so far as Section 22 is concerned at least, because I have always felt that that did not constitute any illegal restraint of trade. But even if we did win, we would then have the result of a long series of expensive litigation, publication of all our intimate affairs and a pretty mean situation all around and nothing gained by it. And in my opinion, the one thing most likely to start this with the Trade Commission is this Section 22. The rest of our contract relations are pretty complex and pretty carefully safeguarded and there is no special point that sticks out like a sore thumb, especially as Owens and ourselves are in pretty active competition. But Section 22 stands out by itself, like a lighthouse, and would be the one point which would focus on us the attention of the Commission and of the Government.

"Holding as I do the belief that Section 22 is legally proper, I nevertheless want to have clear before the executives of our two companies the practical results in the way of inconvenience and publicity that are likely to arise from it. Then if they choose to go ahead in the face of these probabilities, my duty is performed.

"I don't think that the danger to Hartford-Empire is anything like as great as it is to Owens. We are a comparatively small concern and have no such long history of patent monopoly or commercial power behind us. Our only general weakness is the mere fact that we have got together a lot of patents.

"The situation with Owens, of course, is quite different, as you have always pointed out to me.

"Our selfish interest in this matter, however, recognizes the fact that if the dom-

inant position of Owens, taken with Section 22, suggests this sort of a 'ruction', Hartford-Empire is going to get dragged into it and share equally with Owens in the general unhappiness that will follow."

In passing, it might be well to comment here on the fact that Hartford and Owens cancelled Section 22 in 1931, and that it is now claimed by both parties that neither of the companies observes the spirit of Section 22 in their relationship with one another and have not done so since its cancellation; that, when the Ball Brothers Company through its officers was discussing in conferences with the officers of Hartford, Owens and Hazel-Atlas, the question of incorporating into a written agreement a limitation upon Owens and Hazel-Atlas of 100,-000 and 300,000 gross of fruit jars per annum, the conferees were advised by attorneys that such a written provision would be illegal in the face of the anti-trust laws, and that it is now contended by all the parties that such an understanding in the form of a gentlemen's agreement does not now and has not existed. In view of the contemporaneous writing of Herbert Knox Smith, one of the principal actors in the history of this inquiry, that "the rest of our contract relations are pretty complex and pretty carefully safeguarded," it behooves the court to proceed with caution, and perhaps with some degree of suspicion, in the face of the record disclosing the actions of the parties after the cancellation of Section 22 and after the consummation of the Ball Brothers agreement.

In 1929 there was a proposed revision of Section 22. In writing to W. E. Levis about this revision, H. W. Carter of Owens stated on May 10, 1929 (Ex. 665):

"Mr. Goodwin Smith and Mr. Lloyd Williams have always felt that there was danger from Washington in this veto section. It was originally put in over their opposition by the insistence of Mr. Owens, and more recently they have urged its cancellation, but were not able to persuade Mr. Boshart that it was wise.

"As I see it, we would retain little veto power of any practical advantage under the amended section, while at the same time the objection to the section from the Washington point of view would remain about as before."

Under date of May 23, 1930, H. K. Smith directed the following letter to L. T. Williams (Ex. 405):

"We have just had two days talk with Henry Carter and C. B. Belknap here and I have taken up with them a question which was in my mind prior to their coming, namely, the old question of a possible elimination of Section 22—Licensing Restrictions—from our General Agreement of April 9, 1924.

"I have always been of the opinion that this Section in there was a danger point for both of our Companies and for the validity of that Contract, although, so far as the Contract's validity is concerned, I have felt that in strict law, we ought to be able to justify that Section. But the trouble is that when you get into the Anti-Trust problem strict legal interpretation is only a small part of the problem, so that I have always felt that this Section was dangerous.

"But now the Anti-Trust situation is developing in such a way as to add very considerably to my fears about that Section.

"We have, first, the Petroleum Cracking case which you and I have discussed, in which apparent restraint of trade by exchange of licenses is a very important feature. As you know, I didn't like the law of that decision but, of course, it stands until the Supreme Court tips it over, if it ever does.

"Secondly, there has come up pretty much, every session of Congress, a Bill with a good deal of life in it providing that it shall be a good defense to patent litigation if it shall appear that the plaintiff (in the words of the most recent Dill Bill, S-4442) 'is a party to any combination (in the form of trust or otherwise), agreement, understanding, license or cross-license relating to or involving the use or control of said patent with any patentee or other person owning or controlling patent rights that are directly or indirectly related to or connected with the business resulting from the use or control of said patent, the effect of which is to substantially lessen competition or tend to create a monopoly in commerce arising out of the use or control of such patent or patent rights.'

"You will observe that the first part of the above language is a direct quotation from the Sherman Law but that there has been added to it the words 'license or cross-license'. I enclose a copy of the said Bill in case you don't happen to have one. I am informed that this Bill has a pretty good chance of being reported favorably by

the Committee and that there will be a hot fight in the Senate on it.

"Now this all goes to show the tendency on the part of the average citizen toward attacking patent monopolies and the general unfavorable position which such a monopoly has in the minds of the public.

"Thirdly, there is this most recent suit brought by the Government against the General Electric Company, Radio Corporation, American Telephone and Telegraph Company and Western Electric Company and Westinghouse Company, on the patent combination into which these concerns have entered. That Bill raises much the same questions as were raised in the Petroleum cases and, of course, is a much more dangerous action in some ways because the average citizen had not the slightest personal interest in Petroleum Cracking, but is, as a rule, the owner of a radio and can get quite excited about that subject.

"I feel, therefore, that the whole status of exchange or cross-licensing of patent rights or a combination thereof has taken on a new phase; is coming into public attention to a far higher degree than before and that anything in our contract which even looks like restraint of trade by means of patents may be a target for attack.

"I, therefore, urge upon you very strongly the desirability of wholly eliminating Section 22 from that Contract.

"As a matter of fact I think it has been of very little practical use or advantage. You people probably know now a good deal better than you did six years ago in 1924 how firmly our policy is established of avoiding any wild-cat and reckless granting of licenses, regardless of any contract obligations to any one else. In short, I should think it would be pretty clear to you, as it certainly is to me, that the small practical advantages derived from the existence of this Section are negligible as compared to the dangers which it contains.

"In my various talks with you on this general subject I know that you and I have both rather expected, sooner or later, some sort of Governmental investigation, and, possibly, attack of the Anti-Trust Laws. I think we have felt that in such attack Section 22 would be one of the storm centers. I know that both of us would rest a good deal more easier if this danger were removed.

"My suggestion, therefore, is that you take this up with your organization and let us know what their views are".

Exhibit 671-B is a letter from H. K. Smith to L. T. Williams, dated September 18, 1930:

"I am now informed that your deal with the Atlantic Bottle Company has gone through. This adds an additional factor to those which I specified in my letter of May 23rd as constituting the dangers confronting both of our Companies on that Section.

"Won't you be good enough to glance again over my said letter of May 23rd so as to have that in mind and then add the following consideration:

"I think it entirely possible that at any time now some agent, either of the Department of Justice or the Federal Trade Commission, being advised of your latest acquisition of Atlantic Bottle Company, may appear some fine morning in my office and ask me about the relations between our two Companies.

"Of course I could refuse, in the first instance, to give him this information until I had consulted with you. I should hate to do this, however, because it would simply increase his suspicions and he would ultimately get the truth about Section 22 anyhow and if we cancelled it after such an interview it would look like an admission of weakness. Both you and I know very well that if such a man should see Section 22 it would probably cause him to make an unfavorable report to the Department or the Commission. I might explain all I liked about the fact that this Section only covers patents owned by Owens but to the average man I don't think this would have much effect and I think the result would be certainly to start something.

"Therefore, I would greatly like to be in a position when I receive such an inquiry to show him our Contract frankly with that clause already cancelled.

"Now I feel pretty sure that I don't have to argue this point with you. I think you feel about as I do but what I am after is to urge you to bring it before the necessary authority in your Company and to see if we can't get this dangerous clause cut out before it gets us into trouble."

Exhibit 406 is a memorandum by H. K. Smith dated October 28, 1930:

"1. Most important of all, and practically imperative, is the cancellation of Section

22 of the Owens-Hartford 1924 General Agreement. I have put this question up to Henry Carter and Lloyd Williams three or four separate times at least, and I understand that they concur in my view of the matter, namely, that this clause is a distinct danger point from the standpoint of the Anti-Trust Laws.

"In view of the recent combination of Owens and Illinois and of their still more recent purchase of Atlantic Bottle Company, I feel that I may receive, at almost any time, a visit from some agent either of the United States Attorney General's office or of the Federal Trade Commission, asking for information as to our relations with Owens-Illinois.

"When that time comes I shall be obliged either to show that agent the Owens Contract as it now stands with Section 22 in it; or else refuse to show it to him, in which case his suspicion will at once be aroused and, of course, the Government can ultimately get that Contract by subpœna.

"If, on the other hand, I do show it to him right off I am quite sure that his attention will be primarily centered on Section 22 and no amount of explanation will prevent him from reporting that there is substantially a violation of law there. In my opinion it is not a violation of law but the ordinary field agent will, I think, consider it as such and so report it.

"What I want is to be able to show him that Contract with that Section out of it. With that Section out of it it is a perfectly plain license and contract."

Exhibit 408 is a memorandum by H. K. Smith dated November 11, 1930:

"4. At this point Mr. Williams came into conference with Mr. Safford and myself and we took up our desired elimination of Section 22 of the General Agreement. I made my argument to him for such elimination stating the dangers of the Section as it now stands from the Anti-Trust standpoint and the further fact that it was of little practical value because our policy always had been as stringent as Owens, and, while I could not promise anything for the future, I expected that it would remain so.

"Mr. Williams said that Mr. Levis took the position that the General Agreement had been approved by the Board of the Owens Company; that he did not feel that he ought to change it without a similar approval and that this matter would be put up to the Board at its next meeting sometime in December. Mr. Williams said that he agreed, generally, with my position; also that he thought all the Owens' people agreed with it as a broad proposition, but that when each actual case of new licensing came to their attention their thoughts shifted toward the danger of increased competition and they would feel less willing to give up this veto power.

"I pointed out to him that this danger of Government action hit us as well as Owens; that this Section 22, in my opinion, was dangerous mainly because it would serve as a fuse to explode a lot of other highly explosive materials that are in our histories."

Under date of November 20, 1930, H. K. Smith wrote to L. T. Williams as follows (Ex. 407):

"In connection with the suggested cancellation of Section 22 of our General Agreement, I want to add a couple of considerations to what I said to you when I saw you here in Hartford last.

"1. As you know, it is my opinion that Section 22 is probably legal when taken by itself and with a thorough understanding of the principles involved. The real difficulty lies in its

"(a) Psychological effect, and

"(b) Surrounding circumstances

"As to its psychological effect I am quite sure that it would catch the attention of an investigating agent of the Department of Justice as the most suspicious thing in the Contract. If he did not understand it completely he would probably report that in itself it was illegal.

"Secondly, and more important, he might understand it perfectly and regard it as legal in itself but as furnishing a foothold upon which further conduct might be carried on which would be *illegal*.

"You will remember the famous 'Gary Dinners' in the Government's attack on the U. S. Steel Corporation. Judge Gary was in the habit of calling together the heads of the various competing steel corporations for regular dinners at pretty frequent intervals. I do not think that there was any direct evidence that agreement on prices took place at these dinners. But the Government claimed and the public generally believed that such illegal agreements did take place there; that the opportunity was present and that human nature was such

that it was almost certain that they did agree on prices.

"Section 22 is clearly in just about that class. The Government would certainly claim it might be legal in itself but furnished the ground and excuse for illegal conduct.

"2. The second consideration that I want to call to your attention is the probable change in the general attitude of the Department of Justice in this new administration. I was in Washington yesterday and was talking with a man who is not now an official but was formerly a cabinet officer (not under Coolidge) and who still has very close connections with the administration. He indicated that he thought that during the Coolidge administration there was a fairly regular custom in the Attorney General's Office of giving practical consent to transactions and combinations of doubtful legality under the Anti-Trust Laws. He added that that situation no longer exists.

"I had not mentioned any specific case to him, we were simply talking in general. But I feel pretty sure, from what he said, that there is a good deal more danger of an attack on Anti-Trust grounds that there was in the last administration."

Exhibit 409 is a communication by H. W. Carter of Owens to W. E. Levis, dated December 13, 1930, as follows:

"The following is by way of comment upon the insistence of Hartford-Empire management on the desirability of cancelling Section 22 of the General License Agreement of April 9, 1924, entered into between Hartford-Empire Company, on the one hand, and The Owens Bottle Company, on the other:

"Mr. Williams has sent me copy of his letter to you of December 9, on this subject, giving the legal reasons why he believes, with Hartford, that this section should be cancelled. These are based mostly on his consideration of the Sherman and Clayton Acts, and the possible effect of the Dill Bill, if that measure, which has already passed the Senate, should become a law. I understand that the conclusions reached by Mr. Williams in this connection are substantially those heretofore reached by Herbert Knox Smith, General Counsel for the Hartford-Empire Company.

"Both lawyers have made a particular study of the so-called anti-monopoly statutes, and I assume that their position is well taken."

This is followed by comments on why the section might be eliminated from the business and practical standpoints.

Exhibit 410 is a communication from F. Goodwin Smith to H. W. Carter dated February 9, 1931:

"We received this morning the signed agreement canceling Section 22. I think it is a good piece of business for all of us, and that we have forestalled a great many annoyances which might have had considerable danger in them. We appreciate very much indeed the attitude of your company in regard to this matter, and I trust you will express our gratitude to Mr. Levis."

The Manner in Which Competing Patents Were Purchased. Another very pronounced way in which a consciousness of guilt exhibited itself was in the manner in which certain of the purchases of competing patents were accomplished. The parties constantly strove to give the deals the outward sign of validity and, as stated in one of the exhibits, to make it difficult to unscramble them. In very few instances were the patents of other concerns taken directly. Rather they tried to find some indirect method of reaching the desired goal of acquisition of all patents. This was done deliberately with a view toward avoiding the anti-trust laws. In addition, they were afraid of the aggregation of too many patents into a single hand. This is true of the acquisitions of the patents of Howard, W. J. Miller, Tucker, Reeves & Beatty, O'Neill, and of the deal with Lynch.

The W. J. Miller and Tucker, Reeves & Beatty deals were consummated at approximately the same time. The procedures for acquiring the assets and patent rights of these two companies were usually considered together. Exhibit 73 is a letter written by L. T. Williams, counsel for Owens, to H. K. Smith, general counsel of Hartford, on July 9, 1924. It will be noted that this letter deals with important acquisitions that are being contemplated within three months after Hartford and Owens had come together by virtue of their agreement of April 9, 1924:

"Mr. Baker tells me that negotiations are actively in progress for acquiring the Tucker, Reeves and Beatty patents, and that consideration is being given to purchasing Miller's rights, particularly his

applications interfering with the Tucker, Reeves and Beatty applications. I think you and Mr. Goodwin Smith are fully advised of the proposal though perhaps not of the exact present status of the negotiations. As I understand it, it is now proposed that title to the Tucker, Reeves and Beatty patents and applications be transferred to Hartford-Empire. Company directly, or possibly through the Owens Company, (though I see no reason for the latter procedure) and that payment of the purchase price be distributed over a period of years and made out of the royalties payable by the present licensees of Tucker, Reeves and Beatty, with a maximum limit and a guaranteed minimum limit. I also understand that the Miller rights, whatever they are, are probably to be purchased outright, for cash by Hartford-Empire Company.

"You and I discussed very briefly when I was in Hartford last April the question of acquisition of patent rights by Owens or Hartford for joint use and the probable effect of such acquisitions in bringing on an attack from the Federal Trade Commission or some other Government agency. I feel, and I think you do likewise, quite strongly that the Owens-Hartford contract standing by itself offers no just ground for attack by the Government for violation of the Anti-Trust Laws, and that if an attack should be made we ought to be able to defend against it.

"As I said to you last April, though I am somewhat apprehensive as to the effect of acquisition of further patent rights by the joint Owens and Hartford interests, or by either of them for joint use, my fear is that additional acquisitions will tend not only to invite attack as to those acquisitions but also to put a color upon the original Owens-Hartford contract that will make it look like the beginning or a foundation of an attempt to combine all of the gob feeder patents under one control, to thereby control the manufacture of bottles, and thus to restrain trade and tend to create a monopoly.

"I am not thoroughly familiar with the patent situation and particularly with the position that Tucker, Reeves and Beatty and Miller hold with reference to the Owens-Hartford patents. Mr. Rule tells me, however, that the present feeder used commercially by Tucker, Reeves and Beatty infringes Owens patents; that this feeder might possibly be so modified as to escape such infringement; and that there has been some talk of their having in process of development, at least on paper, of a feeder which they claim will not infringe Owens or Hartford patents and which will be covered and protected by applications for patents filed, or to be filed, by them.

"It seems to me it would be much safer, and I would much prefer, to operate under the Owens-Hartford contract without further acquisitions of patent rights other than developments made by our own engineering departments. It may be, of course, that the tangle of interferences and cross-claims of infringement require the acquisition of these rights and taking of consequent risk. What I am trying to do is to point out the tendency to invite, and to increase the danger of, an attack on our original contract if we make additional acquisitions of patent rights.

"The real substance of the matter, as I see it, is that Tucker, Reeves and Beatty are infringing Hartford's patents and that they want protection for themselves and their licensees against an attack by you. Do you not think that the deal would look better if put in such form that Tucker, Reeves and Beatty would pay Hartford rather than that Hartford should pay them? Could not they take a license from Hartford and agree that their licensees should likewise take licenses from Hartford? These licensees would then pay to Tucker, Reeves and Beatty royalties at the regular rates, in the aggregate not less than $50,000 or more than $200,000 (or whatever the final figures may be) and pay the balance to Hartford. That would probably cover the situation except possibly that Hartford is not protected against the granting of further licenses by Tucker, Reeves and Beatty under their present patents and under the patents to issue on their pending applications. This could be covered, of course, by an exclusive license by them to Hartford, subject to their outstanding licenses. Possibly this protection would be secured from the fact that by accepting a license from Hartford they would thereby acknowledge the validity of all the Hartford patents included in the license. I am not familiar enough with the details of the situation to know whether this arrangement would suffice. What I am driving at is this:—that the transaction shall have neither the form nor the substance of further acquisition of patents or of patent rights by Owens or Hartford but that Hart-

ford is simply granting licenses to people who are now infringing its patent rights.

"This letter, I fear, is rather long and rambling but I want to get to you my thought that we should keep away, as far as possible, from the substance and certainly from the form of acquiring competing patents and patent rights. At least a strong argument can be made that the aggregation of competing patent rights is as much prohibited by the Anti-Trust Laws as the aggregation of competing factories.

"Mr. Beatty is to have a conference with Mr. Baker here early next week, at which time the matter will be gone into more particularly as to the form the transaction will take, and I would, therefore, appreciate very much a letter from you at your earliest convenience, giving me your views and suggestions as to procedure."

Exhibit 1749 is a letter from H. K. Smith to L. T. Williams dated October 20, 1925, and reads in part as follows:

"Mr. W. J. Belknap has suggested, I understand, for our consideration here, the possibility of some arrangement with the Miller Engineering Company and W. J. Miller, the Lynch Glass Machinery Company and the O'Neill Company (I don't know its exact name). This arrangement would look to some sort of an elimination of the patent disputes, but mainly, I think, toward a combination into single control of the Miller, Lynch and O'Neill forming machine businesses.

"Now, I can see certain very decided advantages in some such deal. If it did nothing more than to put our present competitors like these into one group rather than into three, it would certainly simplify the situation. And if that group, while legally and financially separate, was, nevertheless, in friendly hands, this also would be an advantage."

This seems to encompass in a few lines the whole philosophy underlying the operations of these two companies, Hartford and Owens, over a period of years from the time they entered into the agreement of April 9, 1924. The elimination of patent disputes, which is the reason assigned now by the defendants in this case for the many combinations and acquisitions that the record discloses, appears to be secondary, and the elimination of competition appears to be primary. Continuing from the exhibit:

"But, of course, you and I have got to keep our friends 'out of jail' and similar difficulties. We don't know very much about the details of this suggestion, but I thought it worth while to put it before you generally, pretty early in the game, so that you can have it in mind. Offhand, I should say that if it were handled in a certain way, it might be perfectly safe from a legal standpoint. Suppose, for instance, that these three concerns were bought up and amalgamated into one concern by outside financial interest: That neither Hartford nor Owens took any share in its stock and that then Hartford and Owens, holding certain important patents on forming machines, should make an ordinary licensing agreement with the new company for substantial royalties on those patents. And, of course, as part of this deal, we would dispose of the present feeder patent conflict. Such an arrangement seems to me, as far as Hartford or Owens is concerned, fairly free from legal objections. Of course, the new combination itself might possibly be attacked simply as a combination. That would depend in the first place on the way in which it was combined and in the second place, on the extent of its business, but I shouldn't regard that danger as very serious.

"Please observe that this letter is very tentative and may be premature and mistaken. I am writing on very insufficient information. But I know that for my own part, when these germs first begin to grow, I like to watch the process from the start and not be called in as an undertaker after the victim has passed out."

Exhibit 76 is a communication by H. K. Smith entitled "Procedure" dated June 1, 1925, and directed to L. T. Williams. It reads as follows:

### "Procedure

"O'Neill

"Have some third party take option on O'Neill and then when the option is exercised, have O'Neill patent rights transferred to Owens or Hartford openly and rest of the O'Neill assets disposed of in whatever way may be desired.

"I do not think there is much danger in the O'Neill matter, however it may be handled. Preferably, however, I think, unless there is some good reason for continuing the O'Neill plant in business, that plant and all tangible assets had better be

disposed of without ever coming into actual ownership of Hartford or Owens. O'Neill wants to go out of business anyhow and is insignificant as a competitor. But, nevertheless, his plant is to some extent, I understand, a producer of competing forming machines and it might be a little better not to have title come to either Owens or Hartford.

"Lynch

"Let this matter lie until Federal, O'Neill and Miller have been attended to. There is no haste about it and in any event, it seems probable that we can accomplish all we want to in this direction without any purchase or any considerable capital investment. His price is probably now at the high point and may be materially reduced if the other things we have in mind are realized.

"Miller

"Probably the best way to handle Miller is to make a contract with some wholly outside party agreeing to pay him a certain sum for the Miller patent rights only, this sum being sufficient to cover the difference between the marketable value of Miller's tangible assets and the option price. Then let this outside party liquidate Miller direct just as a receiver would and turn over the patent rights to us for the agreed price.

"In this case, also, I want to avoid having the productive plant of Miller, which is now in competition with us making feeders, come under our control in any way. We should neither take any interest in the option nor in their plant at any time.

"As to Miller patent rights, I feel that the danger or criticism there is small for the reason that, as I understand it, he has got no patent hold on us at all by way of domination and his patent rights are important to us only as a nuisance in maintaining interferences. If that be so, we are not destroying any competition whatsoever by taking over his patent rights,—we are simply ridding ourselves of patent office litigation which I think we have a right to do.

"Federal

"In this case it seems necessary and reasonably safe also, to handle the matter in a very direct manner. Of course, merely as a special precaution and in order to hold the situation entirely open, I would advise that any option taken on the Federal rights be taken to an outside individual whom we can trust.

"But then I should have that individual transfer all the patent rights of whatsoever character direct either to Hartford or Owens so that they will come under the joint purchase clause and the licensed inventions.

"As to the Federal licenses themselves, I think it would probably be a little safer (not from the standpoint of the Sherman Law, but from the ordinary contractual law) to have the title to those licenses, in the first instance, go to someone outside, like the Hartford Special Machinery Company. That will leave Hartford-Empire in a position to bring any pressure to bear which it desires upon these licensees, because Hartford-Empire will not be a party to their licenses. It is probable, of course, that the Federal people will insist that we grant a complete immunity under our patents to their licensees at substantially the present terms of their existing licenses. But there may be a number of details as to form of license, fields of ware, right to get additional feeders, exclusive rights, etc. that both Federal and we will agree ought to be modified. It is for this reason that I think we should keep our hands clear so that we can bring pressure to bear if we want to.

"The option in this case, if a formal option be taken, should give us the right to pretty complete information as to T. R. & B. income from licenses, license expense, all the important facts as to licenses themselves, the number of feeders, licensees' rights to get additional feeders, etc. Of course, if possible, we should also secure an agreement from them to show us their patent applications, but this may be difficult and is not absolutely essential as I see it.

"We must, of course, insist on knowing all of the liens, grants, licenses and rights of whatsoever nature that are now outstanding against the Federal patent rights. (By Federal above I mean, of course, Tucker, Reeves & Beatty).

"This transaction, merely by virtue of its size and importance, seems to me might invite a Government attack upon us, perhaps more than any of the others. On the other hand, I do not feel that such attack would succeed. We have the most ample grounds for disposing of our difficulties with T. R. & B. in some such way. We have spent several hundred thousand dollars, over a period of six to eight years, in patent litigation with them; it is quite pos-

sible that if their patents come out and ours come out, the situation, as far as the machines are concerned, would be at a deadlock; if this newly discovered application comes to patent, we may be in a position where we have got to have protection from it; So that we seem pretty well justified under the Shoe Machinery cases, in acquiring these patent rights.

"It may be well to consider here, also, what would be the result should any or all of these matters be upset by Government action, as follows:—

"O'Neill

"This matter is comparatively small anyhow. All that we would hold would be the O'Neill patents which are mostly foreign and therefore would not come under any decree arising under the Sherman Law. Meanwhile the O'Neill organization and business as a going concern would have been irrevocably disposed of. We might be forced to put our O'Neill U. S. patents up for auction and sell them for a song and perhaps lose a few thousand dollars this way, but I cannot see that anything serious can happen in any event as to this transaction.

"Miller

"The situation is ever clearer as to Miller. We will get the Miller interferences out of the Patent Office by the transaction and presumably before it can be upset in the courts, our patents will have come to issue and I do not see that any decree can hurt us in any way. Certainly it can't take away our patents from us, because they never belonged to Miller in any sense.

"Federal

"Under similar circumstances, a dissolution here might be much more serious, depending upon the nature of the decree. It could hardly force us to give up any patents taken out in our name. We might conceivably be forced to dispose of patents practically taken out in the name of T. R. & B. and assigned to us. By the time, however, that such decree would become final, we would hope that the situation would be such that those Federal patents would not be worth much to anybody. We might lose whatever value we paid for them, but that would be all.

"Of course, the court might order that we transfer the entire Federal licensing business to some other party and turn over to that party the Federal patents. This, of course, would simply restore to a certain extent the existing situation and establish a competitor. It would have either one of two results—either that competitor would be in a reasonably strong position, in which case we could probably dispose of all these assets as a going concern for somewhere near what we paid for them and take our chances with competition. Or, by that time, the situation would be such that it would be practically impossible to restore the old Federal competition even if it had all the Federal patents; in which case we wouldn't get much for the sale of these assets, but on the other hand, the competition wouldn't be serious.

"Meantime, we would have gotten out our own patents; probably had the income from Federal licenses for several years and very possibly also, as a result of the Federal and the other deals, we might have brought in Hazel-Atlas under license.

"I, therefore, do not see much danger of having any of these deals upset, as set forth. If they are upset, I still believe that by that time, we will be in a better position even with such dissolution than we would be otherwise; and I can see no danger whatsoever of any criminal liability because the cases are necessarily so doubtful in the matter of law that they could never get any jury to convict and I doubt if any prosecuting officer would ever attempt any criminal action. Criminal action in cases of this sort, so far, has practically been non-existent."

Here is laid bare the innermost thoughts of a man whose desire for power over an industry, and the consequent financial gains that flow therefrom, transcends any lurking respect for the laws of his country or concern for its future well-being. He passes lightly over the likelihood of a criminal prosecution—the only language, perhaps, that he could understand. His judgment in this regard has proved to be correct. This court has not been apprised of the reason for failure of criminal prosecution. This unanswered question rests on the doorstep of the Department of Justice.

In analyzing the likelihood of civil prosecution at some time in the distant future, he coldly weighs the consequences on the one side, together with the penalties that might be exacted, and the ultimate financial gains on the other side. Then, like a current popular radio comedian, he decides to do it and risk the whipping.

Exhibit 77 is the reply of L. T. Williams to the last document, and is dated June 6, 1925. It reads as follows:

"Owens Bottle—Hartford Empire

"Discussion was had as to the possibility of a merger or mergers of the following concerns on the basis of figures presented by them severally:

| | |
|---|---|
| O'Neill | $ 300,000 |
| Lynch | 1,500,000 |
| Miller | 500,000 |
| Federal | 1,500,000 |
| Total, | $3,800,000 |

"Miller:

"Some third person might independently purchase the entire assets of Miller and then sell to Hartford and Owens the Miller patents and applications for patents at a figure which would permit him to make some profit out of the salvage value of the remainder of Miller's business. Deal might better take the form of an option so that if the Federal situation should develop properly the Miller deal would be dropped or could be consummated at a lower figure. It would be preferable not to deal with Miller if his feeders could be stopped by the Hartford or Owens Federal patents, which would save capital outlay and legal difficulties.

"O'Neill:

"O'Neill is the least important of the companies mentioned. Little difficulty need be apprehended if he alone is considered but if he is included in the deal with others he simply adds to the load of legal complications. If the Federal situation develops properly O'Neill might well be disregarded. The acquisition of O'Neill's physical plant or its elimination from the competitive business adds a feature not present in the mere disposition of his patents. In any event, the physical property should not go to Owens or Hartford, either permanently or temporarily.

"Lynch:

"Lynch might better be disregarded at this time. Unless the Federal situation can be properly developed, it seems undesirable at this time to undertake the capital outlay and legal burdens incident to consolidating the forming machine situation, at least until such time as it becomes fairly evident that Headley and Thompson can not secure patents of real value. If either the Federal situation or the Headley and Thompson situation properly develops Lynch and O'Neill may be disregarded or may be much more easily disposed of.

"Federal:

"The Federal situation is the most important and demands more immediate attention than the others. If the Federal claims, reasonably allowed, are as good as they now appear, they will suffice to stop all commercial feeders in present use. Owens and Hartford, however, will probably be able to stop the use of Federal's present form of feeder, thus creating a deadlock. Either situation, however, makes a good justification for purchase of the Federal patents. It would be better to take them directly in the name of Hartford or Owens, or both, than to use some indirect method which, on examination, will be perfectly apparent and which will give considerable basis for the claim that the acquisition is not proper within the law. If we are correct in our view of the propriety of acquiring the Federal patents, nothing need be done with the others, thus avoiding capital outlay and loading the structure with legal difficulties. It seems now that if an interference is declared on Federal's allowed claims it will be with Hartford only and not with Miller. Unless Miller is advised of the situation, it would, therefore, appear unnecessary to deal with Miller, or, if later deemed desirable, he can be dealt with on a much better basis after the Federal patent issues. In view, however, of the possibility of successful attack on the Federal acquisition, it might be well to so apportion the rights thereto between Owens and Hartford at the time of acquisition or in the acquisition as to properly protect both Owens and Hartford in case of dissolution. In any event, before the deal with Federal is consummated, we should have complete information as to outstanding licenses and obligations, the breadth of pending applications and the measure of protection to be given to Federal's existing licensees.

"Proposal for an independent organization to take over one or more of these companies is fraught with many difficulties. If it is really independent it will constitute a greater menace to Owens and Hartford's present patent position than the divided situation does, and if not really independent it will present greater objections from a legal viewpoint than their direct acquisition. This conclusion is only tentative and may be entirely erroneous."

Exhibit 1904 is a copy of the minutes of a directors' meeting of Hartford held on July 7, 1925, regarding the Tucker, Reeves & Beatty purchase, and reads in part as follows:

"*Provided* further that the Counsel of Owens Bottle Company and of this Company shall give it as their opinion that the danger of attack and dissolution by the Government under the Anti-trust laws is not sufficiently great to be allowed to stop this purchase."

On July 31, 1925, H. W. Carter of Owens wrote to H. H. Baker of Owens regarding the Tucker, Reeves & Beatty purchase (Ex. 624): "While I have referred to Owens and Hartford as though they were to take the above assignments direct, there is nothing in the suggested arrangement which would prevent the interposition of a holding corporation so as to nominally leave Owens and Hartford entirely out of the deal, and in fact, I would consider this rather desirable. Neither is there anything in this proposed arrangement which would interfere in any way with the suggested sale of certain Hartford rights to a separate party (for example, the Hartford Special Machinery Company), as has been heretofore discussed."

Exhibit 74 is a memorandum by F. Goodwin Smith of Hartford, dated August 7, 1925:

"As far as the Sherman Law and Clayton Act are concerned, Mr. Knox Smith feels that we are on safe ground and are justified in going ahead as far as these two laws are concerned.

"In brief, I feel that the net results of the advantages and liabilities of concluding the deal are more to our benefit than the net results of the advantages and liabilities of staying out of it, as we now, to the best of our abilities, appraise such advantages and liabilities under the complex and difficult problems which the matter presents.

"Mr. Williams is in favor of making the purchase on the basis of the appraisal of its advantages as against its disadvantages and the disadvantages that exist or arise from not making it. He, however, is not so confident that we are entirely safe from attack under the Anti-Trust laws as Mr. Knox Smith is. He also expresses the view that the interposition of the various legal barriers such as the assignment of certain patent rights to Hartford Special Machinery Company, the transfer of licenses to a trustee and the option to Feeder Patents Company to take any or all of the licenses, are more in the nature of screens than barriers or defenses. He insists that the decision to make or not make the purchase should rest on the basis of a clear recognition that we, in the last analysis, are probably assuming the same liabilities and disadvantages we would assume if the Tucker, Reeves and Beatty applications for patents and their licenses were taken directly by the same person. He recognizes, however, that the screens or defenses discussed may, and probably will, look much stronger to the Tucker, Reeves and Beatty licensees than they do to him, with the resulting advantage to us in dealing with them for a revision of their licenses."

Exhibit 80 is a report by H. K. Smith regarding the Miller and Tucker, Reeves & Beatty purchases, dated August 20, 1925: "Of course, in substance, the transaction comes pretty close to a purchase of these licenses with their income by Hartford and Owens. Hartford and Owens certainly furnished the money and expect ultimately to control all these inventions and patents. And if it could be shown by any licensee whom we were suing that this arrangement and separation of title was a mere cover for an inequitable or wrongful transaction, it is probable that any court would strike through these legal diversities of title and tie up the Hartford inventions wherever located with the licensing income and thereby estop us."

Exhibit 650 is a letter from H. W. Carter to W. H. Boshart, both of Owens, dated September 10, 1925, regarding the O'Neill patent rights: "One of the principal questions in this connection, however, would seem to be as to the standing of the proposed purchase with relation to the Sherman law, and on this score, we defer to the better founded opinion of Mr. Williams. It looks dangerous to us."

Exhibit 1860 is a memorandum by H. K. Smith concerning an interview with Chester Underwood of the Knox Company, dated August 1, 1929: "I pointed out the difficulties which arose by reason of the possible bearing of the Sherman and Clayton Acts, namely, that it was impossible for us to take over any of the stock of Knox-O'Neill Company, as this would undoubtedly be a violation of the Clayton Act."

Exhibit 1064 is a communication from A. T. Safford of Hartford to T. C. Werbe of Lynch, dated February 12, 1934: "We

finally concluded to handle it as we are attempting to do now, keeping the Lynch sale and the Hartford license separate. We feel if Lynch is given licenses to issue on our behalf that it will look too much as if in this case Lynch is acting as Hartford's agent for the purpose of issuing licenses. This is a result which we do not wish to have happen, because if it does, then all the advantage of separating the sale and the license disappears."

Exhibit 534 is a communication from A. F. Reed, an applicant for glass machinery, to F. Goodwin Smith, dated August 1, 1936:

"We have built up our business on Lynch machines and have had no other type of machines in our plant for a great many years and we do not think there is any justice in their telling us today that we cannot have any more machines without taking out a Forming Machine License with you, whereas all their other customers operate these machines without a Forming Machine License.

"This seems to us to be a good example of monopoly in restraint of trade."

Exhibit 535, dated August 4, 1936, is the reply of F. Goodwin Smith: "I do not understand what you mean by 'monopoly in restraint of trade.'"

Miscellaneous. The question of a charge of conspiracy or violation of the anti-trust laws came up also in connection with some of the litigation in which Hartford was engaged. Exhibit 1736, a communication from F. Goodwin Smith to H. H. Baker of Owens, dated January 8, 1925, reads in part as follows: "Nester has not paid his minimum royalties and we have brought suit against him covering these payments. We have not actually set the date of trial, due to the fact that Herbert Smith wished to get the price-fixing clause canceled in all our previous contracts. This has practically been completed, and Herbert Smith plans, as soon as he can spare the time, to go to St. Louis and push the matter to a conclusion."

Exhibit 1737 is a communication from H. K. Smith to Lehmann and Lehmann, attorneys, dated April 20, 1926, regarding the suit against the Obear-Nester Company:

"Now what we want to do is to push these defendants as hard as we can in both directions. I am not particularly anxious to have you bring your suit to a trial at once, because there is, of course, an uncertainty in it, based on the Sherman Law question, but on the other hand, I would like to have you give that suit an appearance of activity and if in doing so, you get drawn into a position where you have to try it, I shall not be greatly troubled. Personally, I feel we have at least an even chance to win that case even against the Sherman Law defense and I further believe that the patent case will never be tried, but that as soon as it is started, there will be a movement toward adjustment and we shall insist in any such adjustment that your case is also settled. Therefore, if there is any action you can take which will give the defendants the impression that we are about to push your case, I wish you would take it.

"We have no particular desire to oppress the Obear-Nester Company, but on the other hand, their action in lying back and neglecting to pay minimum royalties for a considerable period and then finally alleging the total invalidity of the contract on the ground of the Sherman Law has left a very bad taste in our mouth and I don't propose, if possible, to let them get away with it."

Exhibit 662 is a communication from H. W. Carter of Owens to F. Goodwin Smith dated December 26, 1928:

"Mr. Boshart would like to talk this matter over with you and at the same time discuss other important questions, such as that of suing Ball. He feels that Ball ought to be sued just as soon as we can find out what patents he is infringing. And this may require considerable thought, inasmuch as it seems altogether probable that the infringement will extend to Hartford's phase controlling patents and perhaps also to our Lott patent.

"If this should prove to be the case, then separate suits by Hartford and by Owens would be indicated, at the risk of the conspiracy charge which we have been dreading but the fear of which up to the present time seems to have been more in anticipation than in reality.

There are other isolated instances where the parties manifested a consciousness of guilt. Exhibit 861 is a communication from W. E. Levis to R. H. Levis, dated August 18, 1937: "Bunn Belknap is not very enthusiastic about the Illinois Company's owning these shares, because he feels that it has been a distinct asset to be able to state that no one connected with Owens-Illinois has any stock in Hartford. It does,

however, fit into the whole Illinois Company investment picture, particularly if the funds with which shares were purchased were furnished by others with whom we may subsequently become associated, such as I. J. Collins and his associates."

Exhibit 1742 is a letter from S. H. Philbin, counsel for Hazel-Atlas, to R. D. Brown of Hartford, dated May 24, 1934, which reads as follows:

"A man called to see me this afternoon who said that he was James L. Dalton, from the Department of Justice, and he showed me an identification card to that effect. He asked for information regarding the Hartford, Hazel and Owens license contracts and the litigation by Hartford against Hazel. I told him what he probably already knew, namely, that there were license contracts entered into between these concerns as of July 1, 1932, and I also told him about the patent suits brought by Hartford against Kearns-Gorsuch and Hazel. He asked for copies of the license contracts and I said that Hazel did not feel free to give them to him without the consent of the other parties to the contracts.

"I also told Mr. Dalton that you had communicated with me in October, 1933, after an inquiry at Hartford regarding Hartford licenses, and that it was then the position of the Hartford Company that it was unwilling to have its licensees, including Hazel, inform others, including the Department of Justice, concerning its license contracts with them.

"Mr. Dalton asked me for the name of the Hartford-Empire counsel and I gave him yours, so that he may call upon you in the near future.

"I am sending a copy of this letter to Mr. McNash."

Exhibit 1778 is a memorandum by C. B. Belknap of Owens dated June 16, 1932, relative to an amendment of the 1924 agreement between Owens and Hartford: "Hartford takes a non-exclusive license in place of an exclusive license, but this is a matter which is done simply to guard against government interference and is nothing which Owens-Illinois itself cares for."

It seems clear to me that the foregoing exhibits—writings made contemporaneously with events as they were occurring in the industry and made by key figures in the industry representing the large companies, defendants herein—give ample evidence of "an ever present manifestation of conscious wrongdoing." Especially are those transactions of a tell-tale character that were set up as obstacles in a possible and expected future Government investigation or suit under the anti-trust laws. In the purchase of the Tucker, Reeves & Beatty and the W. J. Miller patents and assets, deceptive transfers were set up as screens to deceive the uninitiated and hamper an investigation under the anti-trust laws. They appear to be no different from the screening transactions that were complained of by the Supreme Court in the American Tobacco Company case.

### Miscellaneous Practices.

In reviewing a case comprising a record so voluminous as the one involved here and in writing an opinion covering the important matters at issue, it is impossible to touch on many issues and matters developed in the trial of the case for lack of time and space, and it is only possible to record and comment on those matters carrying the most weight in the conclusions arrived at by the court. Only excerpts from certain selected exhibits are quoted herein. There are many matters, developed in the trial and contained in the record, that cannot be discussed here for lack of time. There are some matters in addition to those already discussed which the court feels ought to receive comment as carrying weight.

As we have heretofore seen, after the closing of the April 9, 1924, agreement between Hartford and Owens and through the combined efforts of these two companies acting in conjunction with one another, much litigation was pursued. Many competing patents and businesses were acquired and pending interferences in the Patent Office were pressed to conclusion so that patents in which these companies were interested might be obtained. Protective measures were also taken, especially by Hartford, to insure the position that it had and was acquiring in the glass container industry.

In the pursuit of the ambitions of these companies following the agreement, tactics were pursued and things were done that were of questionable character when looked upon in the light of the ultimate purpose, to wit, domination and control, which were sought to be obtained.

Ten days after the agreement was signed, on April 19, 1924, V. M. Dorsey of Hartford wrote exhibit 1766 to H. W. Car-

ter of Owens, in which he stated that he hoped that Hartford and Owens would "soon have an opportunity for putting the cards on the table and properly stacking them for use against our common adversaries." In testifying from the witness stand, Dorsey stated (R.9395) that by "stacking the cards" he meant "arranging them so they fall in the proper order," and that he was getting the patents and patent applications "so they would come out in the most effective way." This, it will be noted, was a communication to Owens and suggested joint operation upon their part against their common adversaries, which meant, in Dorsey's words, that they would get the patents and patent applications "so they would come out in the most effective way."

Then followed a course of procedure involving a shifting of claims between the patent applications of the two companies in such a manner as to obtain the strongest patents possible. This was done through the joint cooperation of the legal staffs of the two companies. As a result, patents issued virtually as the two cooperating companies desired, and this, of course, set up a distinct handicap to inventors having applications in the Patent Office for patents that might come into competition with those sought by and issued to Hartford. This joint method of action in the Patent Office in order to prevail over their adversaries resulted in distinct advantages to the two companies that otherwise might not have been obtained.

Another method that was pursued for the purpose ostensibly of extending the patent monopolies as long as possible was the practice of "blocking off" and "fencing in" the patents of other inventors. Exhibit 388 is a memorandum by H. K. Smith of Hartford, dated February 18, 1930, and entitled "Memorandum of Policy." It reads in part as follows:

"Many further examples can be cited where applications now owned will have a distinct bearing on our future developments, as well as on developments in many lines by others, and it would seem to us to be the wisest and safest policy to protect all ideas which are so new as to have patentable possibilities.

"We now have a number of applications which were filed to definitely forestall the development of competing machines by others.

"It often happens that if minor improvements are protected by patents, machines and processes licensed under the original basic patents are given much longer earning life by the fact that the minor improvements continue the protection on the machine, and even when the basic patents expire, others are prevented from using the latest commercial form of the machine.

"Example:

"The Owens basic patents expired several years ago. Nobody, however, dare use the present type of Owens machine because of improvements covered by minor patents. Likewise, if the original patent protection obtained on particular machines should not be sustained by the Courts, yet a second line of defense patents covering details and improvements may become a most valuable asset.

"It has always been our ambition to obtain patents which will be related to furnace, melting and refining, feeding, delivery, forming, automatic handling, carrying, stacking and annealing. Conceivably we might lose patent domination of one or more important links, but still retain practical control of the whole chain by means of controlling the most efficient form of the other links. * * *

" 'Direct patent protection' means those patent applications which read directly upon or cover our devices, parts thereof, or proposed physical improvements thereon.

" 'Indirect patent protection' of a device, includes those applications which prevent the use or improvement of an existent or possible substitute for the device. This 'indirect protection' seeks to block competing devices which would lessen our income.

"Of the 223 cases filed in the three years 1927, 1928, and 1929, 200 are direct or indirect protection to the devices mentioned above; 88 applications being 'direct protection' and 112 'indirect protection'."

At pages 15 and 16 of this memorandum appears the following:

"In taking out patents we have three main purposes,—

"(a) To cover the actual machines which we are putting out and prevent duplication of them. * * *

"(b) To block the development of machines which might be constructed by others for the same purpose as our machines, using alternative means.

"(c) To secure patents on possible improvements of competing machines, so as to 'fence in' those and prevent their reaching an improved stage."

This last statement was made by one of the principal actors in the conspiracy and shows that Hartford's purpose in taking out patents had nothing to do with the progress of the arts and sciences and obtaining a reasonable reward to the patentee. It does show that Hartford intended to use the patent privilege for purposes far beyond the intention of Congress in granting letters patent. This, coupled with the fact that the conspiracy involved herein actually discouraged many inventors from further efforts to improve the feeder art, is a complete answer to Hartford's position that everything it did was justified by its patent grants.

The publication and use of the so-called "Clarke Article" has consumed considerable time in the trial of this case, and only such time may be taken here as to show the nature of the proceeding, the purposes sought to be attained, and the results that were obtained from its use.

For a number of years Hartford had on file in the Patent Office its so-called Peiler "stuffing" application, by means of which it hoped to dominate the gob feeding art. The Tucker, Reeves & Beatty and the Miller feeders were competing with Hartford's feeders. Immediately after the April, 1924, agreement between Hartford and Owens, steps were taken which resulted in the acquisition by Hartford of Tucker, Reeves & Beatty and of Miller, with the financial and legal assistance of Owens. After these acquisitions had been accomplished, the Peiler stuffing application was released from the Patent Office interferences with these acquired applications. The Patent Office was still opposed to the issuance of a patent holding such broad claims as those contained in the Peiler application. Steps were taken by Hartford and Owens to change the position of the Patent Office in this regard, and one of these steps was the joint preparation of an article, to be signed by some apparently unprejudiced authority and to be published in some magazine of large circulation in the glass industry, for the purpose of bringing it to the attention of the Patent Office and thereby influencing it to issue the patent with the broad claims sought by Peiler. This article was written by R. M. Hatch of Hartford, acting in conjunction with R. D. Brown of Hartford, and under the critical eye of V. M. Dorsey of Hartford and H. W. Carter of Owens. On April 19, 1926, Hatch wrote to Carter as follows (Ex. H-5138):

"I prepared this article as far as possible with reference only to the proceedings of the Bottle Blowers Association, and knowingly and intentionally I reproduced some of the errors found therein."

Carter wrote to W. H. Boshart of Owens that (Ex. 137): "Under the circumstances, I do not see that we need be very critical in our treatment of the article. If not too rank, would say that we better let it go through."

Hatch procured one W. P. Clarke, then president of the American Flint Glass Workers Union, to sign this article, under the pretense that it bore his authorship and in payment therefor Clarke was later given the sum of $8,000 in cash by Hatch. This payment was shared by Owens and was charged upon the books of Hartford as going to "attorneys fees."

The article was published in the July 17, 1926, number of "National Glass Budget" and was entitled "Introduction of Automatic Glass Machinery; How Received by Organized Labor—By William P. Clarke, President, American Flint Glass Workers Union."

On October 11, 1926, the article was cited to the Patent Office by V. M. Dorsey of Hartford. The attention of the Office was called to the article as evidence that the Hartford feeders had been a great success, but the Patent Office was never apprised of the fact that Hatch, with the assistance of Brown, Dorsey and Carter, was the real author of the article.

On January 13, 1928, the Peiler stuffing patent application was allowed by the Patent Office and a patent was issued to Hartford which contained the broad claims that it sought over the gob feeding art.

At a later date, in the suit of Hartford against Hazel-Atlas, the article was relied upon by Hartford in the Third Circuit Court of Appeals. 59 F.2d 399. It appears that the Court in its opinion placed some reliance upon the Clarke Article, although the fact that one of the parties had written the article was never brought to its attention.

Legal Considerations.

Article 1, Section 8, Clause 8, of the Constitution invests Congress with the

power to enact the necessary legislation for the protection and consequent reward of inventors. This clause reads as follows: "The Congress shall have Power * * * To promote the Progress of Science and useful Arts by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries."

Acting in accordance with this authority, Congress passed laws that awarded to an inventor a patent which conferred upon him the right to exclude others from the use of his invention for a period of seventeen years.

■■■ There is no question but that, under the privilege conferred upon an inventor through the patent, a patentee alone has the right to make, use or vend the patented article. Bement & Sons v. National Harrow Co., 1902, 186 U.S. 70, 22 S.Ct. 747, 46 L.Ed. 1058. He may even refuse to make, use or vend, and thus withhold the value of his inventions from the public.

■■■ There is no question but that the patentee has the exclusive right to license his patents to others to make, use or vend the patented article. He may attach to his licenses such reasonable restrictions on the licensee as may be necessary and advisable to return to the licensor a reasonable reward for the use of his licensed inventions. United States v. United Shoe Machinery Corp., 1918, 247 U.S. 32, 38 S.Ct. 473, 62 L.Ed. 968; United States v. General Electric Co., 1926, 272 U.S. 476, 47 S.Ct. 192, 196, 71 L.Ed. 362.

In the latter case it was said that the patentee may grant a license to make, use and vend patented articles "upon any condition the performance of which is reasonably within the reward which the patentee by the grant of the patent is entitled to secure."

The early policy of the Hartford-Fairmont Company, pursued by its successor, the Hartford-Empire Company, down to recent months, was to refrain from a use of the patented machinery or machines by itself becoming a manufacturer of glass products. The company further pursued a policy of having most of the patented machinery made by the Hartford Special Machinery Company. It refused to sell its machine outright to users thereof. Thus, the Hartford Company did not itself make, use or vend its patented machines, except that it caused the machines to be made for its own disposition. The company chose not to license others to make or vend its machines, but it adopted the plan which it pursued from early days down to recent months of licensing the use of its machines to manufacturers of glassware, and it placed within these licenses certain restrictions that limited the licensee on the kind of glassware that he might produce with the machine, the quantity of glassware that he might produce per annum, and the use to which the licensee might put the manufactured glassware; as well as the market, weight, capacity, color, composition and territory (Northwestern). The record does not disclose that at any time did Hartford impose in its licenses conditions upon the prices which the manufacturer might charge for the product of the machine. This, it clearly appears from the record, was unnecessary. A system of price leadership obtains in the industry based on the control that Hartford exercises over the glassware produced by virtue of its restrictive licenses and its retention of title to the machines which it licenses. A system of price leadership obtains in the industry whereby, for example, Owens publishes its price list chiefly covering narrow neck glassware; Hazel-Atlas operates as the price leader for wide mouth glassware; Ball Brothers serves as price leader for fruit jar output; and Thatcher serves as price leader for milk bottles. The record is replete with instances where some of Hartford's favored licensees complained that another company was engaged in price-cutting. The record also discloses that upon receipt of such complaints Hartford took positive action, if the so-called price-cutter was not a licensee of Hartford, either by way of a threat of litigation, by actual litigation, or by such steps as led eventually to the purchase of the price-cutter by one of the favored licensees. The limited term for which the licenses were issued permitted Hartford to retain such a measure of control over its licensees that it was unnecessary to more than warn them. While there was no compulsory following of these prices, the companies were able to apply moral sanctions, with the cooperation of Hartford, which amounted to the same thing.

It is the contention of Hartford that the restrictions entered in its licenses were reasonable restrictions designed for the purpose of returning to the licensor a re-

ward for his inventive genius, and that these restrictions were resorted to for no other purpose. As put in the concluding argument by counsel for Hartford, "we claim that such domination of any part of the industry, either glass machinery or glass, was only that inherent in the patents to which we believe we were entitled."

It is the contention of the Government that these license restrictions were the forefront of a broad general scheme to obtain and maintain domination and control over the glass container industry.

The record is convincing that despite the fact that the substantial part of Hartford's income is derived from fees and royalties resulting from the licensing system, yet its primary purpose in making use of such a system was to obtain dominance over the industry. It is equally clear that it was the primary purpose of obtaining monopolies and stabilizing the market which prompted the other defendants to join with Hartford.

Again referring to exhibit 395, entitled "Memorandum as to Hartford-Fairmont and Hartford-Empire History and Policy," dated March 26, 1928 and written by H. K. Smith of Hartford, we find on page 2 thereof the following:

"Consequently we adopted the policy which we have followed ever since of restricted licensing. That is to say,

"(a) We licensed the machines only to selected manufacturers of the better type, refusing many licensees whom we thought would be price-cutters, and

"(b) We restricted their fields of manufacture, in each case, to certain specific articles, with the idea of preventing too much competition.

"(c) In order to retain more complete control of the situation, we retained title to the machines, and simply leased them for a definite period of years, usually 8 or 10 years, with the privilege of renewal of a smaller additional term."

In 1922, V. M. Dorsey wrote to A. D. Falck of Corning as follows (Ex.681): "F. G. Smith, in private, suggested to me the most revolutionary theory, which he will no doubt talk to you about, viz., putting out the feeders very much like telephones are installed, that is, with an installation charge with a flat royalty plus royalties on production above a given amount. I think it has much to be com-

mended. It would certainly put the pirates out of business quickly."

It will be seen from the above that Dorsey's chief interest in a licensing system was not the accrual of revenue therefrom, but the use thereof "to put the pirates out of business quickly." This could mean nothing more than the use of the licensing system for the purpose of obtaining domination over the industry.

In July of 1929, H. K. Smith wrote that (Ex. 255, Sec. 71):

"W. E. Levis said that his ideal for the future was a situation where

(a) Hartford would control entirely the licensing under both Owens and Hartford patents, suction, gob feed and any other form.

(b) That Owens should confine itself to a manufacturing business.

(c) That Owens should have the right to use at preferential rates, all of these developments.

(d) That Owens should share in all of the income therefrom."

In November of 1929, W. E. Levis wrote, in a report to the Owens Board of Directors, the following (Ex. 775): "Our negotiations with Hartford-Empire Company and others, so far as our patent situation and royalty income is concerned, should be to attempt to secure a position whereby we pay no royalty on any item we produce and we attempt to have all others pay royalty on every item they produce, we participating with anyone else in the royalties they receive."

It occurs to me that if the issuance of restrictive licenses by patentees on the use of machinery used in an industry wherein the patentees are important units, is part of a common scheme or cooperative effort upon the part of these units to obtain dominance of and unreasonably restrain trade in an industry engaged in producing an unpatented article, then certainly a court of equity has the power to declare such restrictions illegal in an action based on the anti-trust laws.

If the Hartford-Empire Company had extended to its licensees unrestricted licenses, permitting them the use of its machinery without limitations upon the use, kind or quantity, etc., of the unpatented product of the machine and had left them to sell at any price that open competition might dictate, free from any hidden threat, it could not be

said that the patentee or licensor would fail to obtain a reasonable reward within the grant of the patent.

By the operation of the restrictive license plan, Hartford managed to protect the monopoly that Corning attained over the manufacture of the lines of ware particularly reserved to it; it was able to establish a milk bottle monopoly through its license to Thatcher, and a fruit jar monopoly through its license to Ball Brothers. It is here interesting to note that, in many instances, where a restriction limited a licensee to the use of the glassware produced, this course of conduct virtually designated to the licensee the market in which he was to dispose of his unpatented product. If a licensee violated any of his restrictions, Hartford could cancel the license, repossess the machines, and put the licensee out of business. This put the licensees in a position where they had to so conduct themselves as that they might be in a favorable position, upon the expiration of their eight or ten year term, to receive a renewal license. Furthermore, it destroyed in time all incentive to assist in the progress of the arts and sciences by developing machinery and equipment other than that of Hartford. An example of this is shown in exhibit 629, quoted above, written by Garland Lufkin of Owens in 1929:

"I consequently agree with you that there is very little to be gained by us in continuing our present effort to conceive new ideas on feeder type machines."

A requirement in the licenses that were issued for many years, that all improvements on the machines become the property of Hartford and that the licensee acknowledge the validity of the Hartford patents used by him, further served to destroy initiative in promoting the progress of arts and sciences.

 The patent privilege is a grant by the public, through duly elected representatives, made for the purpose of promoting the progress of the arts and sciences. Could it be said that this privilege, when bestowed, gives to the recipient the right to violate substantive laws enacted by the same representatives of the people and for their general protection? I repeat that it is the position of the defendants that the acts and things done by them were within the privileges contained in the patent grant, and that any control that may exist over the production and marketing of unpatented glassware is but the result of a normal exercise of the patent privilege. The court, however, is distinctly of the opinion, in the light of the entire record, that the dominance and control over the field of unpatented glassware are the primary objects of the restrictive licensing system pursued by Hartford, and that that control is so complete, so minute, as to preclude any thought that it is the unplanned result of the exercise of privileges contained within the patent grant.

In Standard Sanitary Manufacturing Co. v. United States, 1912, 226 U.S. 20, at page 48, 33 S.Ct. 9, at page 14, 57 L.Ed. 107, the Court said: "The agreements clearly, therefore, transcend what was necessary to protect the use of the patent or the monopoly which the law conferred upon it. They passed to the purpose and accomplished a restraint of trade condemned by the Sherman Law."

At page 49 of the same case in 226 U.S., at page 15 of 33 S.Ct. we find the following: "Rights conferred by patents are indeed very definite and extensive, but they do not give any more than other rights an universal license against positive prohibitions. The Sherman law is a limitation of rights, rights which may be pushed to evil consequences, and therefore restrained."

In Morton Salt Co. v. G. S. Suppiger Co., 1942, 314 U.S. 488, 62 S.Ct. 402, 404, 86 L. Ed. 363, we find the following: "It thus appears that respondent is making use of its patent monopoly to restrain competition in the marketing of unpatented articles, salt tablets, for use with the patented machines, and is aiding in the creation of a limited monopoly in the tablets not within that granted by the patent. A patent operates to create and grant to the patentee an exclusive right to make, use and vend the particular device described and claimed in the patent. But a patent affords no immunity for a monopoly not within the grant."

Again, at page 405 of 62 S.Ct., we find the following: "The grant to the inventor of the special privilege of a patent monopoly carries out a public policy adopted by the Constitution and laws of the United States, 'to promote the Progress of Science and useful Arts, by securing for limited Times to * * * Inventors the exclusive Right * * *' to their 'new and useful' inventions. * * * But the public policy which includes inventions within the granted monopoly excludes from it all that is not embraced in the invention. It equally forbids the use of the patent to secure an exclusive right or limited monopoly not granted by the

Patent Office and which it is contrary to public policy to grant."

In Ethyl Gasoline Corp. v. United States, 1940, 309 U.S. 436 and 456, 457, 459, 60 S.Ct. 618 at page 625, 84 L.Ed. 852, we find the following:

"The patent law confers on the patentee a limited monopoly, the right or power to exclude all others from manufacturing, using or selling his invention. * * * The extent of that right is limited by the definition of his invention, as its boundaries are marked by the specifications and claims of the patent. Motion Picture Patents Co. v. Universal Film Co., 243 U.S. 502, 510, 37 S.Ct. 416, 418, 61 L.Ed. 871, L.R.A.1917E, 1187, Ann.Cas.1918A, 959. He may grant licenses to make, use or vend, restricted in point of space or time, or with any other restriction upon the exercise of the granted privilege, save only that by attaching a condition to his license he may not enlarge his monopoly and thus acquire some other which the statute and the patent together did not give * * *

"He may not, by virtue of his patent, condition his license so as to tie to the use of the patented device or process the use of other devices, processes or materials which lie outside of the monopoly of the patent licensed; * * * or condition the license so as to control conduct by the licensee not embraced in the patent monopoly. * * *

"A very different scene is depicted by the record. It is one in which appellant has established the marketing of the patented fuel in vast amounts on a nationwide scale through the 11,000 jobbers and at the same time, by the leverage of its licensing contracts resting on the fulcrum of its patents, it has built up a combination capable of use, and actually used, as a means of controlling jobbers' prices and suppressing competition among them. * * *

"The licensing conditions are thus not used as a means of stimulating the commercial development and financial returns of the patented invention which is licensed, but for the commercial development of the business of the refiners and the exploitation of a second patent monopoly not embraced within the first."

So in the case at bar, Hartford, by the leverage of its licensing contracts, resting on the fulcrum of its patents, has built a combination that exercises a dominance and control over the entire glass container industry that carry it far beyond the privileges granted in its patents; it has built up other monopolies not embraced in that granted by the patent.

In the case of Bement & Sons v. National Harrow Co., 1902, 186 U.S. 70, 22 S.Ct. 747, 46 L.Ed. 1058, the plaintiff, the licensor, was suing the defendant, its licensee, for violation of the license agreement which gave to the licensee the privilege of using the rights under those patents in its business of manufacturing, marketing and vending to others to be used, float spring tooth harrows. The license agreement contained certain restrictions, among others, on the actions of the defendant that it would not sell its products manufactured under the license at less than a certain price, and that it would not be directly or indirectly engaged in the manufacture or sale of any other float spring tooth harrows than those it was licensed to manufacture and sell under the terms of the license. The Court, at pages 94, 95 of the opinion in 186 U. S., at page 756 of 22 S.Ct., said:

"There is nothing which violates the act in the agreement that plaintiff would not license any other person than the defendant to manufacture or sell any harrow of the peculiar style and construction then used or sold by the defendant. * * * In brief, after a careful examination of these contracts, we are unable to find any provision in them, either taken separately or in connection with all the others therein contained, which would render the contracts between these parties void as in violation of the act of Congress.

"It must, however, be conceded that the escrow agreement above set forth looks to 'the signing, by the parties mentioned therein, of contracts similar to those between the parties to this suit, designated A and B, and containing like conditions relating to the patents respectively owned by such parties. But there is no finding by the referee that such contracts were in fact entered into by those other parties, nor that they constituted a combination of most, if not all, of the persons or corporations engaged in the business concerning which the agreements between the parties to this suit were made. If such similar agreements had been made, and if, when executed, they would have formed an illegal combination within the act of Congress, we cannot presume for the purpose of reversing this judg-

ment, in the absence of any finding to that effect, that they were made and became effective as an illegal combination. As between these parties, we hold that the agreements A and B actually entered into were not a violation of the act."

This case deals throughout with a license to make, use and vend a patented article, to wit, a spring tooth harrow. There is no attempt in this contract relationship to control an unpatented product of the patented article. In the case at bar, we have the license restrictions on the use of the glass making machinery of Hartford so drawn as to limit the quantity output, the kind and the use of the product of the machines, to wit, glass containers, and the result of these restrictions is to effect a control over the entire glass making industry that unduly and unreasonably restrains trade therein.

█ Moot Questions. Following the filing of the complaint in this case on December 11, 1939, and up to the close of the taking of testimony in January, 1942, the defendants have amended the contract relations existing between them and complained of by the Government, and they have taken other and further steps for the purpose of eliminating illegal practices complained of by the Government, including the making of restrictive licenses, and in some of the steps that they have taken they have exchanged sums of money and even assigned patents. These steps were all taken without the formality of filing a motion or application in the court that had assumed jurisdiction of the case, and without consultation with the court.

In the closing arguments made by the defendants, they took the position that they had set their respective houses in order by eliminating or modifying the agreements and practices complained of by the Government, and that therefore the court is powerless to inaugurate any remedies against them or to enjoin them from doing anything that the Government complained of because those things are not now being done. In effect they say that the Sherman Anti-Trust Law, in Section 4 thereof, authorizes the district court "to prevent and restrain violations of this act [sections 1–7 and 15 of this title]" and that no violations of the act are now in existence which the court is privileged to restrain. They say that all of these matters are moot questions.

It may be said here that the cancellations and the amendments and the new courses of conduct claimed to have been effected by the defendants were all without the knowledge and the consent of the court; the measures taken were those that the defendants believed were sufficient to remove them from any charge of a violation of the anti-trust laws. The court was not consulted as to whether, in the light of the record, he had any opinion as to whether the steps taken were sufficient to absolve the defendants from any restraining orders of the court and, most of all, whether they were sufficient to free the industry and restore free competition among manufacturers in the industry so that the public might have the benefit of competitive prices.

There has been a violation of the anti-trust laws through an illegal aggregation of patents upon the part of the Hartford and Owens companies; there has been an illegal combination resulting in an unreasonable restraint of trade in the glass container industry through the control of machinery used in the manufacture of glass; and there has been a domination and control of the glass container industry that has resulted in an undue and unreasonable restraint of trade. Until the court is satisfied that the illegal effects of those acts and things done have been dispelled and that the industry is freed from the domination and control of the defendants, and until the court is satisfied that these illegal acts and practices will not be resumed by the parties once this suit upon the part of the Government has been dismissed, it has a distinct duty to the public to look through the steps taken by the defendants during the past two and one-half years and during the pendency of this suit, and make such orders as the court deems are necessary and sufficient to remove the effects of the violations of the anti-trust laws. In any event, the court feels that the steps taken by the defendants in this manner do not substantially lessen the control and domination over the industry which they possess.

In accordance with a family tradition, I have been a consistent worshiper at the shrine of the Bard of Avon. So far, in the trip through life, I have seldom found any quirk in human behavior that has not been inquired into and analyzed by the characters created by the famous Bard. In the tragedy of Julius Caesar, one Marcus Brutus is heard to say:

"Lowliness is young ambition's ladder, Whereto the climber upward turns his face;

But when he once attains the upmost round,
He then unto the ladder turns his back,
Looks in the clouds; scorning the base
 degrees
By which he did ascend."

Men cannot, by illegal means, erect an illegal structure—a structure of dominance and control over an industry vital to the welfare of the public—and then, by destroying the illegal means by which the structure has been erected, take the position that they have reformed, that they have adopted a new course of conduct, and that they should go on their way unmolested by the law—as long as the illegal structure and its adverse effects upon the public remain. The court would indeed be derelict in his duty if he did not adopt those remedies which in his conscience he believes to be necessary and feasible to eradicate the illegal structure.

The defendants have eliminated what they believe to be the subject of the complaint by the Government. They say, however, that they were not prompted by a sense of wrongdoing, and that the agreements and practices which they have amended, curbed, or eliminated were not in any way wrong or illegal. It may, therefore, be feared that agreements and practices designed to accomplish the same purpose will be resumed if the court, believing that the agreements and practices are illegal, should dismiss the complaint without taking any measures of relief.

Conclusions. At the outset we have seen that the basic complaint of the Government is that the defendants have violated the anti-trust laws, "By unlawfully conspiring, monopolizing, attempting to monopolize, and by unlawfully contracting, combining, and conspiring, and more particularly by acquiring and maintaining monopolies of (a) patents * * * (b) the manufacture and distribution of glass-making machinery and (c) the manufacture, distribution and sale of glass products."

█ There should be no doubt but that an aggregation of patents collected into the hands of one or two large concerns, acting in combination with one another for the purpose of attaining control over an important industry in this country, is a violation of the anti-trust laws, especially when the means whereby these numerous patents have been acquired are unlawful.

█ In conclusion, it may be said that Hartford, with the cooperation, first, of Corning and Empire and, later, of Owens, Hazel-Atlas, Thatcher, Ball Brothers and Lynch, pursued a plan whereby through threats of litigation backed by the financial power that it controlled, through litigation expensive beyond the dreams of the average man, through the acquisition of the patents and businesses of competing devices and firms at a great outlay of money, has corralled within its possession and control an aggregation of all the patents that pertain to the gob feed process in the manufacture of glass—one of the two automatic processes whereby glass containers may be made. This aggregation of patents for these machines has been strengthened through the acquisition of patents covering other devices necessary in the manufacture of glassware to the extent that all the patents covering these other devices, such as forming machines and lehrs, have been acquired or are controlled by Hartford.

Hartford has acquired from others a total of 317 patents, and many of these were competing patents. In many instances, upon acquisition, the patents were shelved and the manufacture of the patented article discontinued. There are but two objectives that a corporation could have in acquiring an aggregation of all the patents relating to a particular industry—(a) to gain control of the industry and thereby eliminate all competition, or (b) to suppress those patents which it senses would be detrimental to its ultimate aims and desires. In the case at bar, the patents acquired were suppressed for the purpose of attaining control over the industry and for the purpose of eliminating competition.

On the other hand, Owens has similarly effected an aggregation of patents—all that are known to be in existence in the United States, at least—covering the suction art of automatic manufacture of glassware. Through the cooperation and the close working relationship of Hartford and Owens, they dominate the art and have eliminated competition between them, one for the purpose of controlling the art, the other for the purpose of stabilizing the glassware market.

This domination and control is not the result of a haphazard policy resulting in an occasional settlement of patent differences, either in the Patent Office or in the courts, in order to implement and preserve the patent rights at issue. It is the result of an over-all plan, a scheme devised and pursued throughout the years, to attain domi-

619

nance by means of patent ownership and control.

The entire history of the Owens-Hartford "partnership," from its formation in April of 1924 down to the present time, indicates an unholy alliance designed by the parties thereto to attain selfish objectives at the ultimate expense of the public. The primary purpose underlying the alliance was not merely to settle legitimate conflicts, Patent Office interferences or litigation in the courts, in the interest of efficient operation of the patents. The primary purpose was to achieve domination of the industry.

The history of the Corning-Hartford agreements is similarly not a history marked by a desire to eliminate patent differences, for the results alone indicate that the course adopted was for the purpose of assuring domination and control over a specific field of glassware for Corning, who from the beginning and down to the present time controls the policies of Hartford.

The steps taken in acquiring and maintaining monopolies over the manufacture and distribution of glass making machinery are such as to foreclose that market to anyone not already in the industry. Owens exclusively manufactures and uses the suction automatic device. Hartford, through its relationship with Lynch, controls the manufacture of feeding and forming machines and lehrs. It is impossible today for any individual or concern to engage in the manufacture of glass container ware with the use of automatic machinery, either gob or suction, without making application to either Hartford or Owens. Hartford has consistently followed a policy of refusing to license new enterprises, and hence no new concern can have access to the gob feed method of manufacture. Owens manufactures its machines alone for its own use and refuses to license anyone, so that a new enterprise cannot obtain a modern version of the suction automatic process.

In the manufacture, distribution and sale of glass products, the finger-tip control exercised by Hartford is so complete in its make-up and so efficient in its operation as to make the entire industry that is now engaged in the manufacture of glass container ware subservient to the desires of Hartford. This is accomplished, of course, by and with the cooperation of Owens in its control of the suction process and in its cooperation with Hartford in the control of those concerns engaged in the use of the gob feed process.

This whole system of control could not be the accidental result of normal growth and expansion, either of a patent holding and developing company such as Hartford or of a glassware manufacturing company such as Owens. It is the result of a planned procedure which places in the hands of Hartford the power of life and death over individual units in the industry. It is said that the power to exact royalties is the power to control prices. Certainly the power to control price rests in the hands of Hartford to increase the license fees and royalties charged its licensees at any time that it desires. The result of this, of course, is an increase in the charge to the public for the output of the glass making machines. Dominance over the entire industry is today so complete that at any time within the choice of Hartford and Owens prices to the consumer of glassware may arbitrarily be raised beyond all reason. To say that such dominance is a benevolent one, if true, is beside the point. The antitrust laws frown upon such control whether it be benevolent or whether it be vicious, for the power of domination is the evil at which the laws are directed.

It is clear, therefore, that the defendants have far exceeded the rights conferred upon them by the patent grant. As stated by Judge Butler in National Harrow Co. v. Hench, 3 Cir., 1897, 83 F. 36, at page 38, 39 L.R.A. 299: "Patents confer a monopoly as respects the property covered by them, but they confer no right upon the owners of several distinct patents to combine for the purpose of restraining competition and trade. Patented property does not differ in this respect from any other. The fact that one patentee may possess himself of several patents, and thus increase his monopoly, affords no support for an argument in favor of a combination by several distinct owners of such property to restrain manufacture, control sales, and enhance prices. Such combinations are conspiracies against the public interests, and abuses of patent privileges."

And, as stated by the Supreme Court in Standard Oil Co. v. United States, 1931, 283 U.S. 163, at page 174, 51 S.Ct. 421, at page 425, 75 L.Ed. 926: "The lawful individual monopolies granted by the patent statutes cannot be unitedly exercised to restrain competition."

Therefore, upon the facts of this case, the argument of the defendants to the effect that the Hartford patents were controlling and that everything that was done was done to protect the patent monopoly of Hartford, is not a good defense, and it was for this reason that the court excluded all evidence introduced for the purpose of showing validity, prior art, or infringement in connection with the Hartford patents.

██ Evidence was excluded pertaining to the value of the Hartford services to the industry. This, likewise, could not be a valid defense to violations of the anti-trust laws.

██ The defendants also argue that the price of glassware to the consumer has not increased. But again this is not a good defense if there have been violations of the law. Moreover, the history of the case shows the great extent to which automatic machinery has come into use within the past forty years. It is natural to assume that the cost of production would decrease with the great influx of automatic machinery. Evidently the defendants managed to retain this saving in the cost of production by means of the conspiracy herein, which is manifested by the large profits in the industry. The benefits certainly were not passed on to the public. And while this is the privilege of a patentee, he may not do so through concerted action with others in violation of the anti-trust laws.

### Relief.

The problem of relief in a case of this nature is a difficult one. The glass container industry is a large industry and the defendant corporations are large corporations. Nevertheless, the court must make the orders which he believes are necessary. The following is intended as a statement of the principles to be followed and is not a detailed account of all the steps necessary to effect a complete relief from the illegal practices.

The court believes that no half-way measures will suffice. There has been a deliberate violation of the law, and it is the duty of the court to do what he can to make certain that these violations of the law will cease and will not be resumed in the future and that competition will be restored in the industry. The record discloses that some of the individual defendants anticipated legal action by the Government, and went ahead in spite of that and violated the law. They also tried to anticipate the remedies that might be applied and did what they could to forestall the effect of such remedies and retain the benefits of their unlawful actions. The court intends to make certain that this does not occur. The Government has requested the dissolution of Hartford. The court, however, is first going to make an attempt to avoid that, if it is possible to do so and at the same time restore competition to the industry. If this cannot be worked out to the satisfaction of the court, dissolution will be ordered.

The first step to be taken is the immediate appointment of a receiver or receivers of Hartford. The court is going to deny any stay from the appointment of such receivers. It is believed to be absolutely necessary that the receivers take over the management of Hartford forthwith. The court has reached this conclusion because of several considerations. First, as pointed out heretofore, important steps and changes have been made by Hartford during the pendency of this suit and without the knowledge of the court. Some of these have involved heavy financial obligations upon the part of Hartford, and were made for the advancement of the interests of the companies involved. For example, Hartford recently transferred three important patents to Corning. The court feels that this was done for the obvious purpose of continuing Corning's monopolies regardless of the outcome of this suit. Second, the court believes it absolutely necessary to prevent any further abuse of the patent privileges of Hartford and any further violation of the law, and, under the circumstances disclosed by the evidence, the court feels that this can only be done through court officers. It has already been pointed out that while the defendants have taken certain steps which they believe abolish the practices complained of by the Government, they insist that these practices are not unlawful. Hence there is no assurance that different steps designed to accomplish the same ends will not be taken. Third, the court feels it necessary to conserve the assets of Hartford and to preserve the status quo. Pending an appeal and final determination of the issues in this case, the receivers are directed to take over the management of Hartford and continue to operate under the present contracts and agreements of Hartford in its licensing and lease system. The funds received from the Hartford licensees are to be set aside and

specially ear-marked as coming from each licensee. Upon confirmation of this decree by the Supreme Court, the funds so collected and set aside are to be returned to the various licensees without interest. In this way the court feels that Hartford is protected as much as possible and no appreciable injury will result.

The receivers are to remain in control of Hartford until the court is satisfied that the abuses and violations of the law have ceased, until the orders of the court have been carried out, and until the court is satisfied that there no longer remains a reasonable probability that these practices will be resumed. If, after the expiration of a reasonable time, it appears to the court that the steps he is now taking are insufficient to restore a free and competitive status to the industry, the receivers shall be ordered to submit a plan or plans for the dissolution of Hartford.

An order appointing the receivers for the interim until the entry of a final decree herein is being filed with this opinion.

We come now to the permanent steps to be taken. The most important question is with respect to the licensing and lease system now used by Hartford. The court believes that this is the greatest abuse. It is through the licensing and lease system that Hartford retains control over and dominates the industry. It is in this manner that Hartford maintains a system of stablization of the industry and enforces restrictions and conditions far beyond the privileges of the patent grant. It is because of this system that it is unnecessary for Hartford, Owens, Thatcher, Ball Brothers and the others to enter actually into written agreements in restraint of trade. Every manufacturer in the industry knows what will happen if he fails to observe the practices established by these leading concerns—Hartford will repossess his machinery, if not immediately at least upon the expiration of his present lease. The court realizes that a license and lease system may be perfectly legal and just if properly used. However, in the instant case, there has been a deliberate abuse and misuse of that system; and the court believes that there will be further abuses in the future as long as there is a semblance of that system remaining. It is the opinion of the court that this entire system must be abolished.

Any future system for the distribution of automatic machinery must be put on a basis of outright sale at reasonable prices. This is to include machines made under all of the patents and applications for patents owned or controlled by all the defendants herein and involved in this suit. In addition, all the defendants shall be required to license anyone, royalty free, in the manufacture of machines embodying these patent rights. This will include all patent rights relating to the suction machine, feeders, forming machines and lehrs.

Henceforth this machinery is to be sold to anyone, the present licensees of Hartford as well as the remaining outsiders. Any newcomers who desire to go into the business of manufacturing shall be sold the necessary equipment, provided they have a proper credit rating. Anyone who feels that he has been abused in this connection may appeal to the court.

All the existing agreements, leases and licenses must be cancelled and any new agreements must be free of restriction and subject to the approval of the court. Hereafter any manufacturer of glassware may produce any item he desires. The machinery now under license by Hartford will be sold to the present licensees at reasonable rates.

The defendants will be enjoined from engaging in interstate commerce unless they (a) comply with the orders of the court, (b) agree to license anyone, royalty free, on all present patents and pending applications for patents for the life of the patents, and (c) make available to anyone who desires them copies of drawings and patterns relating to suction devices, feeders, forming machines (except Lynch) and lehrs.

There will be an injunction issued against the defendants restraining them from engaging in any of the practices which have resulted in the present unlawful control and domination of the industry. This will include an injunction against any corporate defendant holding stock in any other concern in the industry, and against all the individual defendants from owning stock in more than one concern in the industry and from being or becoming an officer or director in more than one concern in the industry.

The Glass Container Association must be treated separately. The court is of the opinion that this concern has engaged in unlawful practices through its cooperation in the furtherance of some of the aims of the conspiracy. In addition, it has been

622

shown that it is a breeding place for many of the illegal practices established herein, and provides a channel through which they are effectuated. However, the court does not believe that dissolution is necessary. But its trade association activities must be stopped, as well as all the other unlawful practices in which it has been engaged. The court believes it best that it shall continue merely as a statistical and research body, and shall not go afield in an effort to dictate to the industry, or be used for that purpose. Hence its personnel must be changed. This will include the membership of its Board of Directors and its officers. The new members are to be subject to the approval of the court, and shall have no connection whatsoever with any of the defendants herein. The so-called Statistical Committee must be abolished and no committee of a like nature shall be established in the future.

After the taking of testimony had ceased and while final briefs were being prepared, the Buck Glass Company, a licensee of Hartford and not a defendant herein, filed a motion asking that that company and twelve other companies similarly situated be permitted to intervene for the purpose of enlightening the court on the question of relief, if such question should arise.

The court was of the opinion then that the movants desired to be heard on the value of Hartford as a servicing and research unit to the licensees, in event dissolution of Hartford was in the mind of the court. Dissolution is not resorted to by the court unless Hartford wills it so. The measures herein adopted by the court are deemed necessary to install competition to the industry, and the court does not believe that either willing or unwilling licensees of Hartford could assist it in the selection of the necessary measures, short of actual dissolution, as long as a semblance of domination over the industry remains.

The Government shall submit an order on this opinion within forty-five days. The appointment of the receiver or receivers is to take effect in accordance with the order signed and filed herewith. Any stay by the court of this decree, with the exception of the appointment of receivers, is to be conditioned upon the prompt prosecution of an appeal by Hartford and upon the continued carrying out of the impounding order heretofore entered by this court.